IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
NORTHERN DIVISION


UNITED STATES OF AMERICA

     v.                              CRIMINAL CASE NO.
                                       ELH-13-0512

ENZO BLANKS,

     Defendant
_____/


(Sentencing)
Wednesday, March 4, 2015
Baltimore, Maryland


Before:  Honorable Ellen L. Hollander, Judge



Appearances:

      On Behalf of the Government:
       Christopher J. Romano, Esquire
       Seema Mittal, Esquire

      On Behalf of the Defendant:
       Gerald C. Ruter, Esquire




Reported by:
Mary M. Zajac, RPR, FCRR
Fourth Floor, U.S. Courthouse
101 West Lombard Street
Baltimore, Maryland 21201

1          (Proceedings at 2:41 p.m.)

2          MR. ROMANO:  Good afternoon.  Your Honor, this is the

3    matter of United States versus Enzo Blanks.  It's under Criminal

4    Case ELH-13-0512.  Representing the United States are Assistant

5    United States Attorneys Seema Mittal, Chris Romano.  Also present

6    at counsel table is FBI Special Agent Carrie Dayton.  And we are

7    here for a hearing on whether or not two points should be

8    assessed in connection with a leadership or supervisory role

9    under the sentencing guidelines.

10         THE COURT:  All right.  Counsel.

11         MR. RUTER:  Your Honor, good afternoon.  Gerald Ruter

12   on behalf of Mr. Enzo Blanks.  He stands to my right.  And I

13   agree with counsel, Your Honor.  We're here to see whether or not

14   there should be an enhancement under USSG 3B1.1.

15         THE COURT:  Okay.  I wanted to just review -- and you

16   all may have a seat -- we were here on February 13, as you know.

17   And at that time a determination was made that the Court would

18   hear evidence or proffers, whatever the decision was on that,

19   regarding role in the offense, and not drug quantity.  But I

20   wanted to review that with you.

21         The government indicated it would make a record as to

22   drug quantity and explain its view as to the drug quantity.  My

23   question now is about the drug quantity.  And I know everyone is

24   familiar with the history that brings us here today on this case.

25   I guess fair to say perhaps Mr. Blanks's misgivings, maybe, would

1   be the way to put it.  But it had to do with terminology in the

2   plea agreement.

3           The Fourth Circuit issued an opinion on March 3rd, so

4   that's yesterday, in the case of United States v. Marco Antonio

5   Flores-Alvarado, and it had to do with drug quantity.  So I don't

6   know if everybody's had a chance to see this opinion.  And the

7   trial judge was reversed for, it was remanded, not making

8   adequate findings on the drug quantities attributed to the

9   defendant in the case.

10          And reading from the slip opinion at Page 10, it says:

11  "Accordingly, in order to attribute to a defendant for sentencing

12  purposes the acts of others in jointly-undertaken criminal

13  activity, those acts must have been within the scope of the

14  defendant's agreement and must have been reasonably foreseeable

15  to the defendant."  It cites both case law and provisions of the

16  guidelines.

17          "And as to this issue", says the Fourth Circuit, "we

18  require sentencing courts to make particularized findings with

19  respect to both the scope of the defendant's agreement and the

20  foreseeability of the conduct at issue."  And then goes on to

21  say, at Page 11, "foreseeability is not enough."  And then it

22  says, in the particular case the district judge made no findings

23  addressing the critical factual question of the scope of the

24  criminal activity the defendant agreed to jointly undertake.

25          So I want to make sure that the issue here is properly

1    resolved.  In this case, I know, just as it had been planned,

2    anyway, Mr. Romano, you were going to establish that, from the

3    government's perspective, the drug quantity.  But I want to at

4    least discuss with counsel whether this recent opinion has any

5    effect on where we are on the issues in this case, on drug

6    quantity.

7              MR. RUTER:  Your Honor, first of all, I have not seen

8    the opinion, so the Court is one step ahead of me.  So I'm not

9    able to address whether or not that opinion affects directly our

10   case this afternoon.

11             THE COURT:  Do you want to take a minute, while I could

12   take a brief recess, and let you read my copy?

13             MR. RUTER:  I'd love to see it, Your Honor.

14             THE COURT:  Okay.  Are you familiar with it, Mr.

15   Romano?

16             MR. ROMANO:  I am not, Your Honor.

17             THE COURT:  Okay.  Well, you should both read it, then.

18   I saw it and immediately the bells went off on this case.  So

19   since we had talked about that, why don't we take a brief recess

20   while I let you review it?  It's up here.  I can make a copy so

21   you each have one.  What's better for you?

22             MR. RUTER:  It would be easier, Your Honor, if we

23   could.

24             THE COURT:  Okay.  Why don't we just take a brief

25   recess?  We'll bring out two copies, one for each of you.  Okay.

1    We'll take a brief recess.

2         I should note, counsel, I have some markings on there

3    from where you read it.

4         MR. RUTER:  I'll read them carefully, Your Honor.

5         THE COURT:  It was a quick read, too, on my part.

6    Okay.  We'll be right back as soon as the copies are made.

7         (Recess at 2:47 p.m.)

8         (Proceedings at 3:11 p.m.)

9         THE COURT:  Counsel, have you had a chance to review

10   yesterday's decision of the Fourth Circuit in United States v.

11   Marco Antonio Flores-Alvarado?

12        MR. ROMANO:  Yes, Your Honor.

13        MR. RUTER:  Yes, Your Honor.

14        THE COURT:  Okay.  So the reason I flagged it the

15   minute I saw it yesterday was there had been -- and I don't know

16   that I really made the record as clear as it can be or should

17   be -- but this is a case where it seemed the defendant had second

18   thoughts, in my view, about his guilty plea.  This is not the

19   first date this case has been set in for sentencing.  And there

20   were issues about not only role in the offense, but drug

21   quantity.

22        And I looked at the plea agreement, as I know we all

23   did, and it seemed very clear to me that the plea was being

24   entered to an offense in which the drug quantity was stated as

25   one kilogram or more.  And it's in the statement of facts, etc.

1          Nonetheless, based on a paragraph in the plea

2    agreement, 6-C, Mr. Blanks was of the view that he could come in

3    and challenge the drug quantity, not just role in the offense.

4    And if I'm misstating something or my memory is wrong, counsel,

5    do let me know.

6          So basically, on February 13, a decision was made to

7    postpone the sentencing and have a hearing today on role in the

8    offense based on this provision in the plea agreement.  And

9    again, that would be 6-C.  And that paragraph says:  The

10   defendant is free to argue for any offense characteristics,

11   sentencing guideline factors, departures and/or adjustments set

12   forth in Chapters Two, Three Or Four of the U.S. -- United

13   States, really, it says, not U.S. -- Sentencing Guidelines,

14   including role in the offense -- that's the only specific one

15   mentioned -- as well as a variance under 18 USC Section 3553,

16   upon giving the government notice at least two weeks prior to the

17   date of sentencing.  The government reserves the right to oppose

18   any request made by the defendant.

19         And, of course, I should add this was a (C) plea as

20   well.  So I think to some extent the government was surprised by

21   what happened.

22         What would you all like to add to make sure the record

23   is crystal clear?  Anything I didn't mention that I should have?

24         MR. RUTER:  Your Honor, in terms of this case, although

25   it appears as if Mr. Flores-Alvarado was not challenging the

1    existence of the mandatory minimum he was facing, which would

2    have been ten years, nevertheless, he pled guilty to the five

3    year or to a five or more kilogram of cocaine, which subjected

4    him to a possible life imprisonment, with a mandatory minimum of

5    10, 10 years.  And I think, Your Honor, if read just the least

6    bit expansively, this case seems to stand for the proposition

7    that no matter what the plea agreement says, the Presentence

8    Report needs to be clear on how the drug quantity was arrived at.

9          Now, I notice in this case, Judge Hollander, that it

10    went on for a couple, three large paragraphs that they pulled

11    out.  That's on Page Three of the opinion.  Paragraph 12 and

12    Paragraph 17 are evidently lengthy excerpts from the Presentence

13    Report, where this case the presentence investigator found, I'm

14    assuming this case the statement of facts is not important, but

15    he or she made pretty extensive findings about what happened on

16    April 25th of 2011, what happened on August 17th of 2011.  It's

17    very extensive.

18          And after the court analyzed that Presentence Report,

19    the court concluded that it was not able to determine whether or

20    not the defendant, Mr. Flores-Alvarado, was directly involved in

21    these particular transactions because the way the transactions

22    were structured, which got to the issue of foreseeability.

23          If we turn to our Presentence Report, Your Honor --

24          THE COURT:  Let me pull it out.

25          MR. RUTER:  Our Presentence Report, and this is not

1  uncommon, it simply recites the facts contained in the plea

2  agreement.  There's no additional analysis.  There's no attempt

3  to further define the quantity of drugs, where the drug quantity

4  came from.  It just cites word for word the statement of facts.

5          Paragraph 13 on Page 5 of the PSR indicates that the

6  parties do stipulate that one or more kilograms of heroin was

7  foreseeable to the defendant.  I concede that point.  It's right

8  there in black and white.

9          The problem is when one reads this case the way I read

10  it so far, Your Honor, that judge, the Fourth Circuit said that's

11  not enough.

12          THE COURT:  Well, now you see why I brought this case

13  to your attention.

14          MR. RUTER:  Yes.  And again, I recognize, Judge

15  Hollander, that the analysis there deals with whether or not, is

16  this a Level 30 or a 32 or a 34 or 38?  And I think the judge

17  found it was a 40-something.  So it wasn't an analysis of whether

18  or not the mandatory minimum was in play, which is all we have

19  here.  But I don't think you can separate the two.

20          It seems to me that this court, this panel is saying

21  that drug quantities need to be specified so that the court can

22  look at it in the Presentence Report, regardless of what the plea

23  agreement says, and make a factual determination based on the

24  Presentence Report.  That's the way I read it so far.

25          And I would be the first one to say, when you read the

several paragraphs, Paragraph 8 through 13 of the Presentence

Report, clearly, there's insufficient information in there from

which this court could possibly draw, even by a preponderance of

the evidence test, that one or more kilograms of heroin is in

play.

THE COURT: Can you repeat the last sentence, what you

just said?

MR. RUTER: I don't see, Your Honor, how you could read

Paragraphs 8 through 13 of the Presentence Report and find, even

by a preponderance, which is, after all, the standard, that one

or more kilograms of heroin was in play here. And I'm not

faulting anybody, Judge Hollander.

What this Presentence Report does, it talks about an

event which occurred on July the 11th, an event which occurred on

August 15th, an event which occurred on September the 10th, and

finally, an event which occurred on September 13th. And if you

take those events and you try to pull out quantities from there,

you're not going to approximate one kilogram of heroin.

THE COURT: Well, what I needed to raise with you is

just this concern. What I was trying to figure out in this

opinion, the defendant pled guilty to conspiracy to distribute

five kilograms or more of cocaine and a thousand kilograms or

more of marijuana. So my question under the facts there is the

PSR, in that case, said he should be held accountable for at

least -- I wasn't sure I was reading this right -- it says 3886.3

kilograms of marijuana and 136.125 kilograms of cocaine.

I'm not going to ask this question artfully. But I guess what I'm trying to say is, in our case, Mr. Blanks's case, he admitted to one kilogram. In Mr. Flores-Alvarado's case, he admitted to five or more. So is the question in Flores-Alvarado how much more than five, and that mattered? Because that's a big difference from our case. And I say "our" collectively. It's all of our case.

MR. RUTER: Yes.

THE COURT: Mr. Blanks's case. If the only issue were the five kilograms in Mr. Flores-Alvarado's case, would any of this have happened? Isn't the reason all of this transpired in Flores-Alvarado was because the question was how much above five kilograms the Court should attribute to Mr. Flores-Alvarado? Whereas here I need not go above one kilogram, and he's admitted to one kilogram. Isn't that a marked difference?

I read this and I immediately printed it and thought, I've got to let you all know. I almost wrote to you, but since it was just a day before the sentencing and we're coming out, I figured we'll talk about it here, maybe you all are familiar with it.

MR. RUTER: And, Your Honor, I hope that I made that point earlier on because I admit, this is a case which deals with quantities far in excess of any mandatory minimum. We're not talking about, is this a Level 30 or 32. We're talking about

1    whether or not it's a Level 42 or a 40 or a 38.  No one ever, no

2    one ever broached the topic in this case whether the mandatory

3    minimum was in jeopardy.  Nobody did.  So in that regard,

4    factually, there is a difference between the posture of this case

5    factually and that case.

6         What I'm saying, however, is when you then read what

7    the conclusion of the panel is, they're saying, at least what I

8    see, is the court must make a factual finding which you find in

9    the Presentence Report.  And I would suggest it means no matter

10   what, no matter what the quantity is.

11        THE COURT:  Well, that would be a sea change, I think.

12        MR. RUTER:  That would be a sea change.

13        THE COURT:  Because I think without -- I only speak for

14   myself.  But, I mean, typically, if there's no dispute about the

15   drug quantity, it's not an issue the Court addresses beyond, in

16   this case as a perfect example, Mr. Blanks -- and let me pull the

17   plea agreement -- admitted and pled guilty to an offense

18   involving one kilogram or more.  And in the, I'm looking now at

19   my copy of the plea agreement.  But, for example, Paragraph 1 is

20   a plea to Count 1 of the indictment.  And that count charged

21   conspiracy to distribute and possess with intent to distribute

22   one kilogram or more.

23        And then the elements are reviewed in Paragraph 2.  And

24   that, again, that says, Paragraph 2-A, with the intent to

25   distribute one kilogram or more.  The government would have to

1    prove that.

2           And then in the statement of facts it says -- this

3    would be on Pages 10 and 11 -- the parties stipulate and agree

4    the amount of heroin reasonably foreseeable to the defendant was

5    at least one kilogram.

6           So in light of a plea agreement that says all that,

7    what is the requirement for the court?

8           MR. RUTER:  Well, Your Honor, I don't want to --

9           THE COURT:  I mean, because I want to comply with the

10   spirit and beyond, whatever is required by Flores-Alvarado.

11          MR. RUTER:  I would argue, Your Honor, the answer is,

12   is that the statement of facts would indicate that on this date

13   and this date, according to other witnesses, this additional

14   amount of drugs was in play.  And when a court adds it all up in

15   the PSR, it exceeds one kilogram of the drug we're talking about.

16          THE COURT:  So you're saying, basically, in every case,

17   regardless of an admission, that the Court must undertake to make

18   a drug quantity finding in every case?  The PSR should lay it

19   out, how it adds up to one kilogram foreseeable to this

20   particular defendant.

21          MR. RUTER:  When I read this a little bit expansively,

22   Judge Hollander, the answer is yes.

23          THE COURT:  What do you want to say, Mr. Romano?

24          MR. ROMANO:  Well, first I say he's wrong.  Let's talk

25   about the plea agreement first.  The plea agreement says that he

1  agrees that he conspired to distribute one kilogram or more.

2  That's in Paragraphs 1 and 2.

3           THE COURT:  The ones I just mentioned.

4           MR. ROMANO:  Correct.  The guidelines stipulation at

5  6-A --

6           THE COURT:  I didn't mention that.

7           MR. ROMANO:  -- says that the parties agree and

8  stipulate that the base offense level -- well, we know it's not a

9  32 now.  We know it's a 30 because of the --

10           THE COURT:  The change in the drug quantity.

11           MR. ROMANO:  Right.  Regardless of that, it says

12  because there was one kilogram, but less than three kilograms.

13  So there it is again.  The Court's already made reference to the

14  statement of facts, where the parties stipulate.

15           But what Mr. Ruter's either overlooked or perhaps

16  ignored is, at the very beginning of the statement of facts, the

17  last sentence in the first paragraph says the undersigned parties

18  also stipulate and agree that the following facts do not

19  encompass "all", "all" of the evidence that would be presented.

20  Indeed, the word is even underlined.

21           And we have that, coupled with the Presentence Report,

22  where it lays out, again, what the statement of facts are.  And

23  while your attention has been brought to the other paragraphs in

24  the Presentence Report, again, Mr. Ruter either overlooks or

25  ignores that paragraph where Paragraph 16 says, during our

1    interview with the defendant, he agreed with the statement of

2    facts --

3             THE COURT:  What paragraph?

4             MR. ROMANO:  Paragraph 16, Your Honor, on Page 5.

5    Adjustment for acceptance of responsibility.

6             THE COURT:  Oh, right.  In the Presentence Report.  And

7    you mentioned this, incidentally.  We went over this last time.

8    But I think we need to have a sort of a neat record.

9             MR. ROMANO:  Right.  I don't want to keep plowing the

10   same ground here.  It seems to me if you have a plea agreement

11   and the defendant has stipulated and agreed that that's what the

12   quantity was, that's a significant difference than the so-called

13   expansive view that Mr. Ruter wants to take with regard to this

14   case, because the issue in this case is whether he's a 38 or a 34

15   or something in between because some of the marijuana that was

16   attributable to him was apparently stuff that he didn't order,

17   but was marijuana that was seized during a raid.

18            And the same thing is true with the kilograms of

19   cocaine, where they kind of duck it.  But in a footnote they

20   indicate that, well, they equated money that was seized to be the

21   equivalent of five kilos of coke.

22            Those are significant differences, both legally and

23   factually, which then make them significantly different from a

24   legal standpoint than what we have here.  Because in the case

25   that Your Honor's referring to, the Flores-Alvarado case, there

1    apparently is a dispute as to what the base offense level is.  Is

2    it a 34, is it a 36, is it a 38, based on, you know, how much

3    marijuana could be attributed to him and how much cocaine can be

4    attributed to him, where he may have only attempted to purchase a

5    certain amount but, because a different amount was seized, it's

6    not clear whether, whether that was part of a larger plan that he

7    had with regard to the one in, I think in Lexington, Kentucky,

8    but the North Carolina one, where there was a certain amount of

9    that seized, that wasn't the amount that he was trying to buy?

10        Here, we don't have that debate or that dispute because

11   repeatedly, and I'm not going to go into every paragraph again,

12   it's one kilo of heroin.  One kilo of heroin.  One kilo of

13   heroin.  He stipulated to that in the facts.  He stipulated in

14   the base offense level.  So it seems to me that that takes it out

15   of the, out of the arena of this case here, where there was a

16   dispute that the Court needed to decide, what is the actual base

17   offense level.

18        Here, that's not in dispute.  That's not in dispute.

19   He stipulated that it was the Base Offense Level 32, or 30,

20   whatever we want to call it.

21        THE COURT:  Can I just clarify this, also, to be sure

22   the record is clear?  The reason there's a 10-year mandatory

23   minimum is because of the, because the drugs involved were the

24   one kilo.  That's how we get to the ten years, right?

25        MR. ROMANO:  Yes, Your Honor.

1          MR. RUTER:  Yes, Your Honor.

2          THE COURT:  And I think -- I don't want to go over

3     matters we've already covered.  Had it not been for this case, I

4     would have just gone forward as we planned.  I want to make sure

5     I'm in compliance with the case and whether it even applies.

6          MR. ROMANO:  Well, and I understand.  And we all

7     appreciate that.  The other distinction is, I think it's clear

8     from even the statement of facts, which, again, indicates it

9     doesn't encompass all of it, what we're talking about here are

10    drugs that he sold.  Not drugs that were reasonably foreseeable

11    in terms of them saying, well, he's part of a conspiracy.  You

12    know, we know he was going to buy X amount of marijuana, or he

13    had a certain amount of money that could be converted to kilos of

14    cocaine based on the relative value of the money that was seized.

15         Here we're talking about somebody who was actually

16    distributing.  And that's another significant difference.  So

17    we're not getting into these kind of mental gymnastics about,

18    well, what was going to happen with these drugs that he had?  Did

19    he have a kilo or not?  Did he, was he, was it somebody else had

20    the kilo and then he was trying buy a part of the kilo?

21         What's involved here and what the statement of facts

22    makes clear is these were drugs that he was distributing

23    personally, not drugs that we're talking about in terms of

24    reasonably foreseeable from a standpoint of other coconspirators

25    that are referenced in the statement of facts.  They outline

1    transactions that he was involved in.  And again, I don't want to

2    belabor it, but it doesn't encompass all of the facts, and he's

3    acknowledged that.

4         So I don't see where, if we undertake the exercise that

5    what Mr. Ruter is suggesting, there's no point in even trying to

6    have a plea agreement where we stipulate to a guideline quantity

7    because if we're going to have to resolve that at every

8    proceeding, quite frankly, there's not much point in even having

9    a plea.  We might as well just go to trial and let the jury

10   decide it, as opposed to now, you know, kind of a post-facto

11   argument about, well, does the statement of facts add up?  Yeah,

12   he stipulated to all this stuff but, gee, the government still

13   has to jump through hoops that are outlined in Flores-Alvarado

14   that aren't even applicable here, because we're not debating

15   whether it's an Offense Level 38 or an Offense Level 34 or an

16   Offense Level 36.  The parties have stipulated what it is, which

17   is one kilo or more, and that triggers a minimum mandatory

18   sentence of 10 years.

19        THE COURT:  Well, the other, other point I just want to

20   make.  Two of them, really.  First of all, what sort of looms in

21   this case is the (C) plea.  The Court is not permitted to involve

22   itself in plea negotiations, and certainly has not and does not

23   and will not.  But it is relevant because, just the fact that

24   this was a (C) plea, and it was a (C) plea at the bottom, the

25   lowest term it could be, if the one kilo was accurate, of course,

1    I assumed, it was a mandatory minimum 10 year sentence set by

2    Congress, tied to the fact that it was the one kilo.

3          But then Mr. Blanks wrote me a letter, docketed at ECF

4    437, dated February 5, in which, among his many things that he

5    thinks he was coming to court to do, it was to challenge the

6    quantity of the drugs, which is what surprised me because he was

7    basically, I don't know how else to say it, his view was somehow

8    he could come in and show it would be less than a kilo, in which

9    case this plea agreement was, I guess -- I'm not really sure.  I

10   can't speak for Mr. Blanks.

11         It seems like -- he writes on Page 3 of ECF 437 that

12   the government has manufactured a drug quantity of one to three

13   kilos when, in fact, the government knows no evidence will

14   support such a finding o the government's part.  Then on Page 4

15   he wrote the drug quantity was not foreseeable to him.

16         As a result of that, I came out last time and said,

17   does he want to withdraw his guilty plea?  I'll entertain that

18   motion.

19         MR. RUTER:  Your Honor, you did hit upon the -- when I

20   made the comment earlier, though, I didn't want to throw another

21   wrench into this proceedings.  We, of course, started last time

22   with the fact that Mr. Blanks advised this Court that the reason

23   he entered into the plea was because he thought, based upon

24   whatever paragraph it is, Paragraph 6-C, I believe it is, he

25   thought he had the right to challenge quantity, role in the

1   offense, and anything else in Chapters 2, 3 or 4 of the

2   guidelines because the plea agreement says so.

3       THE COURT:  But then what was the point of the (C)

4   plea?  That's what I'm trying to understand.  And I don't want to

5   do anything that suggests I'm involved in the -- but I guess they

6   seem sort of at odds with each other.

7       MR. RUTER:  They are, Your Honor.

8       THE COURT:  So that's why I was confused.

9       MR. RUTER:  There's no doubt about it.

10      THE COURT:  What is the point of challenging it unless

11  somehow the Court would say -- if I agreed with him I reject the

12  (C) plea.

13      MR. RUTER:  Your Honor, if you agree with him, it would

14  seem to me that he would of the option of withdrawing his plea.

15      THE COURT:  But I said, I think --

16      MR. RUTER:  Which is something you asked him repeatedly

17  the last time we were here.

18      MR. ROMANO:  He said he didn't want to.

19      THE COURT:  That's what I thought.  I don't have a

20  transcript from last time and I wasn't taking notes of myself.

21  But my memory was I asked him, I didn't rule on if he would even

22  make that motion how I would come out.  But I believe I started

23  by asking, does he wish to withdraw his plea.  Shall I entertain

24  a motion from him to that effect?

25      MR. RUTER:  You did.

1          THE COURT:  Which I would give you time to submit.

2          MR. ROMANO:  And I believe he indicated repeatedly that

3    he did not wish to withdraw his plea.

4          THE COURT:  And so then I remain equally confused.

5          MR. RUTER:  Your Honor, you have a right to because the

6    two are very inconsistent.  He tells me again right now he does

7    not wish to withdraw his plea.  He thought, Judge Hollander, as

8    wrong as he was, he thought that by raising those issues, maybe

9    there was some chance that he could get less than 120 months.

10   That was the reason why he did what he did.  And he's wrong.  It

11   can't happen.

12         THE COURT:  Well, if I reject the (C) plea, both sides

13   have the right to withdraw.

14         MR. RUTER:  Yes.

15         THE COURT:  And that means, I think, again, the case

16   starts over and --

17         MR. RUTER:  Yeah.

18         THE COURT:  -- I don't know what happens.  I don't have

19   a crystal ball.  And I don't want to say anything that would

20   influence anybody.  But I just wish to say, if he wishes to file

21   that motion, if somehow this recent opinion convinces him he was

22   right in the first place, then he should be given that

23   opportunity to file the motion.  I would not say how I would

24   rule.  I can't say until I have the motion.

25         So, Mr. Blanks, it's up to you.  I don't have a horse

1    in this race.  I think I said last time, I'll say it again or

2    repeat myself if I did say it, and if I didn't I'll say it for

3    the first time, we don't make people plead guilty in the United

4    States of America.  But you did plead guilty.  And there is a

5    process to undo that.  It's not a foregone conclusion.  Just

6    because you wish to undo it doesn't automatically mean you would

7    prevail.  But I would obviously consider very seriously a motion,

8    if that's what you want to do.

9         If you wish to put the government to its burden of

10   proof to prove the drug quantity, I might say okay.  I don't

11   know.  But looking at the plea agreement, I understand why you

12   thought that.  But it sort of doesn't fit with the (C) plea,

13   which is as the bottom of what is presently the mandatory

14   minimum.

15             THE DEFENDANT:  I understand, Your Honor.

16             THE COURT:  It's your call, sir.

17             THE DEFENDANT:  No, I wish not to withdraw the (C)

18   plea.  I said my understanding of what I thought, if somehow we

19   came in and proved that I didn't have a key or more, that I would

20   be rearraigned for a lesser charge, on a lesser amount.  That was

21   my only thought of this.  So it's like if they can only prove

22   that I was foreseeable to 700 to a thousand grams, that changed

23   the whole thing, changed the whole plea.  But that's what I

24   thought.  I didn't know I would have to withdraw it and have to

25   start all over.

1    I thought by me just arguing the drug amount, it just

2  changed, it would change the sentencing.  It's okay, he's not

3  guilty to a key or more, but I do find him guilty to 700 to

4  300 -- I mean 700 to a thousand.  That changes everything.

5  That's what I thought that meant.

6    THE COURT:  Okay.  And I don't speak for any side here.

7  But I guess the answer to that would be I appreciate that.  And

8  you wrote that to me and I then raised all of this on February 13

9  with all of you.  And you could understand probably from the

10  government's perspective, that it might not seem like something

11  they would be interested in because what's the point of it to

12  them.  If you're going to start litigating, they might as well go

13  to trial.

14    THE DEFENDANT:  Right.  And this is clearly, this is an

15  error in the plea agreement.  This probably shouldn't be in

16  there.

17    THE COURT:  Well, that's what I said, I think, last

18  time.

19    THE DEFENDANT:  I just wanted to, I tried to capitalize

20  on that error, same way they would do if I made an error.  And

21  that's all I did.  I did a little reading, did a little research,

22  and found I had to argue it.

23    THE COURT:  Well, that's why I want the record to be

24  clear.  I'm perfectly happy to entertain a motion.  If you are

25  unhappy with this plea agreement and really wish to litigate the

1    issue of the drug quantity -- because, otherwise, I would say

2    what I already said, and with the additions that Mr. Romano made,

3    which I should have pointed out myself, I think it's very

4    different from <u>Flores-Alvarado</u>, plus the fact that, in

5    <u>Flores-Alvarado</u>, it appears that the defendant pled to five or

6    more and the government was trying to prove "or more."  And

7    that's what the judge needed to decide.

8         In this case, I think we're not in that posture because

9    one kilogram gets to the mandatory minimum.  And Congress, as you

10   know, sets that, not the judge.  And there's numerous places in

11   the plea agreement and in the Presentence Report which reflect

12   that you conceded that and stipulated to it.

13        THE DEFENDANT:  Right.  That's what I said.  Basically,

14   I conceded it because I thought I could challenge it.  That's

15   what it was.

16        THE COURT:  Okay.  Well, I think I've exhausted the

17   topic.

18        MR. ROMANO:  I agree.

19        THE COURT:  I don't know what else I can say.  Now, do

20   we still wish to have a hearing on role in the offense?

21        MR. RUTER:  We do, Your Honor.

22        THE COURT:  Okay.

23        MR. RUTER:  I might add, Your Honor, it may not be too

24   soon that we'll find out whether or not my reading is correct.

25   This language is a little bit different.

1          THE COURT:  Well, I feel very prescient in having asked

2    the government to be ready today to establish drug quantity.  Do

3    you recall that, Mr. Romano?

4          MR. ROMANO:  I do recall it, Your Honor.

5          THE COURT:  So I feel like, may not be a trial, but it

6    will enable me to at least comport with your expansive view,

7    shall we say --

8          MR. RUTER:  Yes, Your Honor.

9          THE COURT:  -- of the opinion, hopefully.

10         MR. ROMANO:  Expensive but wrong.

11         Your Honor, the government will call Special Agent

12   Dayton.

13         THE CLERK:  Please raise your right hand.

14        AGENT CARRIE DAYTON, GOVERNMENT'S WITNESS, SWORN

15         THE WITNESS:  I do.

16         THE CLERK:  Please be seated.  Please speak directly

17   into the microphone.  State your full name for the record and

18   spell your last name, please.

19         THE WITNESS:  Carrie Dayton.  D-A-Y-T-O-N.

20         THE CLERK:  Thank you.

21         THE COURT:  And how do you spell Carrie?

22         THE WITNESS:  Carrie is C-A-R-R-I-E.

23         THE COURT:  Thank you.

24         DIRECT EXAMINATION

25   BY MR. ROMANO:

1    Q    Ms. Dayton, with which law enforcement agency are you

2    employed?

3    A    The Federal Bureau of Investigation.

4    Q    And in what capacity are you employed with the FBI?

5    A    I am a special agent.

6    Q    And what are your duties and responsibilities?

7    A    I'm on the Safe Streets Task Force.  We investigate violent

8    gangs and drugs.

9    Q    All right.  How long have you been with the FBI?

10   A    Eleven years in May.

11   Q    Did you have any employment prior to your time with the FBI?

12   A    I did.

13   Q    And what was that?

14   A    I was an attorney for about six and a half years.

15   Q    In your capacity as a special agent with the FBI on the Safe

16   Streets Squad, were you familiar with the investigation that led

17   to the charges and the conviction of the defendant?

18   A    I was.

19   Q    And were you actually personally involved in the

20   investigation?

21   A    I was.

22   Q    Did there come a time when the FBI sought and received

23   authorization to wiretap or intercept certain cellular

24   telephones?

25   A    There was.

1    Q    Was one of those phones a phone of the defendant's?

2    A    Yes.

3    Q    Are you familiar with an individual by the name of Rebecca

4    Belete?

5    A    I am.

6    Q    And was Ms. Belete charged and convicted in this case as

7    being a member of the conspiracy?

8    A    She was.

9    Q    Based on your knowledge and participation in the

10   investigation, were calls intercepted between the defendant and

11   Rebecca Belete?

12   A    Yes.

13   Q    Your Honor, I have one transcript that I was going to put up

14   on the ELMO.

15        THE COURT:  Okay.

16   Q    Mr. Ruter's been provided with a copy of this.  You've

17   reviewed this transcript before you came to court here today,

18   have you not, Special Agent?

19   A    Yes.

20   Q    Your Honor, this is, be Government's Exhibit One.  And we

21   may have to move the exhibit around a little bit.  But at the

22   top, it has an activation number.  What does that refer to?

23   A    As each call or activation comes in, they're numbered

24   sequentially.  So that would have been the 323rd activation on

25   that line.

1    Q    All right.  And the date of the activation is

2    self-explanatory.  It's in July of 2013, correct?

3    A    Correct.

4    Q    We have a start time?

5    A    Yes.

6    Q    And it indicates the duration, correct?

7    A    Yes.

8    Q    And then the participants are the defendant, Mr. Blanks, and

9    Rebecca Belete, correct?

10   A    Correct.

11   Q    For the record, the call states, Ms. Belete states:  Hello.

12   Mr. Blanks says:  You still asleep.  Ms. Belete says:  Hmm,

13   everything all right?

14            Mr. Blanks says "I need a favor.  Singles.  Ms. Belete

15   says:  I did them already.

16            Mr. Blanks says:  Load it up.  Load it up.  Ms. Belete

17   says:  How many?

18            Mr. Blanks says:  Huh, five, all five of them.  Ms.

19   Belete says:  All right.

20            Mr. Blanks says:  Small ones.  Ms. Belete says:  All

21   right.  Mr. Blanks says:  All right.

22            Now, let me just ask you a couple of questions here.

23   With regard to your experience, can you tell me approximately how

24   many drug investigations you've been involved in in your career

25   with the FBI?

1  A    At least 10 to 15 working on my own cases and other people's

2  cases.

3  Q    Did any of them involve heroin?

4  A    They did.

5  Q    And are you familiar with how heroin is packaged or

6  distributed on the streets of Baltimore?

7  A    I am.

8  Q    And how is that?

9  A    It's often placed in gel caps and then the gel caps are

10  sold.

11  Q    Now, in connection with heroin investigations and the

12  interception of cellular telephone calls, have you had an

13  occasion to serve as a monitor with regard to calls?

14  A    I have.

15  Q    And can you estimate for us the number of wiretap calls that

16  you've listened to that involve heroin?

17  A    Hundreds, if not thousands.

18  Q    Have you ever been accepted as an expert witness in the

19  interpretation of coded conversations in heroin investigations?

20  A    I have.

21  Q    In which courts have you testified as an expert?

22  A    Here in the District of Maryland.

23  Q    And on how many occasions, please, ma'am?

24  A    Two trials.

25  Q    All right.  Now, with regard to Government's Exhibit One,

1   then, let me ask you --

2          THE COURT:  An expert in what?

3   Q    Have you been accepted as an expert with regard to

4   interpretation of coded phone conversations with drug

5   terminology?

6   A    Yes.

7   Q    Now, Ms. Dayton, I'm going to ask you, in this transcript,

8   Government's Exhibit One, Mr. Blanks says he needs a favor, and

9   says singles.  And Ms. Belete says:  I did them already.  What is

10  your understanding as to what "singles" are?

11  A    There are two size gel caps.

12          MR. RUTER:  Your Honor, objection to the, the opinion

13  of the special agent as to what --

14          THE COURT:  I'm sorry.

15          MR. RUTER:  Sure.

16          THE COURT:  Could you repeat that question, and then

17  the objection?

18          MR. ROMANO:  Certainly, Your Honor.  Ms. Dayton, based

19  on your training, knowledge, experience and expertise, what is

20  your understanding as to what the reference to "singles" refers

21  to?

22          MR. RUTER:  The objection, Your Honor, as to her

23  interpretation as to what the word "single" means.

24          THE COURT:  Overruled.

25          THE WITNESS:  There are two size gel caps.  One is a

1    smaller one, referred to as singles.  Then there's a larger gel

2    cap that's sometimes described as a jumbo.

3    BY MR. ROMANO:

4    Q    And when Mr. Blanks says he needs a favor and he needs

5    singles, and Ms. Belete says she did them already, Mr. Blanks

6    then says, load it up, load it.  What is your understanding as to

7    what "load it" or "load it up" means?

8    A    There are capping trays that will hold each half of the gel

9    cap once they've been separated, and it opens the gel cap so they

10   can be filled.  So loading up was loading the gel cap trays.

11   Q    And Ms. Belete asks the defendant:  How many.  And Mr.

12   Blanks says:  Five, all five of them.  What is your understanding

13   of that reference, all five of them?

14   A    That was the number of gel cap trays.

15   Q    Trays?

16   A    Trays, yes.

17   Q    And then there's a statement after that where Ms., after

18   being told to essentially load up all five of them, Ms. Belete

19   says, all right, and then Mr. Blanks says, small ones.  What are

20   we talking about there?

21   A    Again, I believe that was a reference to the size of the gel

22   caps.  The small ones versus the large once, or singles versus

23   jumbos.

24   Q    Now, as part of the investigation, did there come a time

25   when a search warrant was executed at Ms. Belete's apartment?

1    A    Yes.

2    Q    And were packaging materials or the capping-type equipment

3    that you're referring to, was that discovered in her apartment?

4    A    Yes.

5    Q    Was a search warrant executed at the defendant's residence?

6    A    Yes.

7    Q    Or apartment?

8    A    Yes, there was.

9    Q    Were similar types of capping equipment or gel caps found

10   there?

11   A    Yes.

12   Q    Incidentally, when the search warrant was executed at the

13   defendant's apartment, was Ms. Belete present?

14   A    She was.

15   Q    Now, after Ms. Belete was arrested, was she interviewed by

16   you?

17   A    She was.

18   Q    And during the interview, what, if anything, did she say

19   about observing the defendant capping heroin?

20   A    She had seen Mr. Blanks capping up heroin in his own

21   apartment at the Redwood.  And then sometime after, I believe it

22   was February 2013, he moved his capping equipment to her

23   apartment and she also saw him capping up at her apartment.

24   Q    With regard to the actual distribution of heroin, did Ms.

25   Belete indicate to you whether she had delivered heroin on the

1    defendant's instructions or at his direction?

2    A    She indicated that she did.

3    Q    And did she indicate how many times she had done this?

4    A    She indicated there were four occasions.

5    Q    Did she identify anyone in particular that she delivered the

6    heroin to?

7    A    She did.

8    Q    And who did she identify?

9    A    She identified Virginia Moore.

10   Q    Did Ms. Belete indicate what, if any, money she received

11   from the defendant for either capping the heroin or making

12   deliveries of the heroin at the defendant's direction?

13   A    She indicated that she didn't, that Mr. Blanks didn't pay

14   her for using her apartment or for making the deliveries, but he

15   did help her with her rent on two occasions, is how she described

16   it.

17   Q    Now, indicated that Ms. Belete identified Virginia Moore as

18   a person to whom she delivered heroin at the defendant's

19   instructions.  Did you interview Ms. Moore?

20   A    We did.

21   Q    Did that interview take place after Ms. Moore had been

22   arrested and charged?

23   A    Yes.

24   Q    Did Ms. Moore indicate whether she, whether or not she knew

25   the defendant?

1   A     She did know him.

2   Q     And what did she say in terms of how she knew him or what,

3   what contact she had with the defendant?

4   A     She knew Mr. Blanks because she had purchased heroin from

5   him.

6   Q     And what did she tell you regarding the quantities or the

7   frequency with which she purchased heroin from Mr. Blanks?

8   A     She estimated that she made two to three trips a week to

9   Baltimore to purchase gel caps or heroin from Mr. Blanks.  And

10  she indicated that she bought 4 to 600 gel caps a week.  She had

11  told us she thought she had been doing that for about three

12  months, but we think it was longer based on our investigation.

13  Q     And with regard to the quantity that she had acquired from

14  Mr. Blanks, what quantity did she indicate?

15  A     I mean, she had described it in gel caps.  But my

16  understanding is she pled guilty to a kilo or more.

17          MR. RUTER:  Objection, Your Honor.  Doesn't answer the

18  question.

19          THE COURT:  What was --

20          MR. RUTER:  Objection to what she pled guilty to.

21          THE COURT:  No.  I know.

22          MR. ROMANO:  The question was --

23          THE COURT:  That wasn't the question.  That wasn't the

24  question.  Right?

25  BY MR. ROMANO:

1    Q    No.  The question was, what quantity did she indicate she

2    purchased?

3    A    She indicated that she purchased 4 to 600 gel caps a week

4    from Mr. Blanks.  She never gave us a total number.  She just

5    broke it down by week for us.

6    Q    Okay.  And she indicated that it was some three-months time

7    period?

8    A    Correct.

9    Q    Okay.  But you've indicated, based on the investigation, you

10   believe the period to be longer?

11   A    Correct.

12   Q    And why is that?

13   A    Just based on phone calls and other conversations, it sounds

14   like the time period that she was coming here, and we picked up

15   in kind of middle of their relationship with phone calls.

16   Clearly, it had other conversations and other meetings prior to

17   our first phone call between Mr. Blanks and Ms. Moore.

18   Q    Incidentally, during the interview that you had with Ms.

19   Moore, did she indicate whether or not she bought heroin from the

20   defendant but it was provided by someone else?

21   A    Yes, she did.

22   Q    What did she tell you?

23   A    She talks about, one occasion she described the woman as Mr.

24   Blanks's lady friend delivered the gel caps to her, and on

25   another time a male that she said Mr. Blanks referred to as

1    Homeboy, Moore was directed by Mr. Blanks to meet with this

2    person that he called Homeboy to receive her gel caps.

3    Q    As part of the investigation, are you familiar with an

4    individual by the name of Randy Adkins?

5    A    I am.

6    Q    And was he also charged and convicted in this case?

7    A    He was.

8    Q    In your interview with Mr. Adkins, did he indicate whether

9    he knew the defendant?

10   A    He did know him.

11   Q    And what did he tell you about how he met him and for how

12   long he had been dealing with him?

13   A    We talked to Mr. Adkins in October 2013.  He indicated that

14   he had met Mr. Blanks approximately six or seven months earlier

15   through an individual he referred to as Big Mike.  And Adkins had

16   met Big Mike through Virginia Moore.  And Mr. Adkins rode to

17   Baltimore with Big Mike and Virginia Moore the first time he met

18   Mr. Blanks.

19   Q    All right.  And he indicated the time period was some six

20   month, is that correct?

21   A    The first time he had met Mr. Blanks was six to seven months

22   earlier.

23   Q    All right.  And that was in the company or in the presence

24   of Ms. Moore, correct?

25   A    Correct.

1    Q    So her estimate about three months, is that part of why you

2    question the time period for her?

3    A    That's part of it.

4    Q    Now, did Mr. Adkins describe how the transaction occurred

5    when he met with Mr. Blanks that first time?

6    A    He described it as that Mr. Adkins had drove.  He parked on

7    what he called Park Street.  He said Mr. Blanks walked up to the

8    car, got into the back seat of the car.  Mr. Blanks handed the

9    pills over to Big Mike, and Big Mike gave Mr. Blanks the money

10   for the gel caps.

11   Q    So there was a third person involved in the transaction?  Is

12   that what you're saying?

13   A    Yes.

14   Q    And did you discuss with Mr. Adkins, during his interview,

15   his contacts or purchases with the defendant within the last

16   month of, before he was arrested?

17   A    Mr. Adkins indicated that he had been buying heroin directly

18   from Mr. Blanks for four or five months and that he bought once

19   every week to ten days, and he got 200 to 250 pills at a time, or

20   gel caps at a time, from Mr. Blanks, is how Mr. Adkins described

21   the relationship.

22   Q    Did he indicate whether there were times when he purchased

23   through a third party at the direction of Mr. Blanks?

24   A    He did.  After, at some point, Mr. Blanks introduced Mr.

25   Adkins and Mrs. Moore to another heroin supplier, who Mr. Adkins

1   knew only as T.  And they, I think there were one or two

2   meetings -- I'm sorry, I'm going to have to look real quick --

3   that Mr. Adkins met with T instead of Mr. Blanks.

4   Q    Well, his connection to Mr. T, did that come through Mr.

5   Blanks or through someone else?

6   A    Through Mr. Blanks.

7   Q    Okay.  So there was heroin purchased by Mr. Adkins from T?

8   A    Yes.

9   Q    Correct?  After he had been introduced to him by the

10  defendant?

11  A    Yes.  And I'm sorry.  Mr. Adkins indicated that he had three

12  meetings with T.

13  Q    Now, you were involved in this investigation from its

14  outset, is that fair to say?

15  A    Yes.

16  Q    All right.  Based on the -- well, strike that.  As part of

17  the investigation, were there other individuals that your

18  investigation revealed that Mr. Blanks distributed heroin to,

19  other than Virginia Moore and Randy Adkins?

20  A    Yes.

21  Q    All right.  In fact, there was an individual that was

22  stopped traversing back, or traveling back to Western Maryland,

23  was there not?

24  A    Yes.

25  Q    And what was that person's name?

1    A    Sherry Whealton.

2    Q    Okay.  And there were drugs seized from her as well,

3    correct?

4    A    There were.

5    Q    Heroin gel caps?

6    A    Yes.

7    Q    There were other, were you privy to or did you intercept

8    other phone calls in which Mr. Blanks discussed distribution of

9    drugs to other individuals?

10   A    Yes.

11   Q    All right.  Based on the totality of your investigation, the

12   drugs that were distributed to Ms. Moore, Mr. Adkins, Ms.

13   Whealton, and the others, do you have an opinion as to what the

14   quantity of heroin was that Mr. Blanks was responsible for

15   distributing, just personally himself?

16   A    A kilo or more.

17   Q    Thank you, ma'am.  That's all the questions I have at this

18   time.

19        THE COURT:  Well, for role in the offense, I'm

20   confused, Mr. Romano.  How does this compare this defendant to

21   anyone else in the offense?

22        MR. ROMANO:  Well, Your Honor, and I'll be happy to

23   provide the Court with the cases.  Mr. Blanks was part -- well,

24   was Mr. Blanks the only individual who was involved in the

25   conspiracy?

1    MR. RUTER:  Your Honor, I'd object.  I think that Mr.

2  Romano has finish his direct examination.

3    MR. ROMANO:  I'm following up on the Court's question.

4    MR. RUTER:  And I'm ready to question.

5    THE COURT:  Whoa, whoa.  The Court asked the question.

6  So I think it's only fair to let him follow up in response to the

7  Court's question.

8  BY MR. ROMANO:

9  Q    Were there other individuals -- ultimately, how many

10  individuals were charged?

11  A    I want to say 13 or 14.  I'm not sure of the exact number

12  off the top of my head.

13  Q    All right.  And with regard to telephone contact, were there

14  calls intercepted between Mr. Blanks and other members of the

15  conspiracy, other than the ones that we've just discussed?

16  A    Yes.

17  Q    All right.  And in your testimony, you indicated that Mr.

18  Blanks directed Ms. Belete to not only cap drugs, but also to

19  deliver to other individuals, correct?

20  A    Well, to set up the gel cap trays, yes, and to deliver to

21  other individuals, yes.

22  Q    And again, not to belabor the point, but so that the Court

23  understands, Mr. Blanks, based on the interviews as well, had

24  other individuals that delivered drugs on his behalf, correct?

25  A    Correct.

1    Q    That's all I would have at this time, Your Honor.

2         THE COURT:  All right.  Cross examine.

3         CROSS EXAMINATION

4    BY MR. RUTER:

5    Q    Thank you, Your Honor.  Special Agent, starting with the

6    first exhibit you were shown by Mr. Romano.  It's the transcript

7    dated July the 11th of 2013, correct?

8    A    Yes.

9    Q    Before you came into court today, did you take it upon

10   yourself to attempt to review any other phone calls between Mr.

11   Blanks and Ms. Belete other than the Exhibit One that we now have

12   in evidence?

13   A    Not today, no.

14   Q    Not today.  But in preparation for today, did you have

15   occasion to examine transcripts and/or listen to phone calls

16   between Ms. Belete and Mr. Blanks?

17   A    Yes.

18   Q    Okay.  And again, that was in preparation for today's

19   hearing?

20   A    Yes.

21   Q    Okay.  And the only exhibit Her Honor has is this one

22   exhibit right here?

23   A    That's the one transcript we selected, yes.

24   Q    Okay.  And you agree with me that Mr. Blanks, in effect,

25   starts the conversation by saying that he needs a favor?

1   A    Can I have you put that back up?  Sorry.

2   Q    Of course.  Of course.  So we have Exhibit One here.  And

3   after Ms. Belete says hello and Mr. Blanks asks the question,

4   "you still asleep", does he not say that he needs a favor?

5   A    Yes.

6   Q    Okay.  And as you read this transcript, is it your

7   understanding that the favor that he was about to ask her she had

8   already performed?

9   A    That's what she says afterwards.  Yes.  I mean, as you go

10  through, yes, she then says, I did them already.

11  Q    Right.  Okay.  So that would mean that before he could ask

12  her to do a favor, she'd already done it?

13  A    It sounds that way.

14  Q    Now, if there were any phone calls that just preceded this

15  which would help us clarify what he wanted and what she was

16  doing, we'd have those in court this afternoon, wouldn't we?

17  A    Yes.

18  Q    You were aware that Ms. Belete and Mr. Blanks, if I

19  understand it, were boyfriend and girlfriend?

20  A    Yes.  They had a personal relationship.

21  Q    Do I understand that Mr. Blanks and Ms. Belete actually

22  lived together in her apartment?

23  A    I know they both had separate places and they spent nights

24  together, but I don't know that I would describe it as lived

25  together since they seemed to come and go.

1    Q    Okay.

2    A    But they did spend time at each other's apartments.

3    Q    Yes.  You were aware from your interviewing with her, and

4    perhaps your investigation overall, that she was employed at some

5    lounge called Eden's Lounge?

6    A    Yes.

7    Q    And you learned through your investigation that Mr. Blanks

8    here frequented the Eden's Lounge?

9    A    Yes.

10    Q    And you learned from your investigation that that's how they

11    met each other and that's how they became ultimately romantically

12    involved with one another.  Would that be a fair statement?

13    A    Yes.

14    Q    I want to show you the statement of facts.  Have you ever

15    read the statement of facts in our plea agreement?

16    A    I don't believe I have.

17    Q    Okay.  Your Honor, I'm going to put on the ELMO a copy of

18    the plea agreement dated September 16th, 2014.  It's not an

19    exhibit today but the Court, I'm sure, has a copy in front of the

20    Court.

21              THE COURT:  Yes.

22    Q    I'm going to show you the statement of facts if I could,

23    ma'am.  And do you see where I'm pointing my finger right here?

24    A    Yes.

25    Q    It says on July the 11th of 2013:  "Blanks, utilizing Target

1   Telephone Number 3, spoke with a codefendant and ordered her to

2   prepare heroin in the form of gel caps for sale."  End quote.

3   A    Yes.

4   Q    You agree with me that that's actually referring to the very

5   transcript that we just got done reading?

6   A    I think that may have come from both Ms. Belete's interview,

7   her describing what that call meant, and that call.  She

8   described that call for us when we interviewed her.

9   Q    Okay.  But now we have a copy of the transcript, which is

10  now into evidence.

11  A    Right.

12  Q    Which we just read.  And I'm asking you, is it your belief

13  that what's referenced in the statement of facts is indeed the

14  very same transcript that is now in evidence before the Court?

15  A    And I apologize if I'm not understanding your question.  I

16  think that statement is based in combination on that transcript

17  and also on Ms. Belete's explanation of what that transcript

18  meant to her.

19  Q    I see.  Okay.  When you read this, you do notice that it

20  says that Mr. Blanks ordered her to prepare heroin, does it not?

21  A    I see that word, yes.

22  Q    When you read the transcript, ma'am, isn't it fair to say he

23  didn't order her to do anything?

24  A    He asked her.

25  Q    Yeah.  Did he order her?

1    A    I guess I don't know that I would say "order."  There was

2    no, you will do.  There was no language like that.

3    Q    Yeah.  Because we know what the language is.

4    A    I said there's no language --

5    Q    There's no order of anything, is there?

6    A    Can I see transcript again?

7    Q    Sure.

8    A    I just want to see the second part of the language.  I know

9    he says "I need a favor" at the beginning.  And I just want to

10   look at the -- I mean, I guess the way, load it up, load it,

11   could be seen as an order.  It wasn't a request.  It was an

12   instruction.  So --

13   Q    Well, you'd agree with me the word "order" is too strong a

14   word to characterize what we can see right here in black and

15   white?

16             MR. ROMANO:  Objection.

17             THE COURT:  Overruled.

18   A    As I read this, maybe "instructed" may be more than

19   "ordered."

20             THE COURT:  Could I see that again?

21             MR. RUTER:  Of course.

22             THE COURT:  I just want to make sure we have this

23   available when we discuss it, because you said you spoke to Ms.

24   Belete?

25             THE WITNESS:  Yes, ma'am.

1      THE COURT:  And when she says "I did them already" and

2  Mr. Blanks says "Load it up, um, load it" and then she asks "how

3  many", did you -- I guess we can debate what that really means.

4  BY MR. RUTER:

5  Q    It is my understanding, Your Honor, that the testimony so

6  far is it meant to load empty gel caps into a gel cap tray.

7  That, I think, is the testimony.  Is that correct, Special Agent?

8  A    Yes, that's what she --

9  Q    Is that your interpretation?

10  A    And that's what she told us.

11      THE COURT:  When I read this, when I read this, I don't

12  think it says -- she said, "I did them already."  And then she

13  asked how many.  And then she says "all right", meaning she may

14  not have done all five trays.  I didn't take it to mean she had

15  already done all five trays.

16      MR. RUTER:  Well, I guess we're not going to know that,

17  Your Honor.

18      THE COURT:  Pardon?

19      MR. RUTER:  I said we may not know that from what we

20  have here.

21      THE COURT:  Right.  The fact finder has to decide.

22  BY MR. RUTER:

23  Q    Yes, that's correct.  Did Ms. Belete tell you that she was

24  aware that Mr. Blanks was involved in the distribution of drugs

25  before they, before he moved into her apartment?

1    A    Yes.  She knew he was doing something.  She said at first

2    she didn't know what the substance was.  She couldn't have told

3    us if it was cocaine or heroin, but she was aware that he was

4    involved in drugs.

5    Q    Okay.  And is it your understanding that, notwithstanding

6    that, when she learned of it, is it your understanding that she

7    just did not ask him to leave or did not ask him to stop, or any

8    such thing?

9    A    That's my understanding.  She allowed it to continue.

10   Q    Okay.  You indicated that Ms. Belete evidently told you that

11   she was not paid for anything that she did as it relates to this

12   conspiracy.  Is that a fair statement?

13   A    I mean, you know, she then qualified by saying he helped her

14   twice with rent, was how she described it to us.

15   Q    Can I ask, did you ask her whether or not she believed she

16   was getting any remuneration, such as the payment of rent, in

17   exchange for her involvement in this conspiracy?

18   A    I think we asked her that and how we -- I'm sorry.  Let me

19   look at how she answered it and how we documented it.  What she

20   had said to us, that Mr. Blanks did not pay her for using her

21   apartment or for making deliveries for him.  Mr. Blanks helped

22   her with her rent on two occasions.

23   Q    And did she make it clear to you, if you can recall, because

24   I've read the report many times myself, can you recall whether

25   she told you whether she was accepting money for the rent in

1    exchange for her being involved in the conspiracy or because they

2    were enjoying a personal relationship with one another?

3    A    I think she described to us she had some financial

4    difficulties when he helped her.  I don't know that -- I don't

5    recall us clarifying if it was simply because they had the

6    relationship or it was kind of like, you help me so I'll help you

7    out.  I can't say 100% either way.

8    Q    Okay.  Can you recall how Ms. Belete discussed with you her

9    making, I think, four deliveries?

10   A    Yes.

11   Q    Of heroin?

12   A    Um-hum.  What she said is Mr. Blanks, she said on four

13   occasions Mr. Blanks then called and asked her to deliver heroin

14   on his behalf, is how she described it.  Mr. Blanks would then

15   instruct Ms. Belete to take the bag of gel caps outside and pick

16   up the money.  He would tell her where the gel caps were in the

17   apartment and -- trying to see.  And then he, I guess he would

18   describe to her who to look for.  She would take the bag of gel

19   caps outside to the cars that had been described to her.  And she

20   would make the delivery and accept the money from the customer to

21   whom she had delivered the bag of gel caps.

22   Q    Okay.  Did she also tell you she knew where the heroin was

23   kept?  It was kept up in the kitchen on top of a cupboard?

24   A    I think she said it was kept like on the top shelf where she

25   couldn't see it.

1    Q    Okay.  Did she want it that way?  Did she say she wanted it

2    that way, she didn't want to see the heroin?

3    A    She never said why it was put there.  She just said it was

4    up there where she couldn't see, on the top shelf.

5    Q    Okay.  You testified a little while ago that you thought

6    that Ms. Moore had some prior relationship with Mr. Blanks before

7    the wiretap went up?

8    A    Correct.

9    Q    Is that right?  Would it be fair to say, though, that you do

10   not have any idea whether that prior history together was a week

11   old, two weeks old, a month old?  Would that be a fair statement?

12   A    That's fair.

13   Q    So, therefore, the next question would be, then you would

14   have no idea how much heroin, if any, had been distributed

15   between Mr. Blanks and Ms. Moore prior to the wiretap going up?

16   A    That's correct.

17   Q    Okay.  You were told by Ms. Moore that almost always, maybe

18   always, that Mr. Blanks came by himself?  When there was a

19   transaction between Mr. Blanks and Ms. Moore, he was by himself,

20   correct?

21   A    Yes.  Except for the three occasions it wasn't him at all.

22   Q    And that was a Mr. T?

23   A    I think Ms. Moore referred to him only -- no, she called him

24   Homeboy.

25   Q    Homeboy?

1    A    Mr. Adkins called him -- assuming it's the same person, T.

2    And then there was one where a female who Ms. Moore described as

3    Mr. Blanks's lady friend delivered to her.

4    Q    Did Homeboy sell drugs, to your knowledge, to Ms. Moore?

5    A    We know that he delivered the gel caps to her.  We don't

6    have any information at this point whether they were Mr. Blanks's

7    gel caps and he was only delivering them on Mr. Blanks's half,

8    behalf.  All we know is that Ms. Moore was instructed -- how did

9    she put that -- that Mr. Blanks referred her to his homeboy.

10   Q    Yes.  So you don't know whether those drugs belonged to Mr.

11   Blanks, do you?

12   A    Only in that, you know, Ms. Moore said that she was directed

13   by Mr. Blanks to meet with Homeboy to buy her heroin.

14   Q    Okay.  Let me try it again.  You do not know whether, on

15   that transaction, those drugs belonged to Mr. Blanks, do you?

16   A    No.

17   Q    You don't know if those drugs belonged to the Homeboy, do

18   you?

19   A    Correct.

20   Q    You don't know whether there was any -- you don't know what

21   the relationship was between Blanks and Homeboy, do you?

22   A    Correct.

23   Q    Same question as to Mr. Adkins.  Same thing, right?  You

24   don't know whether or not when Homeboy showed up at Mr. Adkins,

25   whether they were Blanks's drugs, Homeboy's drugs, or a

1    combination of both, do you?

2    A    Well, T showed up for Mr. Adkins.  But yes, I don't know T's

3    relationship to Mr. Blanks or to the drugs.

4    Q    Okay.

5              THE COURT:  Or to what?

6              THE WITNESS:  Or to the drugs.

7              MR. RUTER:  Nothing further.  Thank you, Judge.

8              THE COURT:  Redirect.

9              REDIRECT EXAMINATION

10   BY MR. ROMANO:

11   Q    Just briefly.  Just following up on the last question.  When

12   Ms. Moore and Mr. Adkins were seeking the heroin, did they

13   contact Mr. Blanks or did they contact Homeboy or Mr. T directly?

14   A    It's my understanding that, I think Ms. Moore indicated that

15   she may have had Homeboy's telephone number, so she may have

16   contacted him at some time.  But she always started with Mr.

17   Blanks, based on her description of the relationship.

18   Q    Do you know how she got the telephone number for the other

19   individual?

20   A    From Mr. Blanks.

21   Q    With regard to Mr. Adkins, you indicated toward the end, the

22   last month, that he met with another individual?

23   A    Yes.  He called, who Mr. Adkins referred to this other

24   individual as T.

25   Q    And was that at Mr. Blanks's direction or through Mr.

1    Blanks, or did he just call him up on his own?

2    A    Mr. Blanks introduced Mr. Adkins to T.

3    Q    Finally, ma'am, Mr. Ruter asked you about the times when Ms.

4    Belete delivered heroin on Mr. Blanks's behalf, correct?

5    A    Correct.

6    Q    Did she tell you she volunteered to do that or did she tell

7    you she was instructed to do that?

8    A    She said she was called and Mr. Blanks instructed her how to

9    deliver the narcotics.

10   Q    And not only how to deliver it, but to whom to deliver it,

11   correct?

12   A    Correct.

13           MR. ROMANO:  Thank you, ma'am.  That's all I have.

14           THE COURT:  Anything else?

15           MR. RUTER:  No thank you.

16           THE COURT:  All right.  Thank you, ma'am.  You may step

17   down.  Any other evidence?

18           MR. ROMANO:  That would be the proffer or the evidence

19   that we have with regard to role in the offense.

20           THE COURT:  Okay.  Do you wish to be heard?

21           MR. ROMANO:  I don't know where -- yes, Your Honor, I

22   do, actually.  I don't know whether Mr. Ruter had anything.

23           THE COURT:  Yes.  I was going to ask him.

24           MR. RUTER:  Yes, Your Honor.  Thank you.  And we will

25   not produce any evidence on the matter before you.

1     MR. ROMANO:  Your Honor, there are two cases that I,

2  before I came over here, I pulled off of Westlaw.  One is United

3  States v. Campbell.  And I'll provide the Court with a copy and

4  counsel with a copy.  Second case is United States v. Woody.  And

5  again, I'll provide counsel with a copy of the case.  May I

6  approach?

7     THE COURT:  Yes, please.  Thank you.

8     MR. ROMANO:  And I'll certainly give the Court and

9  counsel opportunity to review those.  They both deal with the

10 two-point enhancement provisions under 3B1.1 in terms of the

11 assessment of the two points.

12     (Pause in proceedings.)

13     THE COURT:  Okay.  I've looked at them.

14     MR. ROMANO:  The government's position, Your Honor, I

15 think, is analogous in both of these cases.  In the Campbell

16 case, for example, as the facts set forth that in that case it

17 was actually a confidential informant that was attempting to

18 acquire the drugs from Campbell.  But instead, Mr. Campbell

19 handled the sale himself.  As the facts show, he sent runners to

20 deliver the drugs.  And the Court found that that enhancement was

21 proper for the two levels.

22     Here we have at least three individuals.  We have

23 Homeboy, we have Mr. T, and more significantly, we have even Ms.

24 Belete, who, at Mr. Blanks's instructions, she indicated,

25 delivered at least on four occasions drugs.  That's corroborated

1    by the fact that Virginia Moore indicated that she had, in fact,

2    received the drugs from his lady friend, which the evidence would

3    show is Ms. Belete.

4           The Woody case, again, facts are similar to what we

5    have here, where in that case, Mr. Woody, as the Court said, was

6    the appointed contact for the drug transactions, but then he sent

7    other, other members of the conspiracy to conduct the

8    transactions.

9           So we have that information for the Court, as well as

10    the fact that -- you know, we can play a semantic game whether

11    she was instructed or whether she was ordered to fill the gel cap

12    trays.  But it's pretty clear that, regardless of him saying he

13    needs a favor, when she says that she'd done it already, he's

14    saying to her, load it up, load it up.  Then she's asking for

15    direction.  And he says five, all five of them.  So he's telling

16    her what, what needs to be done.

17           Under the, under the case law and under the sentencing

18    guidelines, the government has made a case not simply by the

19    preponderance of the evidence, I would suggest to the Court, but

20    certainly beyond a preponderance of the evidence, at least clear

21    and convincing, that Mr. Blanks directed or instructed at least

22    one person.  In fact, not one person here, but three different

23    people, homeboy, Mr. T, and Ms. Belete, to undertake drug

24    activity on his behalf.

25           So for those reasons, Your Honor, we believe that the

1    requirements under U.S. Sentencing Guideline 3B1.1 for the

2    leadership or supervisory role is appropriate.  And we would ask

3    the Court to find that.  Thank you.

4            THE COURT:  All right.  Thank you.  Mr. Ruter.

5            MR. RUTER:  Your Honor, I did not bring extra copies of

6    the case that I wanted to cite for the Court.  We certainly have

7    a copy machine here.  I would draw the Court's attention to U.S.

8    v. Slade.  It's 631 F.3d 185, decided in 2011 in the Fourth

9    Circuit.  It's a guilty plea case, Your Honor, relating to drugs.

10   And I just want to bring to the Court's attention some of the

11   language in this case.

12           THE COURT:  Let me ask someone in my office to bring

13   out a copy of 631 F.3d 185.

14           MR. RUTER:  It indicates, Your Honor, and I quote:

15   "Slade argues that the district court's determination that he was

16   a manager or supervisor of the drug conspiracy was erroneous

17   because the record evidence is insufficient to show that he

18   actually managed or supervised persons involved in the

19   conspiracy."

20           The court says:  "Although the Guidelines did not

21   define the term manager, this Court utilizes the dictionary

22   definition", and I quote, "a person whose work or profession is

23   the management of a specified thing "as a business, an

24   institution, or a particular phase or activity within a business

25   institution).  End quote.  Quoting from Webster's Third New

1    International Dictionary.

2              THE COURT:  What does it say about what "supervisor"

3    means?

4              MR. RUTER:  Well, there's more language yet to come,

5    Your Honor.

6              THE COURT:  Pardon?

7              MR. RUTER:  It says, according to the Presentence

8    Report, which district court adopted, Slade was a, quote, "mid to

9    upper level member of a drug conspiracy who sold or delivered

10   cocaine and cocaine base both to his clientele and to the other

11   medicals of the conspiracy who, in turn, sold the drugs to their

12   clientele.  Certain coconspirators also sold cocaine and cocaine

13   base for Slade on various occasions.  The PSR reveals further

14   that an unindicted coconspirator drove Slade to various locations

15   to deliver cocaine base to his clients.  These are the only

16   factual findings supporting the role enhancement assessed against

17   Slade, and they do not justify imposition of an enhancement for a

18   management or supervisory role."

19             The last conclusory statement:  There existed on the

20   record evidence that the defendant actively exercised some

21   control, Your Honor.  And they emphasize the words "supervising

22   in an ongoing fashion."

23             Slade case, the Slade case, Judge, I submit, is exactly

24   what happened with Mr. Blanks.  The person in Slade, he had --

25   actually, I think was his cousin was the person who would drive

1    him to many drug transactions. Well, in this case we have four

2    instances, evidently, where Ms. Belete walked outside her

3    apartment, gave heroin to somebody, took money, and went back in.

4    We also know from this transcript here that she loaded, at least

5    on one occasion, she loaded these trays with gel caps, which he

6    then, Mr. Blanks himself, filled up with heroin.

7          The government may not think it's of much to-do, but I

8    do, Your Honor. The fact is this transcript really demonstrates

9    that this is about as voluntary an act on Ms. Belete's part as

10    one can ever imagine.

11          We don't know what preceded this, but she's already

12    saying she's already done what he was going to ask her a favor to

13    do. That's hardly indicative of a person who is occupying a

14    managerial or a supervisory role. They have a romantic

15    relationship, Your Honor. They live with each other. And when

16    he used the word "favor", he meant just what he said. There's no

17    question about it. And I think she took it exactly as he said.

18          Slade, Your Honor, is precisely on all fours with the

19    facts that you now have before you concerning whether or not he

20    managed or he supervised Ms. Belete. I mean, she fits to a T the

21    coconspirator who drove Mr. Slade on various occasions so he

22    could actually perform his drug dealing. Now, if that's not

23    conspiracy with possession to distribute a drug, I don't know

24    what is. But this panel said that does not show that he managed

25    anybody.

1            Now, thinking it through further, Judge Hollander, we

2    know that sometimes we read things in black and white, we don't

3    really think about the circumstances surrounding what's being

4    said.  In Slade's case, we have to imagine this is what happened.

5    He calls his cousin.  He says, I want you to come over so we can,

6    and you can help me do my business.  He asked him or he ordered

7    him or he instructed him, but somehow he got him to bring his car

8    over.  He jumped in it.  And on various occasions, numerous

9    times, he did this.

10           Now, that is, I would assume under the government's

11    theory, that is managing somebody, when you pick up the phone and

12    you ask him to come pick you up and drive you somewhere so you

13    can conduct your business.  There's little difference between

14    that, there's no difference between that and what Ms. Belete did

15    for him as a favor to him.  Does not show the kind of indicia of

16    managerial or supervisory role which the guidelines have in

17    effect when they were, when they were written.

18           The government also posits that Mr. Adkins and Ms.

19    Moore were somehow managed by Mr. Blanks.  And evidently they say

20    that, Your Honor, because Mr. T was introduced to them.  And I

21    think the theory is, is that Mr. Blanks has Mr. T working for

22    him.  No evidence of that.  And Special Agent admitted that.  And

23    that I think the theory is that he then had T sell his drugs to

24    Moore and Adkins.  No evidence of that.  Special Agent says she

25    doesn't know whose drugs they were.

1    So they want you to believe that there's a managerial

2  role between Mr. Blanks and Mr. T, which I think the Special

3  Agent said she doesn't know what the relationship was.  And

4  because Mr. Blanks indicated to Ms. Moore that she wouldn't be

5  seeing him, somebody else would be showing up, they think that

6  somehow demonstrates that he is exercising a managerial control

7  over Ms. Moore, which I don't see at all, or he's exercising

8  control over Mr. T, when the Special Agent said she doesn't even

9  know if the relationship was between Mr. Blanks and Mr. T.  And

10  you can't have it both ways.

11    So I think, Your Honor, that the record is devoid of

12  sufficient evidence for you to find, even by a preponderance of

13  the evidence, that there's any management or supervision which

14  the guidelines requires.  And I think that Slade is just a

15  totally perfect case.  If fits totally into what happened in this

16  case.  And you ought not to allow the government, and you should

17  not find, rather, that he's subject to a two-level enhancement.

18    THE COURT:  Okay.  Well, next time both of you are

19  before me, I hope you'll alert me when you have cases that you're

20  going to rely on so much that you could tell me in advance, so I

21  could have read them.  But I do now have a copy of Slade in front

22  of me.  And what would you like to say in rebuttal, Mr. Romano?

23    MR. ROMANO:  Well, Your Honor, I don't have the Slade

24  case in front of me.  But based on Mr. Ruter's description of the

25  cousin driving him, that is nowhere close to the facts that we

1 have here, where we have Ms. Belete saying that she was

2 instructed. And she did it not in the presence of Mr., Mr.

3 Blanks, she was instructed by Mr. Blanks on four different

4 occasions to pick up heroin, to take it to someone, and to get

5 the money and to bring it back. To the extent that Mr. Ruter

6 attempts to analogize that to a cousin driving the drug dealer to

7 a deal where then the drug dealer conducts the transaction, I

8 think those are significant differences.

9 The government's not suggesting that -- and I had to

10 think for a minute, is he really saying this -- that the

11 government's position is that he was supervising Mr. Adkins and

12 Ms. Moore. Quite the contrary. He had third parties providing

13 drugs to them that they were seeking to get from him. Whether

14 the drugs came directly from Mr. Blanks to Mr. T or to Homeboy,

15 the bottom line is they contacted Mr. Blanks to get the drugs,

16 and Mr. Blanks instructed them to go to other individuals, which,

17 again, is analogous to not the Slade case, where we have, you

18 know, Mr. Slade being driven around by his cousin and then

19 conducting a drug deal, but, rather, it's more analogous to the

20 cases the government has cited, where there's actually third

21 parties, in this case Homeboy, Mr. T, or Ms. Belete, for that

22 matter, at Mr. Blanks's instruction delivering drugs and taking

23 money.

24 It's not like, Rebecca Belete, drive me to some

25 location where I can sell drugs to Ms. Moore. Ms. Belete, drive

1    me to some location where I can sell drugs to Randy Adkins.

2    These are transactions that Ms. Belete was doing on behalf of Mr.

3    Blanks.  And she was doing them at his instruction, as was

4    indicated.

5          So to that extent, Your Honor, I don't see the analysis

6    as being on all fours with the Slade case.

7          We have Mr. Blanks instructing her how many trays of

8    drugs to fill.  We have him instructing her where to take drugs,

9    where to pick up money.  We have him telling customers that they

10   have to deal through intermediaries in the case of the Homeboy

11   and Mr. T.

12         So I think that as far as the definition, you know,

13   we're not going off of a Webster's definition, we're going off of

14   what the court looks at as supervising at least one person.  And

15   I believe that the government has met its burden with regard to

16   the supervisory role.  And we would ask the Court to impose the

17   two levels.  Thank you.

18         THE COURT:  Okay.  Thank you.  Well, I just want to say

19   preliminarily, I want to revisit a couple of things for the sake

20   of the record.

21         In the plea agreement, of course, the parties had

22   stipulated to this two-level offense -- two-level upward

23   adjustment in the offense level.  And that's in Paragraph 6-A.

24   On the other hand, as we've discussed ad nauseam, Paragraph 6-C

25   said the defendant can argue the offense characteristics,

1   including role in the offense.  So that's what, I guess, brings

2   us here today.

3          Nonetheless, I suppose it's worth observing that,

4   unless I'm missing something, this is still somewhat of an

5   academic exercise because it's a (C) plea at the very bottom of

6   the Congressionally-mandated minimum.  So I am not really sure

7   relevant ultimately any of this is.  And if I've missed that,

8   please tell me, because I continue to be a little confused by

9   that.

10         Whether this is applied or not, it doesn't affect the

11  (C) plea.  So did I miss something, before I start my analysis?

12         MR. RUTER:  Your Honor, you have made a good point

13  again.  But this is what's going to happen, Your Honor.  I mean,

14  you know, you know what's going to happen.  If the Court finds

15  that the enhancement should not be given, and the Court then

16  follows the (C) plea, which I believe, Your Honor, that you may

17  have to, we haven't reached that, but that's what it calls for.

18         THE COURT:  And he said repeatedly, including today, he

19  didn't want to withdraw from the plea.

20         MR. RUTER:  He does not want to withdraw the plea.

21  Right.  Then what will happen is there will be an appeal, I would

22  suppose, at which time he will attempt to argue to the Fourth

23  Circuit that he should be allowed to appeal, notwithstanding the

24  language of the plea agreement.  And how it's going to pan out, I

25  don't have the foggiest idea.  But that clearly, Your Honor,

1    would be the next step.  Because if it's only an academic

2    exercise, then we would have spent a couple of hours of the

3    Court's available time for nothing.

4           THE COURT:  Well, I was just trying to understand it.

5    Okay.

6           Well, let me start by saying I have heard the testimony

7    of Special Agent Carrie Dayton, who has been employed by the FBI

8    for approximately 11 years.  In May, it will be 11 years.  I

9    found her to be a very credible witness.  She is assigned to the

10   Safe Streets Task Force, and she has been involved in this case

11   from its inception.  Prior to this, she worked as a lawyer for

12   some six-plus years.

13          I should also note, I think the record will reflect

14   that I took the guilty plea of Ms. Belete and I also sentenced

15   Ms. Belete.  She is one of numerous defendants involved in the

16   case, along with Mr. Blanks.  I happen to remember her quite

17   vividly.  It was presented in the evidence today, but I

18   remembered independently that she and the defendant enjoyed a

19   very personal relationship.  For what relevance that may have, I

20   make note of it.

21          The question presently before the Court is whether the

22   defendant should be subject to a two-level enhancement under

23   Section 3B1.1(c) of the guidelines, it's actually, I think, more

24   accurately called an adjustment, for an aggravating role.  And

25   3B1.1 has three subsections -- (a) being the most serious, one

1    can have an adjustment for up to four levels, and (C), which is

2    at issue, being the most, or shall we say, the least serious in

3    the sense of it would be a two-level increase.

4          3B1.1(c) says:  Based on the defendant's role in the

5    offense, crease the offense level as follows:  (c) If the

6    defendant was an organizer, leader, manager or supervisor in any

7    criminal activity other than described in (a) or (b), increase by

8    two levels.

9          I've done some research on this section generally.  I

10   didn't bring any cases out with me.  But today the parties cite

11   three cases.  The government refers the Court to U.S. v. Woody,

12   an unpublished opinion of the Fourth Circuit, 291 Fed.Appx. 541,

13   from 2008; and U.S. v. Campbell, also unpublished, in the Fourth

14   Circuit, 354 Fed.Appx. 786, from 2009.  And the defense cites a

15   published opinion, U.S. v. Slade 631 F.3d 185, fairly recent,

16   January 2011, in the Fourth Circuit.

17         Now, I have had a chance to look at them for the

18   guidance they provide.

19         Slade does focus on (b).  Three levels were added in

20   that case, for whatever that may be worth.  The Court does

21   discuss the meaning of "manager" and "supervisor", and those are

22   terms that appear in 3B1.1(c).  It is, I think, safe to conclude

23   that I am not finding this defendant to have been an organizer,

24   leader or manager.  My focus is on whether he was a supervisor.

25   And with that in mind, I am going to review the guidelines

1    themselves.

2          In looking at the Application Notes and looking at, in

3    particular, Application Note Two, it says:  To qualify for an

4    adjustment under this section, the defendant must have been the

5    organizer, leader, manager or supervisor -- so you don't have to

6    be all of them -- of one or more other participants.  So it just

7    has to be at least one.

8          And it then goes on to say:  An upward departure may be

9    warranted, however, in the case of a defendant who did not

10   organize, lead, manage or supervise another participant but who

11   nevertheless exercised management responsibility, etc.  That's

12   not an issue.

13         Application Note One refers to what a participant is,

14   and I think that's relatively helpful.  As the court is

15   satisfied, based on the applicable burden of proof on the

16   government, this defendant did supervise at least one person, and

17   that would be Rebecca Belete.

18         Mr. Blanks shakes his head no, but I think the evidence

19   is quite persuasive to the contrary.

20         To be sure, they did enjoy an amorous relationship, but

21   that does not mean because Ms. Belete may have been motivated by

22   a love interest, shall we say, that that means she wasn't a

23   supervisee.  I don't know of any case that says that the

24   motivation of why someone is involved in the first place affects

25   this analysis.  She, in fact, I know was involved because she

1    pled guilty and was sentenced.  So she was a part of this

2    conspiracy.

3            The Court had one transcript for review today.  That

4    was presented through the testimony of Agent Dayton.  And we did

5    have a little bit of a semantic discussion of whether this was a

6    favor or an order.  I didn't glean from it the word "order."  But

7    the fact that the defendant may have requested someone to do

8    something, in fact, and she'd already went ahead and did it, for

9    whatever her motivations were, I don't think changes the reality

10   of what the situation was.  She was allowing herself, perhaps

11   because of their relationship, or otherwise, to be under his

12   supervision.

13           I think the transcript, which is not up for my review

14   right now, but the way I understood it, and I am a fact finder on

15   this point, I think it goes on to make it clear that she, yes,

16   had already, in anticipation of perhaps Mr. Blanks's needs, done

17   some singles, but then there was a discussion of how many.  And

18   it was all five, meaning all five trays.  So I didn't glean from

19   that that she had actually done everything.

20           If you give me the transcript, I'll support my

21   assertions with the actual text of the transcript.  Thank you.

22   Government Exhibit One is the transcript of this call from July

23   11 of 2013.

24           Mr. Blanks starts out kindly asking her, saying:  I

25   need a favor.  Um, singles.  And she says:  I did them already.

1    And then he says, "load it up", which I take to mean

2    she had done some singles, but he wants it all finished.  And

3    then she asks:  How many?  Clearly, if she'd already done all of

4    them, she wouldn't have to ask how many.  And he says:  Five, all

5    five of them.  And she says:  All right.  And he doesn't say --

6    excuse me -- Ms. Belete doesn't say, oh, I did all five.  She

7    says, okay, all right, in other words, meaning, I will accede to

8    your request.  So I think that is one point.

9    Another very important part of my decision in this

10   respect is in terms of the testimony of the agent.  Ms. Belete

11   was interviewed by the government, by the FBI, after she was

12   apprehended.  And she told the government that on four occasions

13   the defendant asked her to deliver heroin on his behalf.  He told

14   her where, he told her how, he told her who to look for.  She did

15   it.  She accepted the money.

16   And in my view, they were coconspirators.  That's

17   obviously what this case was all about.  It was a conspiracy.

18   But she didn't on her own go find those four people, decide to

19   give them the heroin and keep the money, or turn it in to the

20   central repository of funds.  She did what she was asked to do.

21   And the person who asked her to do it, according to the

22   undisputed testimony, was Mr. Blanks.

23   Now, maybe she was willing to put herself in that

24   position because she cared personally about Mr. Blanks.  But I

25   don't think the reason why she agreed to do it is relevant.  The

1    point is that she would -- there's not a shred of indication from

2    that scenario that suggests that but for having been directed by

3    Mr. Blanks, that she otherwise would have taken it upon herself

4    to, on four occasions, take the heroin, find who to deliver it

5    to, go through with the process of delivering it, accept the

6    money, and bring it back.  To me, that is within the realm of

7    supervision.  And I think that's a very important piece of

8    information that was presented to the court.

9         So I think it certainly wouldn't suggest a three or

10   four-level upward adjustment, but I think it does qualify for a

11   two-level upward adjustment.

12        And the other evidence that was presented about T and

13   Mike and some of these other names that were provided to the

14   court, Mr. Adkins, Ms. Moore, they were part of, to me, they

15   struck me, at least speaking, for example, of Mr. Adkins and Ms.

16   Moore, both of whom have already tendered guilty pleas to this

17   judge and who have already been sentenced, were in transactions

18   with the defendant.  That information is much more relevant to

19   drug quantity than supervision, as far as the court is concerned.

20        My finding would be predicated on the defendant's

21   involvement of Ms. Belete, or Belete, however it's pronounced, in

22   this drug conspiracy.  That would be my finding.

23        I would point out that the Slade court cites many other

24   opinions, and those are ones where the 3B1.1(b) upward

25   adjustment, or enhancement is what it uses in terms of the Slade

1    opinion in the parentheticals, that give examples of cases where

2    it's been upheld.  And some of these may involve either

3    Subparagraph A or B.  I can't necessarily tell.  They do actually

4    say 3B1.1(b).  3B1.1(b).  Yes.  These are repeatedly examples of

5    3B1.1(b).  And my finding is based on 3B1.1(c), for whatever

6    distinction that may be worth.  These do seem like more

7    compelling cases, but they were cases in which three levels were

8    added.  So is that would be my ruling.

9          Okay.  Now, what's next?  Drug quantity?  Did you want

10   to make a proffer?

11          MR. ROMANO:  Yes, Your Honor.  I believe from the

12   testimony of Special Agent Dayton, with regard to the quantities

13   that she testified that Mr. Adkins and Ms. Moore had, and as Your

14   Honor's also indicated, in terms of taking the plea with regard

15   to Ms. Belete and these others, Ms. Moore, in her, in her plea,

16   acknowledged that she had acquired more than one kilogram of

17   heroin.  So I believe --

18          THE COURT:  From the defendant?

19          MR. ROMANO:  Well, from the defendant, or whether it

20   was through Mr. T or through Homeboy, those were individuals that

21   she was directed to by the defendant.  So whether it came

22   personally from the defendant or through intermediaries of the

23   defendant, in terms of when they contacted Mr. Blanks to get the

24   drugs and he told them, as Ms. Dayton indicated, she didn't have,

25   they got the phone numbers of these individuals from Mr. Blanks,

1    that when they contacted him to get more heroin, that the

2    government has established by a preponderance of the evidence a

3    kilo or more of heroin, to the extent that we even need to engage

4    in that process independent of what we've already addressed in

5    terms of the plea agreement and the stipulations and what's

6    there.

7            So I believe that the government has satisfied, to the

8    extent that there is a burden here, by a preponderance of the

9    evidence that there was one kilo or more of heroin that's

10   attributable to this defendant, whether it he did it directly or

11   whether he did it through those two intermediaries, that that

12   takes us again out of the realm of the case that we spent

13   considerable time discussing.

14           Court's indulgence.

15           (Pause in proceedings.)

16           MR. ROMANO:  Ms. Mittal also advises me that if we look

17   at the statement of facts of the plea with regard to Virginia

18   Moore, it specifically referred to the interactions with this

19   particular defendant, Mr. Blanks.  I think there were either

20   phone calls and/or text messages, both, that were recounted in

21   her plea agreement, at which time she acknowledged that it was in

22   excess of a kilo of heroin that she was responsible for.

23           So we believe that through that, through the drug

24   quantity, which I don't have off the top of my head with Mr.

25   Adkins, that the government has established through the testimony

1    of Ms. Dayton, as well as the factual predicates not just in this

2    plea agreement, but as to the two customers, if you will, of Mr.

3    Blanks, that a kilo or more of heroin is not only foreseeable,

4    but is actually attributable to Mr. Blanks.  Thank you.

5           THE COURT:  Mr. Ruter.

6           MR. RUTER:  Your Honor, I don't think that the Court

7    should be taking into account the guilty plea and statement of

8    facts of Mr. Adkins or Mr., or Ms. Moore.  The Court should take

9    into account what the Court heard from the special agent today

10    and what's contained in the Presentence Report.  Those are the

11    two places where the Court has to go, in my view, along with the

12    plea agreement.

13           THE COURT:  Why can't the Court consider what other

14    people who've pled guilty admitted?

15           MR. RUTER:  Well, because we just had a two-hour

16    hearing on the matter, and it came from the witness stand.  And

17    it came from exhibits.  That's why we had the hearing, at least

18    in my view.

19           THE COURT:  Well, we weren't having a hearing on drug

20    quantity until I raised anew this issue about the case that the

21    Fourth Circuit decided yesterday.

22           MR. RUTER:  Yes.  And quite frankly, Your Honor, I look

23    at that as an example, and I understand the Court's ruling, and

24    you may be 100% correct, that has to do with are we way above the

25    mandatory 10 or are we just a little bit above it.  But the panel

1    made it very clear that there needs to be a very specific and

2    particular quantity, and I don't think that's been accomplished

3    this afternoon.

4         THE COURT:  But can a finding -- let me ask it this

5    way.  Can a finding be made -- let's say hypothetically the

6    defendant gave a confession.  In the confession he admitted that

7    he was responsible for the distribution or conspiracy to

8    distribute one kilogram.  Is that enough evidence for the Court

9    to make a finding?

10        MR. RUTER:  Your Honor, I would, I would say at a

11   sentencing hearing, this new case kind of does scare me, Judge.

12   I wonder whether or not -- it's a published opinion.  If it

13   doesn't mean what I thought it might say, then there's no reason

14   to have a published opinion like that.  It's just fact-specific.

15        So I would say perhaps, until it's clarified in my

16   mind, the answer would be it's not enough.  It has to be a

17   showing, besides a person's confession as to where that number

18   came from.

19        THE COURT:  I guess I would play devil's advocate and

20   say, what's the point of an admission in a guilty plea to a

21   particular quantity if you can't, if the Court can't rely on

22   that?

23        MR. RUTER:  And my response would be, Your Honor, it

24   only will take two or three more lines in a plea agreement to

25   say, I distributed this much heroin to this person, and this much

1    heroin to that person, and cumulatively it adds up to this

2    amount.  So that then there's a, there's something which a court

3    can actually look at besides a blind, yeah, it was a kilogram.

4              THE COURT:  I think one major difference in

5    Flores-Alvarado is he pleaded guilty to conspiracy with respect

6    to five kilograms or more, and then the focus was on how much

7    more.  But here, the defendant has repeatedly acknowledged one

8    kilogram or more, and no one's seeking to go above the one

9    kilogram.

10             MR. RUTER:  Yes.  And, Your Honor, there is a

11   distinction between the two cases.  And that's why I suggested, I

12   think some day we're going to have another decision coming out to

13   find out whether or not they meant to say what I'm arguing that

14   they did say.

15             THE COURT:  And perhaps you're right.  Let me ask

16   counsel this.  Well, Mr. Romano, let me ask you this.  If I were

17   to just try to deduce a quantity from what Ms. Dayton testified

18   to today, looking at the various quantities that different

19   people, according to her interviews of them said they purchased

20   from Mr. Blanks -- for example, we have the interview of Ms.

21   Moore, which the government's witness thought was understated,

22   but she said she made, she said she had made two to three trips

23   to Baltimore a week to purchase gel caps, about 400 to 600 caps a

24   week for three months.  And then Mr. Adkins, for example, says he

25   was purchasing from the defendant for about four to five months,

1   one time a week, 200 to 250 gel caps at a time.  And then there's

2   the testimony of being referred to T three times, and the various

3   evidence that was educed.  What does that all add up to?  And

4   five trays of singles.

5           MR. ROMANO:  Well, Your Honor, I guess there's a couple

6   other points that we need to consider.  The fact that Mr. Adkins

7   said he dealt with the defendant for four -- I'm sorry -- for --

8           THE COURT:  I had four to five months, one time a week.

9           MR. ROMANO:  Four to five months.  Right.

10          THE COURT:  200 to 250 gel caps at a time.

11          MR. ROMANO:  Right.  But my point is is that he did not

12  know Mr. Blanks except through the contacts that he had with Ms.

13  Moore.  So that's why --

14          THE COURT:  Wasn't that his mother-in-law?

15          MR. ROMANO:  It is his mother-in-law.

16          THE COURT:  I remember correctly?

17          MR. ROMANO:  Yes.  That is correct.  She basically

18  brought him into the, into the, "fold" isn't the right word,

19  let's say she bought him into the drug distribution as well.  So

20  he didn't know Mr. Blanks until she brought him in.  That's why

21  we say the three months is understated when it comes to Ms.

22  Moore.

23          That's significant because if you look at the

24  quantities that both he purchased and she purchased, if it was

25  for more than a three-month time period, we're over, we're

1    over --

2    THE COURT:  Well, he said, Mr. Adkins, according to Ms.

3    Dayton, was four or five months, by his own admission.

4    MR. ROMANO:  Correct.

5    THE COURT:  Exclusive of T.  And I think T would count.

6    MR. ROMANO:  T would count.  And we also referenced

7    that there were other individuals, such as another woman who was

8    intercepted on her way back to Western Maryland, that had been

9    provided heroin by Mr. Blanks.  That the, that the government's

10   position is that, in the aggregate, if you multiply out all these

11   gel caps times the number of weeks, times the frequency with

12   which they went, that it is in excess of a thousand grams.  And

13   again, that's just the drug quantity that's attributable to him

14   directly.

15   As Ms. Dayton also testified, that there were other

16   conversations that were intercepted between he and coconspirators

17   with regard to drug activity.  So I think, on balance, the

18   government has established that it's more than a thousand grams.

19   And I'd also like to kind of go back to the comment

20   that the Court had, was if there had been a confession that it

21   was a kilo or more, isn't that sufficient?  And Mr. Ruter

22   understandably was, was mulling that over in his mind because the

23   plea agreement, the statement under oath that he gave at the time

24   of his guilty plea, is tantamount to a confession that it was a

25   kilo or more.  And I think the Court can consider all of that,

1    coupled with the testimony that we've heard that it is in excess

2    of one kilo.  We're not bumping it up beyond three kilo.  We're

3    not saying that it ratchets him up to the next guideline level.

4          But when he under oath acknowledges what's in a plea

5    agreement and acknowledges under oath that the statement of facts

6    is true --

7          THE COURT:  Well, the probation agent is here.  I could

8    also have her take the stand, and she could testify to what's in

9    the Presentence Report, or I could just rely on it, that that was

10   an admission as well.

11         MR. ROMANO:  Well, I mean, I think we can proffer that.

12   Ms. Martin's here.  I mean, I don't think, quite frankly, Your

13   Honor, I dealt with her for years, that she's going to put words

14   in the defendant's mouth.

15         To the extent that there was any doubt about that,

16   there was no, there was no objection that was filed by the

17   defense with regard to the, with regard to what was contained in

18   the plea agreement, as to not only just the base offense level,

19   but even that paragraph that I cited to the Court where he

20   acknowledged the accuracy of the statement of facts.

21         So I think all of that certainly gives the Court a

22   sufficient basis to determine -- and we're not just simply

23   relying on the plea agreement.  We've heard testimony from the

24   agent.  And I think the Court can consider the fact that another

25   person admitted that what they got from the defendant was a kilo

1     or more, that that certainly takes us beyond the pale of this

2     recent case where they are, as the Court has acknowledged, trying

3     to change the, or certainly assert a greater base offense level

4     than what, than what's in play here.

5            THE COURT:  And one thing that was not referenced was,

6     and it is in Paragraph 11 of the Presentence Report, but on

7     September 10, 2013, the Baltimore Police Department stopped a

8     Ford F-150, and the driver was the defendant, Mr. Blanks, and he

9     was found to be in possession of 444 suspected heroin gel caps.

10     And were those, in fact, tested?

11            MR. ROMANO:  Yes, they were, Your Honor.

12            THE COURT:  So we didn't even count that.

13            MR. ROMANO:  Well, right.  We didn't address that, but

14     it was in the statement of facts.

15            THE COURT:  It is in the statement of facts.  And then

16     Paragraph 13 says the parties stipulated that the amount of

17     heroin reasonably foreseeable to the defendant was at least one

18     kilogram.  And you mentioned the Presentence Report, that

19     defendant acknowledged it was accurate.  What paragraph is that?

20            MR. ROMANO:  I believe it was 16, Your Honor.  Let me

21     check.  Yes, 16.

22            THE COURT:  Okay.  Yes.  During our interview with the

23     defendant, he agreed to the statement of facts and demonstrated

24     acceptance of personal responsibility for his criminal conduct.

25     So the statement of facts does specifically mention the one kilo.

1    And Paragraph 16 indicates, according to the probation agent,

2    that the defendant agreed with it.

3         So I think it's, by a preponderance, certainly, ample

4    evidence of the 1000 grams, or one kilogram.

5         So it's almost five after five.  And I know some people

6    are probably getting anxious about the snow.  I am not one of

7    them.  But I do think I have other issues about keeping people

8    late.  And we haven't even begun the sentencing itself.  So I

9    don't think we can finish today, which is I know a disappointment

10   to everyone, especially me, and Mr. Blanks.  But I think we need

11   to continue.

12        I was going to have a sentencing at 11 on Friday, and

13   it got postponed.  I don't have more than about 40 minutes at

14   that hour.  But is this a sentencing, first of all, if you're

15   free, that we can finish in that period of time?  I don't want

16   anyone to feel rushed.

17        MR. ROMANO:  From the government's standpoint, Your

18   Honor, I think it's doable.  Our position is going to be

19   obviously what we've been pretty much arguing.  So I don't think

20   there's a lot that we need to add or debate at this point.

21        MR. RUTER:  Your Honor, I have to agree to that.  I

22   want the Court to be clear, and the family as well, we have been

23   at these legal objections for some period of time.  And I feel

24   duty bound to ask the Court to impose a sentence of 120 months.

25        And I think, Your Honor, the Court had indicated that

1    it was, it was going to accept that as the number.  And,

2    therefore, the chances are it will not be, unless somebody wants

3    to speak, and the Court wants to hear from them -- I probably

4    wouldn't even do that.  I would just ask the Court to take into

5    account all the factors under Section 3553(a), and if you find

6    that it is a sentence which is reasonable, then you will impose

7    that sentence of 120 months.

8              THE COURT:  Okay.  So let me just confirm with my

9    assistant that the one that's set for 11 has come out.  And then

10   I can substitute this if you all are free.  I have to wait until

11   she comes back.  Hopefully, she hears me.  Because it's still

12   listed as --

13             MR. RUTER:  I'm trying to get my phone to turn on.

14             THE CLERK:  The 11:00 is off the calendar.

15             THE COURT:  It is off the calendar?  Okay.  It's still

16   on my personal calendar.  So if you think we can finish in about

17   40 minutes -- Mr. Romano, you were supposed to be part of that on

18   Friday, but you've been in here.  So you didn't even know that.

19   We were needing to move the one on Friday, with the codefendant,

20   because the Court has to be at something for, with several other

21   judges, and I don't think, from what I've read in that, we'll

22   finish in 40 minutes.

23             MR. ROMANO:  Is that the Wiggins matter?

24             THE COURT:  Yes.

25             MR. ROMANO:  Okay.  I wasn't aware.

1          THE COURT:  I know.  You've been here.  We were going

2     to move that one to the 17th at 11.  If we can finish this one in

3     40 minutes, I can substitute this.  You were going to be here,

4     anyway, so you're definitely free.

5          MR. ROMANO:  Right.  I can, I can be here for this one.

6     On the 17th I'm supposed to be in trial, but we can deal with

7     that at a later point in time.  It's in front of Judge Bennett on

8     a two-week trial.

9          MS. MITTAL:  Your Honor, I can't cover because I'm in

10    trial with him.

11         MR. ROMANO:  We can deal with Mr. Wiggins, relocating

12    that date.  But we would be available on Friday at 11.

13         THE COURT:  Okay.  See if Mr. Ruter, then, is

14    available.

15         MR. RUTER:  My intern is trying to find the calendar,

16    Your Honor.

17         THE COURT:  Okay.

18         MR. RUTER:  If we can accomplish that.

19         THE COURT:  So let me just mention, Mr. Romano, that

20    the 17th is a Friday.  Does Judge Bennet sit on Fridays?

21         MR. ROMANO:  He indicated that -- it is a Tuesday, I

22    believe.

23         THE COURT:  It's not.  It's a Tuesday.  I'm sorry.

24         MR. ROMANO:  Right.  I know on the Friday the 13th, I

25    have something at 1:30 because we have scheduled it during the

1    lunch hour of the trial.  But our case may very well continue

2    over to that following week.

3           THE COURT:  I was thinking the 20th at 10, Mr. Romano,

4    because --

5           MR. ROMANO:  Is that a Friday?

6           THE COURT:  Yeah.

7           MR. ROMANO:  He indicated that he would sit for a half

8    a day on Fridays.  Could we do it in afternoon?

9           THE COURT:  I have something, one at two.  But I could

10   probably do three.

11          MR. ROMANO:  Assuming that Mr. Balarezo is available.

12          THE COURT:  Yeah.  You're probably here at two on that

13   day --

14          MR. ROMANO:  Okay.

15          THE COURT: -- for the codefendant, a codefendant.

16          MR. ROMANO:  If I'm here, then that's fine.

17          THE COURT:  So just keep going.

18          MR. ROMANO:  Keep going.

19          THE COURT:  So we're going to check with Mr. Balarezo

20   to see if he can do 3:00 on the 20th.

21          MR. ROMANO:  That's fine, Your Honor.  I'll put it in

22   for right now.

23          THE COURT:  Okay.

24          MR. ROMANO:  3/20 at 3.

25          MR. RUTER:  Your Honor, Friday at 11?

1          THE COURT:  Yes.

2          MR. RUTER:  That's fine.

3          THE COURT:  Okay.  Then we're going to finish this

4    matter at 11 a.m., Friday, March 6th.  And perhaps the

5    codefendant at 3 on March 20th.

6          MR. ROMANO:  That's fine, Your Honor.  Your Honor, just

7    one other matter, though.  It's after 5:00 so our legal

8    assistants are gone.  And if the weather tomorrow is such that

9    they don't make it in or the courthouse is closed, we're not

10   going to be able to get a come-up.  So I would simply ask the

11   marshals if they can somehow make a notation for Friday at 11 on

12   the, just as a kind of a failsafe if we're not able to do the

13   come-up.  This Friday at 11 a.m.

14         THE COURT:  I'd appreciate that as well.

15         A MARSHAL:  We'll put it on the schedule.

16         THE COURT:  Thank you so much.  That is my concern.  I

17   apologize to all the people who came and we didn't finish.  But I

18   do want to be sure that Mr. Blanks gets careful consideration of

19   his issues from the Court.  So sometimes it takes longer than

20   anticipated.

21         All right.  So Mr. Blanks, I'll see you Friday.

22         (Conclusion of Proceedings at 5:11 p.m.)

23

24

25

1                                    INDEX

2

3                                                              PAGE

4        WITNESS: AGENT CARRIE DAYTON.

5      DIRECT EXAMINATION BY MR. ROMANO                       24

6      CROSS EXAMINATION BY MR. RUTER                         40

7      REDIRECT EXAMINATION BY MR. ROMANO                     50

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          REPORTER'S CERTIFICATE

2

3          I, Mary M. Zajac, do hereby certify that I recorded

4    stenographically the proceedings in the matter of USA v. Enzo

5    Blanks, Case Number(s) ELH-13-512, on March 4, 2015.

6          I further certify that the foregoing pages constitute

7    the official transcript of proceedings as transcribed by me to

8    the within matter in a complete and accurate manner.

9          In Witness Whereof, I have hereunto affixed my

10   signature this _____ day of _____, 2015.

11

12

13

14          _____

                  Mary M. Zajac,
15                Official Court Reporter

16

17

18

19

20

21

22

23

24

25

## 1

**1** [3] - 11:19, 11:20, 13:2
**10** [10] - 3:10, 7:5, 12:3, 17:18, 18:1, 28:1, 70:25, 76:7, 80:3
**10-year** [1] - 15:22
**100%** [2] - 47:7, 70:24
**1000** [1] - 77:4
**101** [1] - 1:23
**10th** [1] - 9:15
**11** [14] - 3:21, 12:3, 62:8, 65:23, 76:6, 77:12, 78:9, 79:2, 79:12, 80:25, 81:4, 81:11, 81:13
**11:00** [1] - 78:14
**11th** [3] - 9:14, 40:7, 42:25
**12** [1] - 7:11
**120** [3] - 20:9, 77:24, 78:7
**13** [8] - 2:16, 6:6, 8:5, 9:1, 9:9, 22:8, 39:11, 76:16
**136.125** [1] - 10:1
**13th** [2] - 9:16, 79:24
**14** [1] - 39:11
**15** [1] - 28:1
**15th** [1] - 9:15
**16** [5] - 13:25, 14:4, 76:20, 76:21, 77:1
**16th** [1] - 42:18
**17** [1] - 7:12
**17th** [4] - 7:16, 79:2, 79:6, 79:20
**18** [1] - 6:15
**185** [3] - 54:8, 54:13, 63:15
**1:30** [1] - 79:25

## 2

**2** [3] - 11:23, 13:2, 19:1
**2-A** [1] - 11:24
**200** [3] - 36:19, 73:1, 73:10
**2008** [1] - 63:13
**2009** [1] - 63:14
**2011** [4] - 7:16, 54:8, 63:16
**2013** [7] - 27:2, 31:22, 35:13, 40:7, 42:25, 65:23, 76:7
**2014** [1] - 42:18
**2015** [3] - 1:10, 83:5, 83:10
**20th** [2] - 80:3, 80:20,

81:5
**21201** [1] - 1:24
**24** [1] - 82:5
**250** [3] - 36:19, 73:1, 73:10
**25th** [1] - 7:16
**291** [1] - 63:12
**2:41** [1] - 2:1
**2:47** [1] - 5:7

## 3

**3** [5] - 18:11, 19:1, 43:1, 80:24, 81:5
**3/20** [1] - 80:24
**30** [4] - 8:16, 10:25, 13:9, 15:19
**300** [1] - 22:4
**32** [4] - 8:16, 10:25, 13:9, 15:19
**323rd** [1] - 26:24
**34** [4] - 8:16, 14:14, 15:2, 17:15
**354** [1] - 63:14
**3553** [1] - 6:15
**3553(a** [1] - 78:5
**36** [2] - 15:2, 17:16
**38** [5] - 8:16, 11:1, 14:14, 15:2, 17:15
**3886.3** [1] - 9:25
**3:00** [1] - 80:20
**3:11** [1] - 5:8
**3B1.1** [4] - 2:14, 52:10, 54:1, 62:25
**3B1.1(b** [1] - 67:24
**3B1.1(b)** [2] - 68:4, 68:5
**3B1.1(c** [2] - 62:23, 63:4, 68:5
**3B1.1(c)** [1] - 63:22
**3rd** [1] - 3:3

## 4

**4** [6] - 1:10, 18:14, 19:1, 33:10, 34:3, 83:5
**40** [6] - 11:1, 77:13, 78:17, 78:22, 79:3, 82:6
**40-something** [1] - 8:17
**400** [1] - 72:23
**42** [1] - 11:1
**437** [2] - 18:4, 18:11
**444** [1] - 76:9

## 5

**5** [3] - 8:5, 14:4, 18:4
**50** [1] - 82:7
**541** [1] - 63:12

**5:00** [1] - 81:7
**5:11** [1] - 81:22

## 6

**6-A** [2] - 13:5, 60:23
**6-C** [4] - 6:2, 6:9, 18:24, 60:24
**600** [3] - 33:10, 34:3, 72:23
**631** [2] - 54:8, 54:13, 63:15
**6th** [1] - 81:4

## 7

**700** [3] - 21:22, 22:3, 22:4
**786** [1] - 63:14

## 8

**8** [2] - 9:1, 9:9

## A

**a.m** [2] - 81:4, 81:13
**able** [4] - 4:9, 7:19, 81:10, 81:12
**academic** [2] - 61:5, 62:1
**accede** [1] - 66:7
**accept** [2] - 47:20, 67:5, 78:1
**acceptance** [2] - 14:5, 76:24
**accepted** [2] - 28:18, 29:3, 66:15
**accepting** [1] - 46:25
**accomplish** [1] - 79:18
**accomplished** [1] - 71:2
**according** [6] - 12:13, 55:7, 66:21, 72:19, 74:2, 77:1
**accordingly** [1] - 3:11
**account** [2] - 70:7, 70:9, 78:5
**accountable** [1] - 9:24
**accuracy** [1] - 75:20
**accurate** [1] - 17:25, 76:19, 83:8
**accurately** [1] - 62:24
**acknowledged** [7] - 17:3, 68:16, 69:21, 72:7, 75:20, 76:2, 76:19
**acknowledges** [2] -

75:4, 75:5
**acquire** [1] - 52:18
**acquired** [2] - 33:13, 68:16
**act** [1] - 56:9
**activation** [4] - 26:22, 26:23, 26:24, 27:1
**actively** [1] - 55:20
**activity** [6] - 3:13, 3:24, 53:24, 54:24, 63:7, 74:17
**acts** [2] - 3:12, 3:13
**actual** [3] - 15:16, 31:24, 65:21
**ad** [1] - 60:24
**add** [6] - 6:19, 6:22, 17:11, 23:23, 73:3, 77:20
**added** [2] - 63:19, 68:8
**additional** [2] - 8:2, 12:13
**additions** [1] - 23:2
**address** [2] - 4:9, 76:13
**addressed** [1] - 69:4
**addresses** [1] - 11:15
**addressing** [1] - 3:23
**adds** [3] - 12:14, 12:19, 72:1
**adequate** [1] - 3:8
**adjustment** [8] - 14:5, 60:23, 62:24, 63:1, 64:4, 67:10, 67:11, 67:25
**adjustments** [1] - 6:11
**Adkins** [37] - 35:4, 35:8, 35:13, 35:15, 35:16, 36:4, 36:6, 36:14, 36:17, 36:20, 36:25, 37:3, 37:7, 37:11, 37:19, 38:12, 49:1, 49:23, 49:24, 50:2, 50:12, 50:21, 50:23, 51:2, 57:18, 57:24, 59:11, 60:1, 67:14, 67:15, 68:13, 69:25, 70:8, 72:24, 73:6, 74:2
**admission** [4] - 12:17, 71:20, 74:3, 75:10
**admit** [1] - 10:23
**admitted** [8] - 10:4, 10:5, 10:15, 11:17, 57:22, 70:14, 71:6, 75:25
**adopted** [1] - 55:8
**advance** [1] - 58:20
**advised** [1] - 18:22
**advises** [1] - 69:16
**advocate** [1] - 71:19
**affect** [1] - 61:10
**affects** [2] - 4:9, 64:24
**affixed** [1] - 83:9
**afternoon** [3] - 2:2, 2:11, 4:10, 41:16, 71:3, 80:8
**afterwards** [1] - 41:9

**agency** [1] - 25:1
**Agent** [12] - 2:6, 24:11, 26:18, 40:5, 45:7, 57:22, 57:24, 58:3, 58:8, 62:7, 65:4, 68:12
**AGENT** [2] - 24:14, 82:4
**agent** [8] - 25:5, 25:15, 29:13, 66:10, 70:9, 75:7, 75:24, 77:1
**aggravating** [1] - 62:24
**aggregate** [1] - 74:10
**ago** [1] - 48:5
**agree** [10] - 2:13, 12:3, 13:7, 13:18, 19:13, 23:18, 40:24, 43:4, 44:13, 77:21
**agreed** [7] - 3:24, 14:1, 14:11, 19:11, 66:25, 76:23, 77:2
**agreement** [35] - 3:2, 3:14, 3:19, 5:22, 6:2, 6:8, 7:7, 8:2, 8:23, 11:17, 11:19, 12:6, 12:25, 14:10, 17:6, 18:9, 19:2, 21:11, 22:15, 22:25, 23:11, 42:15, 42:18, 60:21, 61:24, 69:5, 69:21, 70:2, 70:12, 71:24, 74:23, 75:5, 75:18, 75:23
**agrees** [1] - 13:1
**ahead** [2] - 4:8, 65:8
**alert** [1] - 58:19
**allow** [1] - 58:16
**allowed** [2] - 46:9, 61:23
**allowing** [1] - 65:10
**almost** [3] - 10:18, 48:17, 77:5
**Alvarado** [13] - 3:5, 5:11, 6:25, 7:20, 10:5, 10:13, 10:14, 12:10, 14:25, 17:13, 23:4, 23:5, 72:5
**Alvarado's** [2] - 10:4, 10:11
**America** [1] - 21:4
**AMERICA** [1] - 1:4
**amorous** [1] - 64:20
**amount** [12] - 12:4, 12:14, 15:5, 15:8, 15:9, 16:12, 16:13, 21:20, 22:1, 72:2, 76:16
**ample** [1] - 77:3
**analogize** [1] - 59:6
**analogous** [3] - 52:15, 59:17, 59:19
**analysis** [6] - 8:2, 8:15, 8:17, 60:5, 61:11, 64:25
**analyzed** [1] - 7:18

**anew** [1] - 70:20
**answer** [5] - 12:11, 12:22, 22:7, 33:17, 71:16
**answered** [1] - 46:19
**anticipated** [1] - 81:20
**anticipation** [1] - 65:16
**Antonio** [2] - 3:4, 5:11
**anxious** [1] - 77:6
**anyway** [2] - 4:2, 79:4
**apartment** [13] - 30:25, 31:3, 31:7, 31:13, 31:21, 31:23, 32:14, 41:22, 45:25, 46:21, 47:17, 56:3
**apartments** [1] - 42:2
**apologize** [2] - 43:15, 81:17
**appeal** [2] - 61:21, 61:23
**appear** [1] - 63:22
**Appearances** [1] - 1:15
**applicable** [2] - 17:14, 64:15
**application** [1] - 64:13
**Application** [1] - 64:2, 64:3
**applied** [1] - 61:10
**applies** [1] - 16:5
**appointed** [1] - 53:6
**appreciate** [3] - 16:7, 22:7, 81:14
**apprehended** [1] - 66:12
**approach** [1] - 52:6
**appropriate** [1] - 54:2
**approximate** [1] - 9:18
**April** [1] - 7:16
**arena** [1] - 15:15
**argue** [5] - 6:10, 12:11, 22:22, 60:25, 61:22
**argues** [1] - 54:15
**arguing** [3] - 22:1, 72:13, 77:19
**argument** [1] - 17:11
**arrested** [2] - 31:15, 32:22, 36:16
**arrived** [1] - 7:8
**artfully** [1] - 10:2
**asleep** [2] - 27:12, 41:4
**assert** [1] - 76:3
**assertions** [1] - 65:21
**assessed** [2] - 2:8, 55:16
**assessment** [1] - 52:11
**assigned** [1] - 62:9
**assistant** [1] - 78:9
**Assistant** [1] - 2:4
**assistants** [1] - 81:8
**assume** [1] - 57:10
**assumed** [1] - 18:1

**assuming** [3] - 7:14, 49:1, 80:11
**attempt** [3] - 8:2, 40:10, 61:22
**attempted** [1] - 15:4
**attempting** [1] - 52:17
**attempts** [1] - 59:6
**attention** [4] - 8:13, 13:23, 54:7, 54:10
**attorney** [1] - 25:14
**Attorneys** [1] - 2:5
**attributable** [4] - 14:16, 69:10, 70:4, 74:13
**attribute** [2] - 3:11, 10:14
**attributed** [3] - 3:8, 15:3, 15:4
**August** [2] - 7:16, 9:15
**authorization** [1] - 25:23
**automatically** [1] - 21:6
**available** [5] - 44:23, 62:3, 79:12, 79:14, 80:11
**aware** [5] - 41:18, 42:3, 45:24, 46:3, 78:25

**B**

**b)** [1] - 63:19
**bag** [3] - 47:15, 47:18, 47:21
**balance** [1] - 74:17
**Balarezo** [2] - 80:11, 80:19
**ball** [1] - 20:19
**Baltimore** [7] - 1:11, 1:24, 28:6, 33:9, 35:17, 72:23, 76:7
**Base** [1] - 15:19
**base** [9] - 13:8, 15:1, 15:14, 15:16, 55:10, 55:13, 55:15, 75:18, 76:3
**based** [20] - 6:1, 6:8, 8:23, 15:2, 16:14, 18:23, 26:9, 29:18, 33:12, 34:9, 34:13, 37:16, 38:11, 39:23, 43:16, 50:17, 58:24, 63:4, 64:15, 68:5
**basis** [1] - 75:22
**became** [1] - 42:11
**beginning** [2] - 13:16, 44:9
**begun** [1] - 77:8
**behalf** [8] - 2:12, 39:24, 47:14, 49:8, 51:4, 53:24, 60:2, 66:13
**Behalf** [2] - 1:16, 1:18
**belabor** [2] - 17:2, 39:22

**belete** [1] - 62:14
**Belete** [50] - 26:4, 26:6, 26:11, 27:9, 27:11, 27:12, 27:14, 27:16, 27:19, 27:20, 29:9, 30:5, 30:11, 30:18, 31:13, 31:15, 31:25, 32:10, 32:17, 39:18, 40:11, 40:16, 41:3, 41:18, 41:21, 44:24, 45:23, 46:10, 47:8, 47:15, 51:4, 52:24, 53:3, 53:23, 56:2, 56:20, 57:14, 59:1, 59:21, 59:24, 59:25, 60:2, 62:15, 64:17, 64:21, 66:6, 66:10, 67:21, 68:15
**Belete's** [4] - 30:25, 43:6, 43:17, 56:9
**belief** [1] - 43:12
**bells** [1] - 4:18
**belonged** [2] - 49:10, 49:15, 49:17
**Bennet** [1] - 79:20
**Bennett** [1] - 79:7
**better** [1] - 4:21
**between** [16] - 11:4, 14:15, 26:10, 34:17, 39:14, 40:10, 40:16, 48:15, 48:19, 49:21, 57:13, 57:14, 58:2, 58:9, 72:11, 74:16
**beyond** [3] - 11:15, 12:10, 53:20, 75:2, 76:1
**big** [1] - 10:6
**Big** [5] - 35:15, 35:16, 35:17, 36:9
**bit** [6] - 7:6, 12:21, 23:25, 26:21, 65:5, 70:25
**black** [3] - 8:8, 44:14, 57:2
**Blanks** [117] - 2:3, 2:12, 6:2, 11:16, 18:3, 18:10, 18:22, 20:25, 27:12, 27:14, 27:16, 27:18, 27:20, 27:21, 29:8, 30:4, 30:5, 30:19, 31:20, 32:13, 33:4, 33:7, 33:9, 33:14, 34:4, 34:17, 34:25, 35:1, 35:14, 35:18, 35:21, 36:5, 36:7, 36:8, 36:9, 36:18, 36:20, 36:23, 36:24, 37:3, 37:5, 37:6, 37:18, 38:8, 38:14, 38:23, 38:24, 39:14, 39:18, 39:23, 40:11, 40:16, 40:24, 41:3, 41:18, 41:21, 42:7, 42:25, 43:20, 45:2, 45:24, 46:20, 46:21,

47:12, 47:13, 47:14, 48:6, 48:15, 48:18, 48:19, 49:9, 49:11, 49:13, 49:15, 49:21, 50:3, 50:13, 50:17, 50:20, 51:1, 51:2, 51:8, 53:21, 55:24, 56:6, 57:19, 57:21, 58:2, 58:4, 58:9, 59:3, 59:14, 59:15, 59:16, 60:3, 60:7, 62:16, 64:18, 65:24, 66:22, 66:24, 67:3, 68:23, 68:25, 69:19, 70:3, 70:4, 72:20, 73:12, 73:20, 74:9, 76:8, 77:10, 81:18, 81:21, 83:5
**blanks** [2] - 27:8, 30:12
**BLANKS** [1] - 1:6
**Blanks's** [13] - 2:25, 10:3, 10:10, 34:24, 49:3, 49:4, 49:7, 49:25, 50:25, 51:4, 52:24, 59:22, 65:16
**blind** [1] - 72:3
**bottom** [4] - 17:24, 21:13, 59:15, 61:5
**bought** [4] - 33:10, 34:19, 36:18, 73:19
**bound** [1] - 77:24
**boyfriend** [2] - 41:19
**brief** [4] - 4:12, 4:19, 4:24, 5:1
**briefly** [1] - 50:11
**bring** [8] - 4:25, 54:5, 54:10, 54:12, 57:7, 59:5, 63:10, 67:6
**brings** [2] - 2:24, 61:1
**broached** [1] - 11:2
**broke** [1] - 34:5
**brought** [8] - 8:12, 13:23, 73:18, 73:20
**bumping** [1] - 75:2
**burden** [4] - 21:9, 60:15, 64:15, 69:8
**Bureau** [1] - 25:3
**business** [4] - 54:23, 54:24, 57:6, 57:13
**buy** [4] - 15:9, 16:12, 16:20, 49:13
**buying** [1] - 36:17
**BY** [11] - 24:25, 30:3, 33:25, 39:8, 40:4, 45:4, 45:22, 50:10, 82:5, 82:6, 82:7

**C**

**C-A-R-R-I-E** [1] - 24:22
**calendar** [4] - 78:14, 78:15, 78:16, 79:15

**Campbell** [5] - 52:3, 52:15, 52:18, 63:13
**cap** [9] - 30:2, 30:9, 30:10, 30:14, 39:18, 39:20, 45:6, 53:11
**capacity** [2] - 25:4, 25:15
**capitalize** [1] - 22:19
**capping** [8] - 30:8, 31:2, 31:9, 31:19, 31:20, 31:22, 31:23, 32:11
**capping-type** [1] - 31:2
**caps** [30] - 28:9, 29:11, 29:25, 30:22, 31:9, 33:9, 33:10, 33:15, 34:3, 34:24, 35:2, 36:10, 36:20, 38:5, 43:2, 45:6, 47:15, 47:16, 47:19, 47:21, 49:5, 49:7, 56:5, 72:23, 73:1, 73:10, 74:11, 76:9
**car** [3] - 36:8, 57:7
**cared** [1] - 66:24
**career** [1] - 27:24
**careful** [1] - 81:18
**carefully** [1] - 5:4
**Carolina** [1] - 15:8
**CARRIE** [3] - 24:14, 82:4
**Carrie** [5] - 2:6, 24:19, 24:21, 24:22, 62:7
**cars** [1] - 47:19
**CASE** [1] - 1:5
**Case** [2] - 2:4, 83:5
**case** [79] - 2:24, 3:4, 3:9, 3:15, 3:22, 4:1, 4:5, 4:10, 4:18, 5:17, 5:19, 6:24, 7:6, 7:9, 7:13, 7:14, 8:9, 8:12, 9:24, 10:3, 10:4, 10:7, 10:8, 10:10, 10:11, 10:23, 11:2, 11:4, 11:5, 11:16, 12:16, 12:18, 14:14, 14:24, 14:25, 15:15, 16:3, 16:5, 17:21, 18:9, 20:15, 23:8, 26:6, 35:6, 52:4, 52:5, 52:16, 53:4, 53:5, 53:17, 53:18, 54:6, 54:9, 54:11, 55:23, 56:1, 57:4, 58:15, 58:16, 58:24, 59:17, 59:21, 60:6, 60:10, 62:10, 62:16, 63:20, 64:9, 64:23, 66:17, 69:12, 70:20, 71:11, 76:2, 80:1
**cases** [13] - 28:1, 28:2, 38:23, 52:1, 52:15, 58:19, 59:20, 63:10, 63:11, 68:1, 68:7, 72:11
**cellular** [2] - 25:23,

28:12
**central** [1] - 66:20
**certain** [5] - 15:5, 15:8, 16:13, 25:23, 55:12
**certainly** [10] - 17:22, 29:18, 52:8, 53:20, 54:6, 67:9, 75:21, 76:1, 76:3, 77:3
**CERTIFICATE** [1] - 83:1
**certify** [2] - 83:3, 83:6
**challenge** [4] - 6:3, 18:5, 18:25, 23:14
**challenging** [2] - 6:25, 19:10
**chance** [4] - 3:6, 5:9, 20:9, 63:17
**chances** [1] - 78:2
**change** [5] - 11:11, 11:12, 13:10, 22:2, 76:3
**changed** [3] - 21:22, 21:23, 22:2
**changes** [2] - 22:4, 65:9
**Chapters** [2] - 6:12, 19:1
**characteristics** [2] - 6:10, 60:25
**characterize** [1] - 44:14
**charge** [1] - 21:20
**charged** [5] - 11:20, 26:6, 32:22, 35:6, 39:10
**charges** [1] - 25:17
**check** [2] - 76:21, 80:19
**Chris** [1] - 2:5
**Christopher** [1] - 1:16
**Circuit** [10] - 3:3, 3:17, 5:10, 8:10, 54:9, 61:23, 63:12, 63:14, 63:16, 70:21
**circumstances** [1] - 57:3
**cite** [2] - 54:6, 63:10
**cited** [2] - 59:20, 75:19
**cites** [4] - 3:15, 8:4, 63:14, 67:23
**clarified** [1] - 71:15
**clarify** [2] - 15:21, 41:15
**clarifying** [1] - 47:5
**clear** [9] - 5:16, 5:23, 6:23, 7:8, 15:6, 15:22, 16:7, 16:22, 22:24, 46:23, 53:12, 53:20, 65:15, 71:1, 77:22
**clearly** [5] - 9:2, 22:14, 34:16, 61:25, 66:3
**CLERK** [4] - 24:13, 24:16, 24:20, 78:14
**clientele** [2] - 55:10, 55:12
**clients** [1] - 55:15
**close** [1] - 58:25

**closed** [1] - 81:9
**cocaine** [12] - 7:3, 9:22, 10:1, 14:19, 15:3, 16:14, 46:3, 55:10, 55:12, 55:15
**coconspirator** [2] - 55:14, 56:21
**coconspirators** [4] - 16:24, 55:12, 66:16, 74:16
**coded** [2] - 28:19, 29:4
**codefendant** [5] - 43:1, 78:19, 80:15, 81:5
**coke** [1] - 14:21
**collectively** [1] - 10:7
**combination** [2] - 43:16, 50:1
**come-up** [2] - 81:10, 81:13
**coming** [4] - 10:19, 18:5, 34:14, 72:12
**comment** [1] - 18:20, 74:19
**company** [1] - 35:23
**compare** [1] - 38:20
**compelling** [1] - 68:7
**complete** [1] - 83:8
**compliance** [1] - 16:5
**comply** [1] - 12:9
**comport** [1] - 24:6
**concede** [1] - 8:7
**conceded** [2] - 23:12, 23:14
**concern** [2] - 9:20, 81:16
**concerned** [1] - 67:19
**concerning** [1] - 56:19
**conclude** [1] - 63:22
**concluded** [1] - 7:19
**conclusion** [3] - 11:7, 21:5, 81:22
**conclusory** [1] - 55:19
**conduct** [4] - 3:20, 53:7, 57:13, 76:24
**conducting** [1] - 59:19
**conducts** [1] - 59:7
**confession** [6] - 71:6, 71:17, 74:20, 74:24
**confidential** [1] - 52:17
**confirm** [1] - 78:8
**confused** [4] - 19:8, 20:4, 38:20, 61:8
**Congress** [2] - 18:2, 23:9
**Congressionally** [1] - 61:6
**Congressionally-mandated** [1] - 61:6
**connection** [3] - 2:8, 28:11, 37:4

**consider** [5] - 21:7, 70:13, 73:6, 74:25, 75:24
**considerable** [1] - 69:13
**consideration** [1] - 81:18
**conspiracy** [20] - 9:21, 11:21, 16:11, 26:7, 38:25, 39:15, 46:12, 46:17, 47:1, 53:7, 54:16, 54:19, 55:9, 55:11, 56:23, 65:2, 66:17, 67:22, 71:7, 72:5
**conspired** [1] - 13:1
**constitute** [1] - 83:6
**contact** [5] - 33:3, 39:13, 50:13, 53:6
**contacted** [4] - 50:16, 59:15, 68:23, 69:1
**contacts** [2] - 36:15, 73:12
**contained** [3] - 8:1, 70:10, 75:17
**continue** [4] - 46:9, 61:8, 77:11, 80:1
**contrary** [2] - 59:12, 64:19
**control** [3] - 55:21, 58:6, 58:8
**conversation** [1] - 40:25
**conversations** [5] - 28:19, 29:4, 34:13, 34:16, 74:16
**converted** [1] - 16:13
**convicted** [2] - 26:6, 35:6
**conviction** [1] - 25:17
**convinces** [1] - 20:21
**convincing** [1] - 53:21
**copies** [1] - 4:25, 5:6, 54:5
**copy** [13] - 4:12, 4:20, 11:19, 26:16, 42:17, 42:19, 43:9, 52:3, 52:4, 52:5, 54:7, 54:13, 58:21
**correct** [32] - 13:4, 23:24, 27:2, 27:3, 27:6, 27:9, 27:10, 34:8, 34:11, 35:20, 35:24, 35:25, 37:9, 38:3, 39:19, 39:24, 39:25, 40:7, 45:7, 45:23, 48:8, 48:16, 48:20, 49:19, 49:22, 51:4, 51:5, 51:11, 51:12, 70:24, 73:17, 74:4
**correctly** [1] - 73:16
**corroborated** [1] - 52:25
**counsel** [11] - 2:6, 2:10,

2:13, 4:4, 5:2, 5:9, 6:4, 52:4, 52:5, 52:9, 72:16
**Count** [1] - 11:20
**count** [4] - 11:20, 74:5, 74:6, 76:12
**couple** [5] - 7:10, 27:22, 60:19, 62:2, 73:5
**coupled** [2] - 13:21, 75:1
**course** [7] - 6:19, 17:25, 18:21, 41:2, 44:21, 60:21
**Court** [52] - 2:17, 4:8, 10:14, 11:15, 12:17, 15:16, 17:21, 18:22, 19:11, 38:23, 39:5, 39:22, 42:19, 42:20, 43:14, 52:3, 52:8, 52:20, 53:5, 53:9, 53:19, 54:3, 54:6, 54:21, 60:16, 61:14, 61:15, 62:21, 63:11, 63:20, 65:3, 70:6, 70:8, 70:9, 70:11, 70:13, 71:8, 71:21, 74:20, 74:25, 75:19, 75:21, 75:24, 76:2, 77:22, 77:24, 77:25, 78:3, 78:4, 78:20, 81:19, 83:15
**court** [7] - 7:18, 7:19, 8:20, 8:21, 9:3, 11:8, 12:7, 12:14, 18:5, 26:17, 40:9, 41:16, 54:20, 55:8, 60:14, 64:14, 67:8, 67:14, 67:19, 67:23, 72:2
**COURT** [124] - 1:1, 2:10, 2:15, 4:11, 4:14, 4:17, 4:24, 5:5, 5:9, 5:14, 7:24, 8:12, 9:6, 9:19, 10:10, 11:11, 11:13, 12:9, 12:16, 12:23, 13:3, 13:6, 13:10, 14:3, 14:6, 15:21, 16:2, 17:19, 19:3, 19:8, 19:10, 19:15, 19:19, 20:1, 20:4, 20:12, 20:15, 20:18, 21:16, 22:6, 22:17, 22:23, 23:16, 23:19, 23:22, 24:1, 24:5, 24:9, 24:21, 24:23, 26:15, 29:2, 29:14, 29:16, 29:24, 33:19, 33:21, 33:23, 38:19, 39:5, 40:2, 42:21, 44:17, 44:20, 44:22, 45:1, 45:11, 45:18, 45:21, 50:5, 50:8, 51:14, 51:16, 51:20, 51:23, 52:7, 52:13, 54:4, 54:12, 55:2, 55:6, 58:18, 60:18, 61:18, 62:4, 68:18, 70:5, 70:13, 70:19, 71:4, 71:19, 72:4, 72:15, 73:8,

73:10, 73:14, 73:16, 74:2, 74:5, 75:7, 76:5, 76:12, 76:15, 76:22, 78:8, 78:15, 78:24, 79:1, 79:13, 79:17, 79:19, 79:23, 80:3, 80:6, 80:9, 80:12, 80:15, 80:17, 80:19, 80:23, 81:1, 81:3, 81:14, 81:16
**Court's** [8] - 13:13, 39:3, 39:7, 54:7, 54:10, 62:3, 69:14, 70:23
**court's** [1] - 54:15
**courthouse** [1] - 81:9
**Courthouse** [1] - 1:23
**courts** [2] - 3:18, 28:21
**cousin** [5] - 55:25, 57:5, 58:25, 59:6, 59:18
**cover** [1] - 79:9
**covered** [1] - 16:3
**crease** [1] - 63:5
**credible** [1] - 62:9
**Criminal** [1] - 2:3
**criminal** [4] - 3:12, 3:24, 63:7, 76:24
**CRIMINAL** [1] - 1:5
**critical** [1] - 3:23
**cross** [1] - 40:2
**CROSS** [2] - 40:3, 82:6
**crystal** [2] - 6:23, 20:19
**cumulatively** [1] - 72:1
**cupboard** [1] - 47:23
**customer** [1] - 47:20
**customers** [2] - 60:9, 70:2

**D**

**D-A-Y-T-O-N** [1] - 24:19
**date** [6] - 5:19, 6:17, 12:12, 12:13, 27:1, 79:12
**dated** [3] - 18:4, 40:7, 42:18
**days** [1] - 36:19
**Dayton** [2] - 2:6, 24:12, 24:19, 25:1, 29:7, 29:18, 62:7, 65:4, 68:12, 68:24, 70:1, 72:17, 74:15
**dayton** [1] - 74:3
**DAYTON** [2] - 24:14, 82:4
**deal** [6] - 52:9, 59:7, 59:19, 60:10, 79:6, 79:11
**dealer** [2] - 59:6, 59:7
**dealing** [2] - 35:12, 56:22
**deals** [2] - 8:15, 10:23
**dealt** [2] - 73:7, 75:13
**debate** [3] - 15:10, 45:3,

77:20
debating [1] - 17:14
decide [5] - 15:16, 17:10, 23:7, 45:21, 66:18
decided [2] - 54:8, 70:21
decision [5] - 2:18, 5:10, 6:6, 66:9, 72:12
deduce [1] - 72:17
defendant [57] - 3:9, 3:11, 3:15, 3:24, 5:17, 6:10, 6:18, 7:20, 8:7, 9:21, 12:4, 12:20, 14:1, 14:11, 23:5, 25:17, 26:10, 27:8, 30:11, 31:19, 32:11, 32:25, 33:3, 34:20, 35:9, 36:15, 37:10, 38:20, 55:20, 60:25, 62:18, 62:22, 63:6, 63:23, 64:4, 64:9, 64:16, 65:7, 66:13, 67:18, 68:18, 68:19, 68:21, 68:22, 68:23, 69:10, 69:19, 71:6, 72:7, 72:25, 73:7, 75:25, 76:8, 76:17, 76:19, 76:23, 77:2
DEFENDANT [5] - 21:15, 21:17, 22:14, 22:19, 23:13
Defendant [2] - 1:7, 1:18
defendant's [11] - 3:14, 3:19, 26:1, 31:5, 31:13, 32:1, 32:12, 32:18, 63:4, 67:20, 75:14
defendants [1] - 62:15
defense [2] - 63:14, 75:17
define [2] - 8:3, 54:21
definitely [1] - 79:4
definition [3] - 54:22, 60:12, 60:13
deliver [10] - 39:19, 39:20, 47:13, 51:9, 51:10, 52:20, 55:15, 66:13, 67:4
delivered [1] - 31:25, 32:5, 32:18, 34:24, 39:24, 47:21, 49:3, 49:5, 51:4, 52:25, 55:9
deliveries [4] - 32:12, 32:14, 46:21, 47:9
delivering [3] - 49:7, 59:22, 67:5
delivery [1] - 47:20
demonstrated [1] - 76:23
demonstrates [2] - 56:8, 58:6
Department [1] - 76:7

departure [1] - 64:8
departures [1] - 6:11
describe [3] - 36:4, 41:24, 47:18
described [13] - 30:2, 32:15, 33:15, 34:23, 36:6, 36:20, 43:8, 46:14, 47:3, 47:14, 47:19, 49:2, 63:7
describing [1] - 43:7
description [2] - 50:17, 58:24
determination [3] - 2:17, 8:23, 54:15
determine [2] - 7:19, 75:22
devil's [1] - 71:19
devoid [1] - 58:11
dictionary [1] - 54:21
Dictionary [1] - 55:1
difference [8] - 10:7, 10:16, 11:4, 14:12, 16:16, 57:13, 57:14, 72:4
differences [1] - 14:22, 59:8
different [7] - 14:23, 15:5, 23:4, 23:25, 53:22, 59:3, 72:18
difficulties [1] - 47:4
DIRECT [2] - 24:24, 82:5
direct [1] - 39:2
directed [6] - 35:1, 39:18, 49:12, 53:21, 67:2, 68:21
direction [5] - 32:1, 32:12, 36:23, 50:25, 53:15
directly [8] - 4:9, 7:20, 24:16, 36:17, 50:13, 59:14, 69:10, 74:14
disappointment [1] - 77:9
discovered [1] - 31:3
discuss [4] - 4:4, 36:14, 44:23, 63:21
discussed [2] - 38:8, 39:15, 47:8, 60:24
discussing [1] - 69:13
discussion [2] - 65:5, 65:17
dispute [6] - 11:14, 15:1, 15:16, 15:16, 15:18
distinction [1] - 16:7, 68:6, 72:11
distribute [7] - 9:21, 11:21, 11:25, 13:1, 56:23, 71:8
distributed [5] - 28:6, 37:18, 38:12, 48:14,

71:25
distributing [3] - 16:16, 16:22, 38:15
distribution [5] - 31:24, 38:8, 45:24, 71:7, 73:19
DISTRICT [2] - 1:1, 1:1
District [1] - 28:22
district [3] - 3:22, 54:15, 55:8
DIVISION [1] - 1:2
doable [1] - 77:18
docketed [1] - 18:3
documented [1] - 46:19
done [13] - 32:3, 41:12, 43:5, 45:14, 45:15, 53:13, 53:16, 56:12, 63:9, 65:16, 65:19, 66:2, 66:3
doubt [2] - 19:9, 75:15
down [2] - 34:5, 51:17
draw [3] - 9:3, 54:7
drive [4] - 55:25, 57:12, 59:24, 59:25
driven [1] - 59:18
driver [1] - 76:8
driving [2] - 58:25, 59:6
drove [3] - 36:6, 55:14, 56:21
drug [44] - 2:19, 2:22, 2:23, 3:5, 3:8, 4:3, 4:5, 5:20, 5:24, 6:3, 7:8, 8:3, 8:21, 11:15, 12:15, 12:18, 13:10, 18:12, 18:15, 21:10, 22:1, 23:1, 24:2, 27:24, 29:4, 53:6, 53:23, 54:16, 55:9, 56:1, 56:22, 56:23, 59:6, 59:7, 59:19, 67:19, 67:22, 68:9, 69:23, 70:19, 73:19, 74:13, 74:17
drugs [42] - 8:3, 12:14, 15:23, 16:10, 16:18, 16:22, 16:23, 18:6, 25:8, 38:2, 38:9, 38:12, 39:18, 39:24, 45:24, 46:4, 49:4, 49:10, 49:15, 49:17, 49:25, 50:3, 50:6, 52:18, 52:20, 52:25, 53:2, 54:9, 55:11, 57:23, 57:25, 59:13, 59:14, 59:15, 59:22, 59:25, 60:1, 60:8, 68:24
duck [1] - 14:19
duration [1] - 27:6
during [7] - 13:25, 14:17, 31:18, 34:18, 36:14, 76:22, 79:25
duties [1] - 25:6
duty [1] - 77:24

E

easier [1] - 4:22
ECF [2] - 18:3, 18:11
Eden's [2] - 42:5, 42:8
educed [1] - 73:3
effect [4] - 4:5, 19:24, 40:24, 57:17
either [6] - 13:15, 13:24, 32:11, 47:7, 68:2, 69:19
elements [1] - 11:23
Eleven [1] - 25:10
ELH-13-0512 [2] - 1:6, 2:4
ELH-13-512 [1] - 83:5
Ellen [1] - 1:12
ELMO [2] - 26:14, 42:17
emphasize [1] - 55:21
employed [4] - 25:2, 25:4, 42:4, 62:7
employment [1] - 25:11
empty [1] - 45:6
enable [1] - 24:6
encompass [3] - 13:19, 16:9, 17:2
end [3] - 43:2, 50:21, 54:25
enforcement [1] - 25:1
engage [1] - 69:3
enhancement [9] - 2:14, 52:10, 52:20, 55:16, 55:17, 58:17, 61:15, 62:22, 67:25
enjoy [1] - 64:20
enjoyed [1] - 62:18
enjoying [1] - 47:2
entered [2] - 5:24, 18:23
entertain [3] - 18:17, 19:23, 22:24
ENZO [1] - 1:6
Enzo [3] - 2:3, 2:12, 83:4
equally [1] - 20:4
equated [1] - 14:20
equipment [3] - 31:2, 31:9, 31:22
equivalent [1] - 14:21
erroneous [1] - 54:16
error [2] - 22:15, 22:20
especially [1] - 77:10
Esquire [3] - 1:16, 1:17, 1:18
essentially [1] - 30:18
establish [2] - 4:2, 24:2
established [3] - 69:2, 69:25, 74:18
estimate [2] - 28:15, 36:1

estimated [1] - 33:8
etc [2] - 5:25, 64:11
event [4] - 9:14, 9:15, 9:16
events [1] - 9:17
evidence [27] - 2:18, 9:4, 13:19, 18:13, 40:12, 43:10, 43:14, 51:17, 51:18, 51:25, 53:2, 53:19, 53:20, 54:17, 55:20, 57:22, 57:24, 58:12, 58:13, 62:17, 64:18, 67:12, 69:2, 69:9, 71:8, 73:3, 77:4
evidently [4] - 7:12, 46:10, 56:2, 57:19
exact [1] - 39:11
exactly [2] - 55:23, 56:17
examination [1] - 39:2
EXAMINATION [6] - 24:24, 40:3, 50:9, 82:5, 82:6, 82:7
examine [2] - 40:2, 40:15
example [7] - 11:16, 11:19, 52:16, 67:15, 70:23, 72:20, 72:24
examples [2] - 68:1, 68:4
exceeds [1] - 12:15
except [2] - 48:21, 73:12
excerpts [1] - 7:12
excess [4] - 10:24, 69:22, 74:12, 75:1
exchange [2] - 46:17, 47:1
exclusive [1] - 74:5
excuse [1] - 66:6
executed [2] - 30:25, 31:5, 31:12
exercise [2] - 17:4, 61:5, 62:2
exercised [2] - 55:20, 64:11
exercising [2] - 58:6, 58:7
exhausted [1] - 23:16
Exhibit [6] - 26:20, 28:25, 29:8, 40:11, 41:2, 65:22
exhibit [5] - 26:21, 40:6, 40:21, 40:22, 42:19
exhibits [1] - 70:17
existed [1] - 55:19
existence [1] - 7:1
expansive [1] - 14:13, 24:6
expansively [2] - 7:6,

12:21
**expensive** [1] - 24:10
**experience** [2] - 27:23, 29:19
**expert** [4] - 28:18, 28:21, 29:2, 29:3
**expertise** [1] - 29:19
**explain** [1] - 2:22
**explanation** [1] - 43:17
**explanatory** [1] - 27:2
**extensive** [2] - 7:15, 7:17
**extent** [6] - 6:20, 59:5, 60:5, 69:3, 69:8, 75:15
**extra** [1] - 54:5

### F

**F-150** [1] - 76:8
**F.3d** [3] - 54:8, 54:13, 63:15
**facing** [1] - 7:1
**fact** [20] - 17:23, 18:2, 18:13, 18:22, 23:4, 37:21, 45:21, 53:1, 53:10, 53:22, 56:8, 64:25, 65:7, 65:8, 65:14, 71:14, 73:6, 75:24, 76:10
**fact-specific** [1] - 71:14
**facto** [1] - 17:10
**factors** [2] - 6:11, 78:5
**facts** [5] - 5:25, 7:14, 8:1, 8:4, 9:23, 12:2, 12:12, 13:14, 13:16, 13:18, 13:22, 14:2, 15:13, 16:8, 16:21, 16:25, 17:2, 17:11, 42:14, 42:15, 42:22, 43:13, 52:16, 52:19, 53:4, 56:19, 58:25, 69:17, 70:8, 75:5, 75:20, 76:14, 76:15, 76:23, 76:25
**factual** [5] - 3:23, 8:23, 11:8, 55:16, 70:1
**factually** [3] - 11:4, 11:5, 14:23
**failsafe** [1] - 81:12
**fair** [9] - 2:25, 37:14, 39:6, 42:12, 43:22, 46:12, 48:9, 48:11, 48:12
**fairly** [1] - 63:15
**familiar** [7] - 2:24, 4:14, 10:20, 25:16, 26:3, 28:5, 35:3
**family** [1] - 77:22
**far** [6] - 8:10, 8:24, 10:24, 45:6, 60:12, 67:19
**fashion** [1] - 55:22

**faulting** [1] - 9:12
**favor** [14] - 27:14, 29:8, 30:4, 40:25, 41:4, 41:7, 41:12, 44:9, 53:13, 56:12, 56:16, 57:15, 65:6, 65:25
**FBI** [9] - 2:6, 25:4, 25:9, 25:11, 25:15, 25:22, 27:25, 62:7, 66:11
**FCRR** [1] - 1:22
**February** [5] - 2:16, 6:6, 18:4, 22:8, 31:22
**Fed.Appx** [2] - 63:12, 63:14
**Federal** [1] - 25:3
**female** [1] - 49:2
**figure** [1] - 9:20
**figured** [1] - 10:20
**file** [2] - 20:20, 20:23
**filed** [1] - 75:16
**fill** [1] - 53:11, 60:8
**filled** [2] - 30:10, 56:6
**finally** [2] - 9:16, 51:3
**financial** [1] - 47:3
**finder** [2] - 45:21, 65:14
**findings** [5] - 3:8, 3:18, 3:22, 7:15, 55:16
**fine** [4] - 80:16, 80:21, 81:2, 81:6
**finger** [1] - 42:23
**finish** [8] - 39:2, 77:9, 77:15, 78:16, 78:22, 79:2, 81:3, 81:17
**finished** [1] - 66:2
**first** [17] - 4:7, 5:19, 8:25, 12:24, 12:25, 13:17, 17:20, 20:22, 21:3, 34:17, 35:17, 35:21, 36:5, 40:6, 46:1, 64:24, 77:14
**fit** [1] - 21:12
**fits** [2] - 56:20, 58:15
**five** [33] - 7:2, 7:3, 9:22, 10:5, 10:6, 10:11, 10:13, 14:21, 23:5, 27:18, 30:12, 30:13, 30:18, 36:18, 45:14, 45:15, 53:15, 65:18, 66:4, 66:5, 66:6, 72:6, 72:25, 73:4, 73:8, 73:9, 74:3, 77:5
**flagged** [1] - 5:14
**Floor** [1] - 1:23
**Flores** [15] - 3:5, 5:11, 6:25, 7:20, 10:4, 10:5, 10:11, 10:13, 10:14, 12:10, 14:25, 17:13, 23:4, 23:5, 72:5
**Flores-Alvarado** [13] - 3:5, 5:11, 6:25, 7:20, 10:5, 10:13, 10:14,

12:10, 14:25, 17:13, 23:4, 23:5, 72:5
**Flores-Alvarado's** [2] - 10:4, 10:11
**focus** [3] - 63:19, 63:24, 72:6
**foggiest** [1] - 61:25
**fold** [1] - 73:18
**follow** [1] - 39:6
**following** [4] - 13:18, 39:3, 50:11, 80:2
**follows** [2] - 61:16, 63:5
**footnote** [1] - 14:19
**FOR** [1] - 1:1
**Force** [2] - 25:7, 62:10
**Ford** [1] - 76:8
**foregoing** [1] - 83:6
**foregone** [1] - 21:5
**foreseeability** [3] - 3:20, 3:21, 7:22
**foreseeable** [10] - 3:14, 8:7, 12:4, 12:19, 16:10, 16:24, 18:15, 21:22, 70:3, 76:17
**form** [1] - 43:2
**forth** [2] - 6:12, 52:16
**forward** [1] - 16:4
**four** [17] - 32:4, 36:18, 47:9, 47:12, 52:25, 56:1, 59:3, 63:1, 66:12, 66:18, 67:4, 67:10, 72:25, 73:7, 73:8, 73:9, 74:3
**Four** [1] - 6:12
**four-level** [1] - 67:10
**fours** [2] - 56:18, 60:6
**Fourth** [11] - 1:23, 3:3, 3:17, 5:10, 8:10, 54:8, 61:22, 63:12, 63:13, 63:16, 70:21
**frankly** [1] - 17:8, 70:22, 75:12
**free** [4] - 6:10, 77:15, 78:10, 79:4
**frequency** [2] - 33:7, 74:11
**frequented** [1] - 42:8
**Friday** [12] - 77:12, 78:18, 78:19, 79:12, 79:20, 79:24, 80:5, 80:25, 81:4, 81:11, 81:13, 81:21
**Fridays** [2] - 79:20, 80:8
**friend** [3] - 34:24, 49:3, 53:2
**front** [4] - 42:19, 58:21, 58:24, 79:7
**full** [1] - 24:17
**funds** [1] - 66:20

### G

**game** [1] - 53:10
**gangs** [1] - 25:8
**gee** [1] - 17:12
**gel** [37] - 28:9, 29:11, 29:25, 30:1, 30:8, 30:9, 30:10, 30:14, 30:21, 31:9, 33:9, 33:10, 33:15, 34:3, 34:24, 35:2, 36:10, 36:20, 38:5, 39:20, 43:2, 45:6, 47:15, 47:16, 47:18, 47:21, 49:5, 49:7, 53:11, 56:5, 72:23, 73:1, 73:10, 74:11, 76:9
**generally** [1] - 63:9
**Gerald** [2] - 1:18, 2:11
**girlfriend** [1] - 41:19
**given** [2] - 20:22, 61:15
**glean** [2] - 65:6, 65:18
**Government** [1] - 1:16
**government** [27] - 2:21, 6:16, 6:17, 6:20, 11:25, 17:12, 18:12, 18:13, 21:9, 23:6, 24:2, 24:11, 45:6, 47:15, 47:16, 53:18, 56:7, 57:18, 58:16, 59:20, 60:15, 63:11, 64:16, 65:22, 66:11, 66:12, 69:2, 69:7, 69:25, 74:18
**Government's** [3] - 26:20, 28:25, 29:8
**GOVERNMENT'S** [1] - 24:14
**government's** [10] - 4:3, 18:14, 22:10, 52:14, 57:10, 59:9, 59:11, 72:21, 74:9, 77:17
**grams** [2] - 21:22, 74:12, 74:18, 77:4
**greater** [1] - 76:3
**ground** [1] - 14:10
**guess** [13] - 2:25, 10:3, 18:9, 19:5, 22:7, 44:1, 44:10, 45:3, 45:16, 47:17, 61:1, 71:19, 73:5
**guidance** [1] - 63:18
**guideline** [3] - 6:11, 17:6, 75:3
**Guideline** [1] - 54:1
**guidelines** [9] - 2:9, 3:16, 13:4, 19:2, 53:18, 57:16, 58:14, 62:23, 63:25
**Guidelines** [2] - 6:13, 54:20
**guilty** [20] - 5:18, 7:2, 9:21, 11:17, 18:17, 21:3, 21:4, 22:3, 33:16, 33:20,

54:9, 62:14, 65:1, 67:16, 70:7, 70:14, 71:20, 72:5, 74:24
**gymnastics** [1] - 16:17

### H

**half** [4] - 25:14, 30:8, 49:7, 80:7
**hand** [2] - 24:13, 60:24
**handed** [1] - 36:8
**handled** [1] - 52:19
**happy** [2] - 22:24, 38:22
**hardly** [1] - 56:13
**head** [3] - 39:12, 64:18, 69:24
**hear** [2] - 2:18, 78:3
**heard** [5] - 51:20, 62:6, 70:9, 75:1, 75:23
**hearing** [8] - 2:7, 6:7, 23:20, 40:19, 70:16, 70:17, 70:19, 71:11
**hears** [1] - 78:11
**held** [1] - 9:24
**hello** [2] - 27:11, 41:3
**help** [5] - 32:15, 41:15, 47:6, 57:6
**helped** [3] - 46:13, 46:21, 47:4
**helpful** [1] - 64:14
**hereby** [1] - 83:3
**hereunto** [1] - 83:9
**heroin** [59] - 8:6, 9:4, 9:11, 9:18, 12:4, 15:12, 15:13, 28:3, 28:5, 28:11, 28:16, 28:19, 31:19, 31:20, 31:24, 31:25, 32:6, 32:11, 32:12, 32:18, 33:4, 33:7, 33:9, 34:19, 36:17, 36:25, 37:7, 37:18, 38:5, 38:14, 43:2, 43:20, 46:3, 47:11, 47:13, 47:22, 48:2, 48:14, 49:13, 50:12, 51:4, 56:3, 56:6, 59:4, 66:13, 66:19, 67:4, 68:17, 69:1, 69:3, 69:9, 69:22, 70:3, 71:25, 72:1, 74:9, 76:9, 76:17
**herself** [2] - 65:10, 66:23, 67:3
**himself** [5] - 38:15, 48:18, 48:19, 52:19, 56:6
**history** [2] - 2:24, 48:10
**hit** [1] - 18:19
**hmm** [1] - 27:12
**hold** [1] - 30:8
**Hollander** [7] - 1:12, 7:9, 8:15, 9:12, 12:22,

20:7, 57:1
**Homeboy** [14] - 35:1, 35:2, 48:24, 49:4, 49:13, 49:17, 49:21, 49:24, 50:13, 52:23, 59:14, 59:21, 60:10, 68:20
**homeboy** [3] - 48:25, 49:9, 53:23
**Homeboy's** [2] - 49:25, 50:15
**Honor** [85] - 2:2, 2:11, 2:13, 4:7, 4:13, 4:16, 4:22, 5:4, 5:12, 5:13, 6:24, 7:5, 7:23, 8:10, 9:8, 10:22, 12:8, 12:11, 14:4, 15:25, 16:1, 18:19, 19:7, 19:13, 20:5, 21:15, 23:21, 23:23, 24:4, 24:8, 24:11, 26:13, 26:20, 29:12, 29:18, 29:22, 33:17, 38:22, 39:1, 40:1, 40:5, 40:21, 42:17, 45:5, 45:17, 51:21, 51:24, 52:1, 52:14, 53:25, 54:5, 54:9, 54:14, 55:5, 55:21, 56:8, 56:15, 56:18, 57:20, 58:11, 58:23, 60:5, 61:12, 61:13, 61:16, 61:25, 68:11, 70:6, 70:22, 71:10, 71:23, 72:10, 73:5, 75:13, 76:11, 76:20, 77:18, 77:21, 77:25, 79:9, 79:16, 80:21, 80:25, 81:6
**Honor's** [2] - 14:25, 68:14
**Honorable** [1] - 1:12
**hoops** [1] - 17:13
**hope** [2] - 10:22, 58:19
**hopefully** [2] - 24:9, 78:11
**horse** [1] - 20:25
**hour** [3] - 70:15, 77:14, 80:1
**hours** [1] - 62:2
**hum** [1] - 47:12
**hundreds** [1] - 28:17
**hypothetically** [1] - 71:5

**I**

**idea** [3] - 48:10, 48:14, 61:25
**identified** [2] - 32:9, 32:17
**identify** [2] - 32:5, 32:8
**ignored** [1] - 13:16

**ignores** [1] - 13:25
**imagine** [2] - 56:10, 57:4
**immediately** [2] - 4:18, 10:17
**important** [3] - 7:14, 66:9, 67:7
**impose** [3] - 60:16, 77:24, 78:6
**imposition** [1] - 55:17
**imprisonment** [1] - 7:4
**IN** [1] - 1:1
**inception** [1] - 62:11
**incidentally** [3] - 14:7, 31:12, 34:18
**including** [3] - 6:14, 61:1, 61:18
**inconsistent** [1] - 20:6
**increase** [2] - 63:3, 63:7
**indeed** [2] - 13:20, 43:13
**independent** [1] - 69:4
**independently** [1] - 62:18
**INDEX** [1] - 82:1
**indicate** [11] - 12:12, 14:20, 31:25, 32:3, 32:10, 32:24, 33:14, 34:1, 34:19, 35:8, 36:22
**indicated** [27] - 2:21, 20:2, 32:2, 32:4, 32:13, 32:17, 33:10, 34:3, 34:6, 34:9, 35:13, 35:19, 36:17, 37:11, 39:17, 46:10, 50:14, 50:21, 52:24, 53:1, 58:4, 60:4, 68:14, 68:24, 77:25, 79:21, 80:7
**indicates** [5] - 8:5, 16:8, 27:6, 54:14, 77:1
**indication** [1] - 67:1
**indicative** [1] - 56:13
**indicia** [1] - 57:15
**indictment** [1] - 11:20
**individual** [8] - 26:3, 35:4, 35:15, 37:21, 38:24, 50:19, 50:22, 50:24
**individuals** [12] - 37:17, 38:9, 39:9, 39:10, 39:19, 39:21, 39:24, 52:22, 59:16, 68:20, 68:25, 74:7
**indulgence** [1] - 69:14
**influence** [1] - 20:20
**informant** [1] - 52:17
**information** [5] - 9:2, 49:6, 53:9, 67:8, 67:18
**instances** [1] - 56:2
**instead** [2] - 37:3, 52:18
**institution** [1] - 54:24

**institution)** [1] - 54:25
**instruct** [1] - 47:15
**instructed** [10] - 44:18, 49:8, 51:7, 51:8, 53:11, 53:21, 57:7, 59:2, 59:3, 59:16
**instructing** [2] - 60:7, 60:8
**instruction** [3] - 44:12, 59:22, 60:3
**instructions** [3] - 32:1, 32:19, 52:24
**insufficient** [2] - 9:2, 54:17
**intent** [2] - 11:21, 11:24
**interactions** [1] - 69:18
**intercept** [2] - 25:23, 38:7
**intercepted** [4] - 26:10, 39:14, 74:8, 74:16
**interception** [1] - 28:12
**interest** [1] - 64:22
**interested** [1] - 22:11
**intermediaries** [3] - 60:10, 68:22, 69:11
**intern** [1] - 79:15
**International** [1] - 55:1
**interpretation** [4] - 28:19, 29:4, 29:23, 45:9
**interview** [10] - 14:1, 31:18, 32:19, 32:21, 34:18, 35:8, 36:14, 43:6, 72:20, 76:22
**interviewed** [3] - 31:15, 43:8, 66:11
**interviewing** [1] - 42:3
**interviews** [2] - 39:23, 72:19
**introduced** [4] - 36:24, 37:9, 51:2, 57:20
**investigate** [1] - 25:7
**Investigation** [1] - 25:3
**investigation** [14] - 25:16, 25:20, 26:10, 30:24, 33:12, 34:9, 35:3, 37:13, 37:17, 37:18, 38:11, 42:4, 42:7, 42:10
**investigations** [3] - 27:24, 28:11, 28:19
**investigator** [1] - 7:13
**involve** [4] - 17:21, 28:3, 28:16, 68:2
**involved** [19] - 7:20, 15:23, 16:21, 17:1, 19:5, 25:19, 27:24, 36:11, 37:13, 38:24, 42:12, 45:24, 46:4, 47:1, 54:18, 62:10, 62:15, 64:24, 64:25
**involvement** [2] -

46:17, 67:21
**involving** [1] - 11:18
**issue** [11] - 3:17, 3:20, 3:25, 7:22, 10:10, 11:15, 14:14, 23:1, 63:2, 64:12, 70:20
**issued** [1] - 3:3
**issues** [5] - 4:5, 5:20, 20:8, 77:7, 81:19
**itself** [2] - 17:22, 77:8

**J**

**January** [1] - 63:16
**jeopardy** [1] - 11:3
**jointly** [2] - 3:12, 3:24
**jointly-undertaken** [1] - 3:12
**Judge** [12] - 1:12, 7:9, 8:14, 9:12, 12:22, 20:7, 50:7, 55:23, 57:1, 71:11, 79:7, 79:20
**judge** [7] - 3:7, 3:22, 8:10, 8:16, 23:7, 23:10, 67:17
**judges** [1] - 78:21
**July** [5] - 9:14, 27:2, 40:7, 42:25, 65:22
**jumbo** [1] - 30:2
**jumbos** [1] - 30:23
**jump** [1] - 17:13
**jumped** [1] - 57:8
**jury** [1] - 17:9
**justify** [1] - 55:17

**K**

**keep** [4] - 14:9, 66:19, 80:17, 80:18
**keeping** [1] - 77:7
**Kentucky** [1] - 15:7
**kept** [3] - 47:23, 47:24
**key** [2] - 21:19, 22:3
**kilo** [23] - 15:12, 15:24, 16:19, 16:20, 17:17, 17:25, 18:2, 18:8, 33:16, 38:16, 69:3, 69:9, 69:22, 70:3, 74:21, 74:25, 75:2, 75:25, 76:25
**kilogram** [22] - 5:25, 7:3, 9:18, 10:4, 10:15, 10:16, 11:18, 11:22, 11:25, 12:5, 12:15, 12:19, 13:1, 13:12, 23:9, 68:16, 71:8, 72:3, 72:8, 72:9, 76:18, 77:4
**kilograms** [12] - 8:6, 9:4, 9:11, 9:22, 10:1, 10:11, 10:14, 13:12,

14:18, 72:6
**kilos** [3] - 14:21, 16:13, 18:13
**kind** [9] - 14:19, 16:17, 17:10, 34:15, 47:6, 57:15, 71:11, 74:19, 81:12
**kindly** [1] - 65:24
**kitchen** [1] - 47:23
**knowledge** [3] - 26:9, 29:19, 49:4
**knows** [1] - 18:13

**L**

**lady** [3] - 34:24, 49:3, 53:2
**language** [8] - 23:25, 44:2, 44:3, 44:4, 44:8, 54:11, 55:4, 61:24
**large** [2] - 7:10, 30:22
**larger** [2] - 15:6, 30:1
**last** [14] - 9:6, 13:17, 14:7, 18:16, 18:21, 19:17, 19:20, 21:1, 22:17, 24:18, 36:15, 50:11, 50:22, 55:19
**late** [1] - 77:8
**law** [5] - 3:15, 25:1, 53:17, 73:14, 73:15
**lawyer** [1] - 62:11
**lay** [1] - 12:18
**lays** [1] - 13:22
**lead** [1] - 64:10
**leader** [3] - 63:6, 63:24, 64:5
**leadership** [2] - 2:8, 54:2
**learned** [3] - 42:7, 42:10, 46:6
**least** [20] - 4:4, 6:16, 7:5, 9:25, 11:7, 12:5, 24:6, 28:1, 52:22, 52:25, 53:20, 53:21, 56:4, 60:14, 63:2, 64:7, 64:16, 67:15, 70:17, 76:17
**leave** [1] - 46:7
**led** [1] - 25:16
**legal** [3] - 14:24, 77:23, 81:7
**legally** [1] - 14:22
**lengthy** [1] - 7:12
**less** [3] - 13:12, 18:8, 20:9
**lesser** [2] - 21:20
**letter** [1] - 18:3
**Level** [6] - 8:16, 10:25, 11:1, 15:19, 17:15, 17:16
**level** [17] - 13:8, 15:1,

15:14, 15:17, 55:9, 58:17, 60:22, 60:23, 62:22, 63:3, 63:5, 67:10, 67:11, 75:3, 75:18, 76:3

**levels** [6] - 52:21, 60:17, 63:1, 63:8, 63:19, 68:7

**Lexington** [1] - 15:7

**life** [1] - 7:4

**light** [1] - 12:6

**line** [2] - 26:25, 59:15

**lines** [1] - 71:24

**listed** [1] - 78:12

**listen** [1] - 40:15

**listened** [1] - 28:16

**litigate** [1] - 22:25

**litigating** [1] - 22:12

**live** [1] - 56:15

**lived** [2] - 41:22, 41:24

**Load** [1] - 45:2

**load** [14] - 27:16, 30:6, 30:7, 30:18, 44:10, 45:2, 45:6, 53:14, 66:1

**loaded** [2] - 56:4, 56:5

**loading** [2] - 30:10

**location** [2] - 59:25, 60:1

**locations** [1] - 55:14

**Lombard** [1] - 1:23

**look** [11] - 8:22, 37:2, 44:10, 46:19, 47:18, 63:17, 66:14, 69:16, 70:22, 72:3, 73:23

**looked** [2] - 5:22, 52:13

**looking** [5] - 11:18, 21:11, 64:2, 72:18

**looks** [1] - 60:14

**looms** [1] - 17:20

**lounge** [1] - 42:5

**Lounge** [2] - 42:5, 42:8

**love** [2] - 4:13, 64:22

**lowest** [1] - 17:25

**lunch** [1] - 80:1

## M

**ma'am** [8] - 28:23, 38:17, 42:23, 43:22, 44:25, 51:3, 51:13, 51:16

**machine** [1] - 54:7

**major** [1] - 72:4

**male** [1] - 34:25

**manage** [1] - 64:10

**managed** [4] - 54:18, 56:20, 56:24, 57:19

**management** [4] - 54:23, 55:18, 58:13, 64:11

**manager** [6] - 54:16,

54:21, 63:6, 63:21, 63:24, 64:5

**managerial** [4] - 56:14, 57:16, 58:1, 58:6

**managing** [1] - 57:11

**mandated** [1] - 61:6

**mandatory** [11] - 7:1, 7:4, 8:18, 10:24, 11:2, 15:22, 17:17, 18:1, 21:13, 23:9, 70:25

**manner** [1] - 83:8

**manufactured** [1] - 18:12

**March** [5] - 1:10, 3:3, 81:4, 81:5, 83:5

**Marco** [2] - 3:4, 5:11

**marijuana** [6] - 9:23, 10:1, 14:15, 14:17, 15:3, 16:12

**marked** [1] - 10:16

**markings** [1] - 5:2

**MARSHAL** [1] - 81:15

**marshals** [1] - 81:11

**Martin's** [1] - 75:12

**Mary** [3] - 1:22, 83:3, 83:14

**MARYLAND** [1] - 1:1

**Maryland** [5] - 1:11, 1:24, 28:22, 37:22, 74:8

**materials** [1] - 31:2

**matter** [12] - 2:3, 7:7, 11:9, 11:10, 51:25, 59:22, 70:16, 78:23, 81:4, 81:7, 83:4, 83:8

**mattered** [1] - 10:6

**matters** [1] - 16:3

**mean** [17] - 11:14, 12:9, 21:6, 22:4, 33:15, 41:9, 41:11, 44:10, 45:14, 46:13, 56:20, 61:13, 64:21, 66:1, 71:13, 75:11, 75:12

**meaning** [4] - 45:13, 63:21, 65:18, 66:7

**means** [7] - 11:9, 20:15, 29:23, 30:7, 45:3, 55:3, 64:22

**meant** [6] - 22:5, 43:7, 43:18, 45:6, 56:16, 72:13

**medicals** [1] - 55:11

**meet** [2] - 35:1, 49:13

**meetings** [3] - 34:16, 37:2, 37:12

**member** [2] - 26:7, 55:9

**members** [2] - 39:14, 53:7

**memory** [2] - 6:4, 19:21

**mental** [1] - 16:17

**mention** [4] - 6:23, 13:6, 76:25, 79:19

**mentioned** [4] - 6:15, 13:3, 14:7, 76:18

**messages** [1] - 69:20

**met** [10] - 35:11, 35:14, 35:16, 35:17, 35:21, 36:5, 37:3, 42:11, 50:22, 60:15

**microphone** [1] - 24:17

**mid** [1] - 55:8

**middle** [1] - 34:15

**might** [6] - 17:9, 21:10, 22:10, 22:12, 23:23, 71:13

**Mike** [6] - 35:15, 35:16, 35:17, 36:9, 67:13

**mind** [3] - 63:25, 71:16, 74:22

**minimum** [11] - 7:1, 7:4, 8:18, 10:24, 11:3, 15:23, 17:17, 18:1, 21:14, 23:9, 61:6

**minute** [3] - 4:11, 5:15, 59:10

**minutes** [4] - 77:13, 78:17, 78:22, 79:3

**misgivings** [1] - 2:25

**miss** [1] - 61:11

**missed** [1] - 61:7

**missing** [1] - 61:4

**misstating** [1] - 6:4

**Mittal** [3] - 1:17, 2:5, 69:16

**MITTAL** [1] - 79:9

**money** [15] - 14:20, 16:13, 16:14, 32:10, 36:9, 46:25, 47:16, 47:20, 56:3, 59:5, 59:23, 60:9, 66:15, 66:19, 67:6

**monitor** [1] - 28:13

**month** [5] - 35:20, 36:16, 48:11, 50:22, 73:25

**months** [15] - 20:9, 33:12, 34:6, 35:14, 35:21, 36:1, 36:18, 72:24, 72:25, 73:8, 73:9, 73:21, 74:3, 77:24, 78:7

**Moore** [41] - 32:9, 32:17, 32:19, 32:21, 32:24, 34:17, 34:19, 35:1, 35:16, 35:17, 35:24, 36:25, 37:19, 38:12, 48:6, 48:15, 48:17, 48:19, 48:23, 49:2, 49:4, 49:8, 49:12, 50:12, 50:14, 53:1, 57:19, 57:24, 58:4, 58:7, 59:12, 59:25, 67:14, 67:16, 68:13, 68:15, 69:18, 70:8, 72:21,

73:13, 73:22

**most** [2] - 62:25, 63:2

**mother** [2] - 73:14, 73:15

**mother-in-law** [2] - 73:14, 73:15

**motion** [8] - 18:18, 19:22, 19:24, 20:21, 20:23, 20:24, 21:7, 22:24

**motivated** [1] - 64:21

**motivation** [1] - 64:24

**motivations** [1] - 65:9

**mouth** [1] - 75:14

**move** [3] - 26:21, 78:19, 79:2

**moved** [2] - 31:22, 45:25

**MR** [129] - 2:2, 2:11, 4:7, 4:13, 4:16, 4:22, 5:4, 5:12, 5:13, 6:24, 7:25, 8:14, 9:8, 10:9, 10:22, 11:12, 12:8, 12:11, 12:21, 12:24, 13:4, 13:7, 13:11, 14:4, 14:9, 15:25, 16:1, 16:6, 18:19, 19:7, 19:9, 19:13, 19:16, 19:18, 19:25, 20:2, 20:5, 20:14, 20:17, 23:18, 23:21, 23:23, 24:4, 24:8, 24:10, 24:25, 29:12, 29:15, 29:18, 29:22, 30:3, 33:17, 33:20, 33:22, 33:25, 38:22, 39:1, 39:3, 39:4, 39:8, 40:4, 44:16, 44:21, 45:4, 45:16, 45:19, 45:22, 50:7, 50:10, 51:13, 51:15, 51:18, 51:21, 51:24, 52:1, 52:8, 52:14, 54:5, 54:14, 55:4, 55:7, 58:23, 61:12, 61:20, 68:11, 68:19, 69:16, 70:6, 70:15, 70:22, 71:10, 71:23, 72:10, 73:5, 73:9, 73:11, 73:15, 73:17, 74:4, 74:6, 75:11, 76:11, 76:13, 76:20, 77:17, 77:21, 78:13, 78:23, 78:25, 79:5, 79:11, 79:15, 79:18, 79:21, 79:24, 80:5, 80:7, 80:11, 80:14, 80:16, 80:18, 80:21, 80:24, 80:25, 81:2, 81:6, 82:5, 82:6, 82:7

**MS** [1] - 79:9

**mulling** [1] - 74:22

**multiply** [1] - 74:10

**must** [5] - 3:13, 3:14, 11:8, 12:17, 64:4

## N

**name** [5] - 24:17, 24:18, 26:3, 35:4, 37:25

**names** [1] - 67:13

**narcotics** [1] - 51:9

**nauseam** [1] - 60:24

**neat** [1] - 14:8

**necessarily** [1] - 68:3

**need** [10] - 8:21, 10:15, 14:8, 27:14, 44:9, 65:25, 69:3, 73:6, 77:10, 77:20

**needed** [3] - 9:19, 15:16, 23:7

**needing** [1] - 78:19

**needs** [10] - 7:8, 29:8, 30:4, 40:25, 41:4, 53:13, 53:16, 65:16, 71:1

**negotiations** [1] - 17:22

**never** [2] - 34:4, 48:3

**nevertheless** [2] - 7:2, 64:11

**New** [1] - 54:25

**new** [1] - 71:11

**next** [5] - 48:13, 58:18, 62:1, 68:9, 75:3

**nights** [1] - 41:23

**NO** [1] - 1:5

**nobody** [1] - 11:3

**nonetheless** [2] - 6:1, 61:3

**North** [1] - 15:8

**NORTHERN** [1] - 1:2

**notation** [1] - 81:11

**Note** [2] - 64:3, 64:13

**note** [5] - 5:2, 62:13, 62:20

**notes** [1] - 19:20

**Notes** [1] - 64:2

**nothing** [2] - 50:7, 62:3

**notice** [3] - 6:16, 7:9, 43:19

**notwithstanding** [2] - 46:5, 61:23

**nowhere** [1] - 58:25

**Number** [1] - 43:1

**number** [10] - 26:22, 28:15, 30:14, 34:4, 39:11, 50:15, 50:18, 71:17, 74:11, 78:1

**Number(s** [1] - 83:5

**numbered** [1] - 26:23

**numbers** [1] - 68:25

**numerous** [3] - 23:10, 57:8, 62:15

# O

**oath** [3] - 74:23, 75:4, 75:5
**object** [1] - 39:1
**objection** [7] - 29:12, 29:17, 29:22, 33:17, 33:20, 44:16, 75:16
**objections** [1] - 77:23
**observing** [2] - 31:19, 61:3
**obviously** [3] - 21:7, 66:17, 77:19
**occasion** [4] - 28:13, 34:23, 40:15, 56:5
**occasions** [13] - 28:23, 32:4, 32:15, 46:22, 47:13, 48:21, 52:25, 55:13, 56:21, 57:8, 59:4, 66:12, 67:4
**occupying** [1] - 56:13
**occurred** [9] - 9:14, 9:15, 9:16, 36:4
**October** [1] - 35:13
**odds** [1] - 19:6
**OF** [2] - 1:1, 1:4
**Offense** [4] - 15:19, 17:15, 17:16
**offense** [25] - 2:19, 5:20, 5:24, 6:3, 6:8, 6:10, 6:14, 11:17, 13:8, 15:1, 15:14, 15:17, 19:1, 23:20, 38:19, 38:21, 51:19, 60:22, 60:23, 60:25, 61:1, 63:5, 75:18, 76:3
**office** [1] - 54:12
**official** [1] - 83:7
**Official** [1] - 83:15
**often** [1] - 28:9
**old** [3] - 48:11
**once** [3] - 30:9, 30:22, 36:18
**one** [80] - 4:8, 4:21, 4:25, 5:25, 6:14, 8:6, 8:9, 8:25, 9:4, 9:10, 9:18, 10:4, 10:15, 10:16, 11:1, 11:2, 11:18, 11:22, 11:25, 12:5, 12:15, 12:19, 13:1, 13:12, 15:7, 15:8, 15:12, 15:24, 17:17, 17:25, 18:2, 18:12, 23:9, 26:1, 26:13, 29:25, 30:1, 34:23, 37:1, 40:21, 40:23, 42:12, 47:2, 49:2, 52:2, 53:22, 56:5, 56:10, 60:14, 62:15, 62:25, 64:6, 64:7, 64:16, 65:3, 66:8, 68:16,
69:9, 71:8, 72:4, 72:7, 72:8, 73:1, 73:8, 75:2, 76:5, 76:17, 76:25, 77:4, 77:6, 78:9, 78:19, 79:2, 79:5, 80:9, 81:7
**One** [7] - 26:20, 28:25, 29:8, 40:11, 41:2, 64:13, 65:22
**one's** [1] - 72:8
**ones** [6] - 13:3, 27:20, 30:19, 30:22, 39:15, 67:24
**ongoing** [1] - 55:22
**opens** [1] - 30:9
**opinion** [17] - 3:3, 3:6, 3:10, 4:4, 4:8, 4:9, 7:11, 9:21, 20:21, 24:9, 29:12, 38:13, 63:12, 63:15, 68:1, 71:12, 71:14
**opinions** [1] - 67:24
**opportunity** [2] - 20:23, 52:9
**oppose** [1] - 6:17
**opposed** [1] - 17:10
**option** [1] - 19:14
**order** [10] - 3:11, 14:16, 43:23, 43:25, 44:1, 44:5, 44:11, 44:13, 65:6
**ordered** [2] - 43:1, 43:20, 44:19, 53:11, 57:6
**organize** [1] - 64:10
**organizer** [3] - 63:6, 63:23, 64:5
**otherwise** [3] - 23:1, 65:11, 67:3
**ought** [1] - 58:16
**outline** [1] - 16:25
**outlined** [1] - 17:13
**outset** [1] - 37:14
**outside** [3] - 47:15, 47:19, 56:2
**overall** [1] - 42:4
**overlooked** [1] - 13:15
**overlooks** [1] - 13:24
**overruled** [2] - 29:24, 44:17
**own** [5] - 28:1, 31:20, 51:1, 66:18, 74:3

# P

**p.m** [4] - 2:1, 5:7, 5:8, 81:22
**packaged** [1] - 28:5
**packaging** [1] - 31:2
**PAGE** [1] - 82:3
**Page** [7] - 3:10, 3:21, 7:11, 8:5, 14:4, 18:11, 18:14
**Pages** [1] - 12:3
**pages** [1] - 83:6
**paid** [1] - 46:11
**pale** [1] - 76:1
**pan** [1] - 61:24
**panel** [4] - 8:20, 11:7, 56:24, 70:25
**paragraph** [11] - 6:1, 6:9, 7:11, 13:17, 13:25, 14:3, 14:4, 15:11, 18:24, 75:19, 76:19
**Paragraph** [13] - 7:12, 8:5, 9:1, 11:19, 11:23, 11:24, 13:25, 18:24, 60:23, 60:24, 76:6, 76:16, 77:1
**Paragraphs** [2] - 9:9, 13:2
**paragraphs** [3] - 7:10, 9:1, 13:23
**pardon** [2] - 45:18, 55:6
**parentheticals** [1] - 68:1
**Park** [1] - 36:7
**parked** [1] - 36:6
**part** [17] - 5:5, 15:6, 16:11, 16:20, 18:14, 30:24, 35:3, 36:1, 36:3, 37:16, 38:23, 44:8, 56:9, 65:1, 66:9, 67:14, 78:17
**participant** [2] - 64:10, 64:13
**participants** [2] - 27:8, 64:6
**participation** [1] - 26:9
**particular** [3] - 3:22, 7:21, 12:20, 32:5, 54:24, 64:3, 69:19, 71:2, 71:21
**particularized** [1] - 3:18
**parties** [1] - 8:6, 12:3, 13:7, 13:14, 13:17, 17:16, 59:12, 59:21, 60:21, 63:10, 76:16
**party** [1] - 36:23
**pause** [2] - 52:12, 69:15
**pay** [2] - 32:13, 46:20
**payment** [1] - 46:16
**people** [8] - 21:3, 53:23, 66:18, 70:14, 72:19, 77:5, 77:7, 81:17
**people's** [1] - 28:1
**perfect** [2] - 11:16, 58:15
**perfectly** [1] - 22:24
**perform** [1] - 56:22
**performed** [1] - 41:8
**perhaps** [8] - 2:25, 13:15, 42:4, 65:10, 65:16, 71:15, 72:15, 81:4
**period** [8] - 34:7, 34:10,
34:14, 35:19, 36:2, 73:25, 77:15, 77:23
**permitted** [1] - 17:21
**person** [16] - 32:18, 35:2, 36:11, 49:1, 53:22, 54:22, 55:24, 55:25, 56:13, 60:14, 64:16, 66:21, 71:25, 72:1, 75:25
**person's** [2] - 37:25, 71:17
**personal** [5] - 41:20, 47:2, 62:19, 76:24, 78:16
**personally** [5] - 16:23, 25:19, 38:15, 66:24, 68:22
**persons** [1] - 54:18
**perspective** [2] - 4:3, 22:10
**persuasive** [1] - 64:19
**phase** [1] - 54:24
**phone** [13] - 26:1, 29:4, 34:13, 34:15, 34:17, 38:8, 40:10, 40:15, 41:14, 57:11, 68:25, 69:20, 78:13
**phones** [1] - 26:1
**pick** [5] - 47:15, 57:11, 57:12, 59:4, 60:9
**picked** [1] - 34:14
**piece** [1] - 67:7
**pills** [2] - 36:9, 36:19
**place** [3] - 20:22, 32:21, 64:24
**placed** [1] - 28:9
**places** [3] - 23:10, 41:23, 70:11
**plan** [1] - 15:6
**planned** [2] - 4:1, 16:4
**play** [7] - 8:18, 9:5, 9:11, 12:14, 53:10, 71:19, 76:4
**plea** [67] - 3:2, 5:18, 5:22, 5:23, 6:1, 6:8, 6:19, 7:7, 8:1, 8:22, 11:17, 11:19, 11:20, 12:6, 12:25, 14:10, 17:6, 17:9, 17:21, 17:22, 17:24, 18:9, 18:17, 18:23, 19:2, 19:4, 19:12, 19:14, 19:23, 20:3, 20:7, 20:12, 21:11, 21:12, 21:18, 21:23, 22:15, 22:25, 23:11, 42:15, 42:18, 54:9, 60:21, 61:5, 61:11, 61:16, 61:19, 61:20, 61:24, 62:14, 68:14, 68:15, 69:5, 69:17, 69:21, 70:2, 70:7, 70:12, 71:20, 71:24, 74:23, 74:24, 75:4,
75:18, 75:23
**plead** [2] - 21:3, 21:4
**pleaded** [1] - 72:5
**pleas** [1] - 67:16
**pled** [8] - 7:2, 9:21, 11:17, 23:5, 33:16, 33:20, 65:1, 70:14
**plowing** [1] - 61:24
**plus** [2] - 23:4, 62:12
**point** [21] - 8:7, 10:23, 17:5, 17:8, 17:19, 19:3, 19:10, 22:11, 36:24, 39:22, 49:6, 52:10, 61:12, 65:15, 66:8, 67:1, 67:23, 71:20, 73:11, 77:20, 79:7
**pointed** [1] - 23:3
**pointing** [1] - 42:23
**points** [3] - 2:7, 52:11, 73:6
**Police** [1] - 76:7
**position** [5] - 52:14, 59:11, 66:24, 74:10, 77:18
**posits** [1] - 57:18
**possess** [1] - 11:21
**possession** [2] - 56:23, 76:9
**possible** [1] - 7:4
**possibly** [1] - 9:3
**post** [1] - 17:10
**post-facto** [1] - 17:10
**postpone** [1] - 6:7
**postponed** [1] - 77:13
**posture** [2] - 11:4, 23:8
**preceded** [2] - 41:14, 56:11
**precisely** [1] - 56:18
**predicated** [1] - 67:20
**predicates** [1] - 70:1
**preliminarily** [1] - 60:19
**preparation** [2] - 40:14, 40:18
**prepare** [2] - 43:2, 43:20
**preponderance** [8] - 9:3, 9:10, 53:19, 53:20, 58:12, 69:2, 69:8, 77:3
**prescient** [1] - 24:1
**presence** [2] - 35:23, 59:2
**present** [2] - 2:5, 31:13
**presently** [3] - 13:19, 62:17, 65:4, 67:8, 67:12
**presentence** [1] - 7:13
**Presentence** [20] - 7:7, 7:12, 7:18, 7:23, 7:25, 8:22, 8:24, 9:1, 9:9, 9:13, 11:9, 13:21, 13:24, 14:6, 23:11, 55:7, 70:10,

75:9, 76:6, 76:18

**presently** [2] - 21:13, 62:21

**pretty** [3] - 7:15, 53:12, 77:19

**prevail** [1] - 21:7

**printed** [1] - 10:17

**privy** [1] - 38:7

**probation** [2] - 75:7, 77:1

**problem** [1] - 8:9

**proceeding** [1] - 17:8

**Proceedings** [1] - 81:22

**proceedings** [7] - 2:1, 5:8, 18:21, 52:12, 69:15, 83:4, 83:7

**process** [3] - 21:5, 67:5, 69:4

**produce** [1] - 51:25

**profession** [1] - 54:22

**proffer** [2] - 51:18, 68:10, 75:11

**proffers** [1] - 2:18

**pronounced** [1] - 67:21

**proof** [2] - 21:10, 64:15

**proper** [1] - 52:21

**properly** [1] - 3:25

**proposition** [1] - 7:6

**prove** [4] - 12:1, 21:10, 21:21, 23:6

**proved** [1] - 21:19

**provide** [4] - 38:23, 52:3, 52:5, 63:18

**provided** [4] - 26:16, 34:20, 67:13, 74:9

**providing** [1] - 59:12

**provision** [1] - 6:8

**provisions** [2] - 3:15, 52:10

**PSR** [8] - 8:5, 9:24, 12:15, 12:18, 55:13

**published** [3] - 63:15, 71:12, 71:14

**pull** [3] - 7:24, 9:17, 11:16

**pulled** [2] - 7:10, 52:2

**purchase** [3] - 15:4, 33:9, 72:23

**purchased** [9] - 33:4, 33:7, 34:2, 34:3, 36:22, 37:7, 72:19, 73:24

**purchases** [1] - 36:15

**purchasing** [1] - 72:25

**purposes** [1] - 3:12

**put** [11] - 3:1, 21:9, 26:13, 41:1, 42:17, 48:3, 49:9, 66:23, 75:13, 80:21, 81:15

## Q

**qualified** [1] - 46:13

**qualify** [2] - 64:3, 67:10

**quantities** [8] - 3:8, 8:21, 9:17, 10:24, 33:6, 68:12, 72:18, 73:24

**quantity** [38] - 2:19, 2:22, 2:23, 3:5, 4:3, 4:6, 5:21, 5:24, 6:3, 7:8, 8:3, 11:10, 11:15, 12:18, 13:10, 14:12, 17:6, 18:6, 18:12, 18:15, 18:25, 21:10, 23:1, 24:2, 33:13, 33:14, 34:1, 38:14, 67:19, 68:9, 69:24, 70:20, 71:2, 71:21, 72:17, 74:13

**questions** [2] - 27:22, 38:17

**quick** [2] - 5:5, 37:2

**quite** [6] - 17:8, 59:12, 62:16, 64:19, 70:22, 75:12

**quote** [5] - 43:2, 54:14, 54:22, 54:25, 55:8

**quoting** [1] - 54:25

## R

**race** [1] - 21:1

**raid** [1] - 14:17

**raise** [2] - 9:19, 24:13

**raised** [2] - 22:8, 70:20

**raising** [1] - 20:8

**Randy** [2] - 35:4, 37:19, 60:1

**ratchets** [1] - 75:3

**rather** [2] - 58:17, 59:19

**reached** [1] - 61:17

**read** [25] - 4:12, 4:17, 5:3, 5:4, 5:5, 7:5, 8:9, 8:24, 8:25, 9:8, 10:17, 11:6, 12:21, 41:6, 42:15, 43:12, 43:19, 43:22, 44:18, 45:11, 46:24, 57:2, 58:21, 78:21

**reading** [5] - 3:10, 9:25, 22:21, 23:24, 43:5

**reads** [1] - 8:9

**ready** [2] - 24:2, 39:4

**real** [1] - 37:2

**reality** [1] - 65:9

**really** [10] - 5:16, 6:13, 17:20, 18:9, 22:25, 45:3, 56:8, 57:3, 59:10, 61:6

**realm** [2] - 67:6, 69:12

**rearraigned** [1] - 21:20

**reason** [7] - 5:14, 10:12, 15:22, 18:22, 20:10, 66:25, 71:13

**reasonable** [1] - 78:6

**reasonably** [5] - 3:14, 12:4, 16:10, 16:24, 76:17

**reasons** [1] - 53:25

**Rebecca** [3] - 26:3, 26:11, 27:9, 59:24, 64:17

**rebuttal** [1] - 58:22

**receive** [1] - 35:2

**received** [2] - 25:22, 32:10, 53:2

**recent** [4] - 4:4, 20:21, 63:15, 76:2

**recess** [5] - 4:12, 4:19, 4:25, 5:1, 5:7

**recites** [1] - 8:1

**recognize** [1] - 8:14

**record** [13] - 2:21, 5:16, 6:22, 14:8, 15:22, 22:23, 24:17, 27:11, 54:17, 55:20, 58:11, 60:20, 62:13

**recorded** [1] - 83:3

**recounted** [1] - 69:20

**redirect** [1] - 50:8

**REDIRECT** [2] - 50:9, 82:7

**Redwood** [1] - 31:21

**refer** [1] - 26:22

**reference** [4] - 13:13, 29:20, 30:13, 30:21

**referenced** [4] - 16:25, 43:13, 74:6, 76:5

**referred** [8] - 30:1, 34:25, 35:15, 48:23, 49:9, 50:23, 69:18, 73:2

**referring** [4] - 14:25, 31:3, 43:4

**refers** [3] - 29:20, 63:11, 64:13

**reflect** [2] - 23:11, 62:13

**regard** [19] - 11:3, 14:13, 15:7, 27:23, 28:13, 28:25, 29:3, 31:24, 33:13, 39:13, 50:21, 51:19, 60:15, 68:12, 68:14, 69:17, 74:17, 75:17

**regarding** [2] - 2:19, 33:6

**regardless** [4] - 8:22, 12:17, 13:11, 53:12

**reject** [2] - 19:11, 20:12

**relates** [1] - 46:11

**relating** [1] - 54:9

**relationship** [15] - 34:15, 36:21, 41:20, 47:2, 47:6, 48:6, 49:21,

50:3, 50:17, 56:15, 58:3, 58:9, 62:19, 64:20, 65:11

**relative** [1] - 16:14

**relatively** [1] - 64:14

**relevance** [1] - 62:19

**relevant** [4] - 17:23, 61:7, 66:25, 67:18

**relocating** [1] - 79:11

**rely** [2] - 58:20, 71:21, 75:9

**relying** [1] - 75:23

**remain** [1] - 20:4

**remanded** [1] - 3:7

**remember** [2] - 62:16, 73:16

**remembered** [1] - 62:18

**remuneration** [1] - 46:16

**rent** [5] - 32:15, 46:14, 46:16, 46:22, 46:25

**repeat** [3] - 9:6, 21:2, 29:16

**repeatedly** [6] - 15:11, 19:16, 20:2, 61:18, 68:4, 72:7

**Report** [20] - 7:8, 7:13, 7:18, 7:23, 7:25, 8:22, 8:24, 9:2, 9:9, 9:13, 11:9, 13:21, 13:24, 14:6, 23:11, 55:8, 70:10, 75:9, 76:6, 76:18

**report** [1] - 46:24

**Reported** [1] - 1:22

**Reporter** [1] - 83:15

**REPORTER'S** [1] - 83:1

**repository** [1] - 66:20

**representing** [1] - 2:4

**request** [2] - 6:18, 44:11, 66:8

**requested** [1] - 65:7

**require** [1] - 3:18

**required** [1] - 12:10

**requirement** [1] - 12:7

**requirements** [1] - 54:1

**requires** [1] - 58:14

**research** [2] - 22:21, 63:9

**reserves** [1] - 6:17

**residence** [1] - 31:5

**resolve** [1] - 17:7

**resolved** [1] - 4:1

**respect** [3] - 3:19, 66:10, 72:5

**response** [2] - 39:6, 71:23

**responsibilities** [1] - 25:6

**responsibility** [3] - 14:5, 64:11, 76:24

**responsible** [3] - 38:14,

69:22, 71:7

**result** [1] - 18:16

**revealed** [1] - 37:18

**reveals** [1] - 55:13

**reversed** [1] - 3:7

**review** [9] - 2:15, 2:20, 4:20, 5:9, 40:10, 52:9, 63:25, 65:3, 65:13

**reviewed** [2] - 11:23, 26:17

**revisit** [1] - 60:19

**rode** [1] - 35:16

**role** [20] - 2:8, 2:19, 5:20, 6:3, 6:7, 6:14, 18:25, 23:20, 38:19, 51:19, 54:5, 55:16, 55:18, 56:14, 57:16, 58:2, 60:16, 61:1, 62:24, 63:4

**Romano** [15] - 1:16, 2:5, 4:2, 4:15, 12:23, 23:2, 24:3, 38:20, 39:2, 40:6, 58:22, 72:16, 78:17, 79:19, 80:3

**ROMANO** [65] - 2:2, 4:16, 5:12, 12:24, 13:4, 13:7, 13:11, 14:4, 14:9, 15:25, 16:6, 19:18, 20:2, 23:18, 24:4, 24:10, 24:25, 29:18, 30:3, 33:22, 33:25, 38:22, 39:3, 39:8, 44:16, 50:10, 51:13, 51:18, 51:21, 52:1, 52:8, 52:14, 58:23, 68:11, 68:19, 69:16, 73:5, 73:9, 73:11, 73:15, 73:17, 74:4, 74:6, 75:11, 76:11, 76:13, 76:20, 77:17, 78:23, 78:25, 79:5, 79:11, 79:21, 79:24, 80:5, 80:7, 80:11, 80:14, 80:16, 80:18, 80:21, 80:24, 81:6, 82:5, 82:7

**romantic** [1] - 56:14

**romantically** [1] - 42:11

**RPR** [1] - 1:22

**rule** [2] - 19:21, 20:24

**ruling** [2] - 68:8, 70:23

**runners** [1] - 52:19

**rushed** [1] - 77:16

**RUTER** [64] - 2:11, 4:7, 4:13, 4:22, 5:4, 5:13, 6:24, 7:25, 8:14, 9:8, 10:9, 10:22, 11:12, 12:8, 12:11, 12:21, 16:1, 18:19, 19:7, 19:9, 19:13, 19:16, 19:25, 20:5, 20:14, 20:17, 23:21, 23:23, 24:8, 29:12,

29:15, 29:22, 33:17, 33:20, 39:1, 39:4, 40:4, 44:21, 45:4, 45:16, 45:19, 45:22, 50:7, 51:15, 51:24, 54:5, 54:14, 55:4, 55:7, 61:12, 61:20, 70:6, 70:15, 70:22, 71:10, 71:23, 72:10, 77:21, 78:13, 79:15, 79:18, 80:25, 81:2, 82:6

**Ruter** [12] - 1:18, 2:11, 13:24, 14:13, 17:5, 51:3, 51:22, 54:4, 59:5, 70:5, 74:21, 79:13

**Ruter's** [3] - 13:15, 26:16, 58:24

## S

**safe** [1] - 63:22
**Safe** [3] - 25:7, 25:15, 62:10
**sake** [1] - 60:19
**sale** [2] - 43:2, 52:19
**satisfied** [2] - 64:15, 69:7
**saw** [3] - 4:18, 5:15, 31:23
**scare** [1] - 71:11
**scenario** [1] - 67:2
**schedule** [1] - 81:15
**scheduled** [1] - 79:25
**scope** [3] - 3:13, 3:19, 3:23
**sea** [2] - 11:11, 11:12
**search** [3] - 30:25, 31:5, 31:12
**seat** [2] - 2:16, 36:8
**seated** [1] - 24:16
**second** [3] - 5:17, 44:8, 52:4
**Section** [3] - 6:15, 62:23, 78:5
**section** [2] - 63:9, 64:4
**see** [23] - 2:13, 3:6, 4:13, 8:12, 9:8, 11:8, 17:4, 42:23, 43:19, 43:21, 44:6, 44:8, 44:14, 44:20, 47:17, 47:25, 48:2, 48:4, 58:7, 60:5, 79:13, 80:20, 81:21
**seeing** [1] - 58:5
**seeking** [3] - 50:12, 59:13, 72:8
**seem** [4] - 19:6, 19:14, 22:10, 68:6
**Seema** [2] - 1:17, 2:5
**seized** [6] - 14:17,

14:20, 15:5, 15:9, 16:14, 38:2
**selected** [1] - 40:23
**self** [1] - 27:2
**self-explanatory** [1] - 27:2
**sell** [4] - 49:4, 57:23, 59:25, 60:1
**semantic** [2] - 53:10, 65:5
**sense** [1] - 63:3
**sent** [2] - 52:19, 53:6
**sentence** [7] - 9:6, 13:17, 17:18, 18:1, 77:24, 78:6, 78:7
**sentenced** [2] - 62:14, 65:1, 67:17
**sentencing** [14] - 2:9, 3:11, 3:18, 5:19, 6:7, 6:11, 6:17, 10:19, 22:2, 53:17, 71:11, 77:8, 77:12, 77:14
**Sentencing** [3] - 1:10, 6:13, 54:1
**separate** [2] - 8:19, 41:23
**separated** [1] - 30:9
**September** [4] - 9:15, 9:16, 42:18, 76:7
**sequentially** [1] - 26:24
**serious** [2] - 62:25, 63:2
**seriously** [1] - 21:7
**serve** [1] - 28:13
**set** [6] - 5:19, 6:11, 18:1, 39:20, 52:16, 78:9
**sets** [1] - 23:10
**seven** [2] - 35:14, 35:21
**several** [2] - 9:1, 78:20
**shakes** [1] - 64:18
**shall** [4] - 19:23, 24:7, 63:2, 64:22
**shelf** [2] - 47:24, 48:4
**Sherry** [1] - 38:1
**show** [8] - 18:8, 42:14, 42:22, 52:19, 53:3, 54:17, 56:24, 57:15
**showed** [2] - 49:24, 50:2
**showing** [2] - 58:5, 71:17
**shown** [1] - 40:6
**shred** [1] - 67:1
**side** [1] - 22:6
**sides** [1] - 20:12
**signature** [1] - 83:10
**significant** [5] - 14:12, 14:22, 16:16, 59:8, 73:23
**significantly** [2] - 14:23, 52:23
**similar** [2] - 31:9, 53:4

**simply** [5] - 8:1, 47:5, 53:18, 75:22, 81:10
**single** [1] - 29:23
**singles** [7] - 27:14, 29:9, 29:10, 29:20, 30:1, 30:5, 30:22, 65:17, 65:25, 66:2, 73:4
**sit** [2] - 79:20, 80:7
**situation** [1] - 65:10
**six** [5] - 25:14, 35:14, 35:19, 35:21, 62:12
**six-plus** [1] - 62:12
**size** [3] - 29:11, 29:25, 30:21
**Slade** [13] - 55:8, 55:13, 55:14, 55:17, 55:23, 55:24, 58:14, 58:21, 58:23, 59:17, 60:6, 67:23, 67:25
**slade** [8] - 54:8, 54:15, 55:23, 56:18, 56:21, 59:18, 63:15, 63:19
**Slade's** [1] - 57:4
**slip** [1] - 3:10
**small** [3] - 27:20, 30:19, 30:22
**smaller** [1] - 30:1
**snow** [1] - 77:6
**so-called** [1] - 14:12
**sold** [5] - 16:10, 28:10, 55:9, 55:11, 55:12
**someone** [6] - 34:20, 37:5, 54:12, 59:4, 64:24, 65:7
**sometime** [1] - 31:21
**sometimes** [3] - 30:2, 57:2, 81:19
**somewhat** [1] - 61:4
**somewhere** [1] - 57:12
**soon** [2] - 5:6, 23:24
**sorry** [7] - 29:14, 37:2, 37:11, 41:1, 46:18, 73:7, 79:23
**sort** [4] - 14:8, 17:20, 19:6, 21:12
**sought** [1] - 25:22
**sounds** [2] - 34:13, 41:13
**speaking** [1] - 67:15
**Special** [11] - 2:6, 24:11, 26:18, 40:5, 45:7, 57:22, 57:24, 58:2, 58:8, 62:7, 68:12
**special** [4] - 25:5, 25:15, 29:13, 70:9
**specific** [3] - 6:14, 71:1, 71:14
**specifically** [2] - 69:18, 76:25
**specified** [2] - 8:21,

54:23
**spell** [2] - 24:18, 24:21
**spend** [1] - 42:2
**spent** [3] - 41:23, 62:2, 69:12
**spirit** [1] - 12:10
**Squad** [1] - 25:16
**stand** [3] - 7:6, 70:16, 75:8
**standard** [1] - 9:10
**standpoint** [3] - 14:24, 16:24, 77:17
**stands** [1] - 2:12
**start** [5] - 21:25, 22:12, 27:4, 61:11, 62:6
**started** [3] - 18:21, 19:22, 50:16
**starting** [1] - 40:5
**starts** [3] - 20:16, 40:25, 65:24
**state** [1] - 24:17
**statement** [32] - 5:25, 7:14, 8:4, 12:2, 12:12, 13:14, 13:16, 13:22, 14:1, 16:8, 16:21, 16:25, 17:11, 30:17, 42:12, 42:14, 42:15, 42:22, 43:13, 43:16, 46:12, 48:11, 55:19, 69:17, 70:7, 74:23, 75:5, 75:20, 76:14, 76:15, 76:23, 76:25
**STATES** [2] - 1:1, 1:4
**states** [2] - 27:11
**States** [9] - 2:3, 2:4, 2:5, 3:4, 5:10, 6:13, 21:4, 52:3, 52:4
**stenographically** [1] - 83:4
**step** [3] - 4:8, 51:16, 62:1
**still** [7] - 17:12, 23:20, 27:12, 41:4, 61:4, 78:11, 78:15
**stipulate** [6] - 8:6, 12:3, 13:8, 13:14, 13:18, 17:6
**stipulated** [5] - 14:11, 15:13, 15:19, 17:12, 17:16, 23:12, 60:22, 76:16
**stipulation** [1] - 13:4
**stipulations** [1] - 69:5
**stop** [1] - 46:7
**stopped** [2] - 37:22, 76:7
**Street** [2] - 1:23, 36:7
**streets** [1] - 28:6
**Streets** [3] - 25:7, 25:16, 62:10
**strike** [1] - 37:16

**strong** [1] - 44:13
**struck** [1] - 67:15
**structured** [1] - 7:22
**stuff** [2] - 14:16, 17:12
**subject** [2] - 58:17, 62:22
**subjected** [1] - 7:3
**submit** [2] - 20:1, 55:23
**Subparagraph** [1] - 68:3
**subsections** [1] - 62:25
**substance** [1] - 46:2
**substitute** [2] - 78:10, 79:3
**sufficient** [3] - 58:12, 74:21, 75:22
**suggest** [3] - 11:9, 53:19, 67:9
**suggested** [2] - 72:11
**suggesting** [2] - 17:5, 59:9
**suggests** [2] - 19:5, 67:2
**supervise** [2] - 64:10, 64:16
**supervised** [2] - 54:18, 56:20
**supervisee** [1] - 64:23
**supervising** [3] - 55:21, 59:11, 60:14
**supervision** [3] - 58:13, 65:12, 67:7, 67:19
**supervisor** [6] - 54:16, 55:2, 63:6, 63:21, 63:24, 64:5
**supervisory** [6] - 2:8, 54:2, 55:18, 56:14, 57:16, 60:16
**supplier** [1] - 36:25
**support** [2] - 18:14, 65:20
**supporting** [1] - 55:16
**suppose** [2] - 61:3, 61:22
**supposed** [2] - 78:17, 79:6
**surprised** [2] - 6:20, 18:6
**surrounding** [1] - 57:3
**suspected** [1] - 76:9
**SWORN** [1] - 24:14

## T

**T's** [1] - 50:2
**table** [1] - 2:6
**talks** [2] - 9:13, 34:23
**tantamount** [1] - 74:24
**Target** [1] - 42:25

**Task** [2] - 25:7, 62:10
**telephone** [4] - 28:12, 39:13, 50:15, 50:18
**Telephone** [1] - 43:1
**telephones** [1] - 25:24
**ten** [3] - 7:2, 15:24, 36:19
**tendered** [1] - 67:16
**term** [2] - 17:25, 54:21
**terminology** [2] - 3:1, 29:5
**terms** [11] - 6:24, 16:11, 16:23, 33:2, 52:10, 63:22, 66:10, 67:25, 68:14, 68:23, 69:5
**test** [1] - 9:4
**tested** [1] - 76:10
**testified** [5] - 28:21, 48:5, 68:13, 72:17, 74:15
**testify** [1] - 75:8
**testimony** [12] - 39:17, 45:5, 45:7, 62:6, 65:4, 66:10, 66:22, 68:12, 69:25, 73:2, 75:1, 75:23
**text** [2] - 65:21, 69:20
**THE** [140] - 1:1, 1:1, 2:10, 2:15, 4:11, 4:14, 4:17, 4:24, 5:5, 5:9, 5:14, 7:24, 8:12, 9:6, 9:19, 10:10, 11:11, 11:13, 12:9, 12:16, 12:23, 13:3, 13:6, 13:10, 14:3, 14:6, 15:21, 16:2, 17:19, 19:3, 19:8, 19:10, 19:15, 19:19, 20:1, 20:4, 20:12, 20:15, 20:18, 21:15, 21:16, 21:17, 22:6, 22:14, 22:17, 22:19, 22:23, 23:13, 23:16, 23:19, 23:22, 24:1, 24:5, 24:9, 24:13, 24:15, 24:16, 24:19, 24:20, 24:21, 24:22, 24:23, 26:15, 29:2, 29:14, 29:16, 29:24, 29:25, 33:19, 33:21, 33:23, 38:19, 39:5, 40:2, 42:21, 44:17, 44:20, 44:22, 44:25, 45:1, 45:11, 45:18, 45:21, 50:5, 50:6, 50:8, 51:14, 51:16, 51:20, 51:23, 52:7, 52:13, 54:4, 54:12, 55:2, 55:6, 58:18, 60:18, 61:18, 62:4, 68:18, 70:5, 70:13, 70:19, 71:4, 71:19, 72:4, 72:15, 73:8, 73:10, 73:14, 73:16, 74:2, 74:5, 75:7, 76:5, 76:12, 76:15, 76:22,

78:8, 78:14, 78:15, 78:24, 79:1, 79:13, 79:17, 79:19, 79:23, 80:3, 80:6, 80:9, 80:12, 80:15, 80:17, 80:19, 80:23, 81:1, 81:3, 81:14, 81:16
**themselves** [1] - 64:1
**theory** [3] - 57:11, 57:21, 57:23
**therefore** [2] - 48:13, 78:2
**they've** [1] - 30:9
**thinking** [2] - 57:1, 80:3
**thinks** [1] - 18:5
**Third** [1] - 54:25
**third** [4] - 36:11, 36:23, 59:12, 59:20
**thoughts** [1] - 5:18
**thousand** [5] - 9:22, 21:22, 22:4, 74:12, 74:18
**thousands** [1] - 28:17
**Three** [2] - 6:12, 7:11
**three** [24] - 7:10, 13:12, 18:12, 33:8, 33:11, 34:6, 36:1, 37:11, 48:21, 52:22, 53:22, 62:25, 63:11, 63:19, 67:9, 68:7, 71:24, 72:22, 72:24, 73:2, 73:21, 73:25, 75:2, 80:10
**three-month** [1] - 73:25
**three-months** [1] - 34:6
**throw** [1] - 18:20
**tied** [1] - 18:2
**to-do** [1] - 56:7
**today** [17] - 2:24, 6:7, 24:2, 26:17, 40:9, 40:13, 40:14, 42:19, 61:2, 61:18, 62:17, 63:10, 65:3, 70:9, 72:18, 77:9
**today's** [1] - 40:18
**together** [4] - 41:22, 41:24, 41:25, 48:10
**tomorrow** [1] - 81:8
**took** [3] - 56:3, 56:17, 62:14
**top** [6] - 26:22, 39:12, 47:23, 47:24, 48:4, 69:24
**topic** [2] - 11:2, 23:17
**total** [1] - 34:4
**totality** [1] - 38:11
**totally** [1] - 58:15
**toward** [1] - 50:21
**training** [1] - 29:19
**transaction** [5] - 36:4, 36:11, 48:19, 49:15, 59:7
**transactions** [8] - 7:21, 17:1, 53:6, 53:8, 56:1, 60:2, 67:17

**transcribed** [1] - 83:7
**transcript** [22] - 19:20, 26:13, 26:17, 29:7, 40:6, 40:23, 41:6, 43:5, 43:9, 43:14, 43:16, 43:17, 43:22, 44:6, 56:8, 56:8, 65:3, 65:13, 65:20, 65:21, 65:22, 83:7
**transcripts** [1] - 40:15
**transpired** [1] - 10:12
**traveling** [1] - 37:22
**traversing** [1] - 37:22
**tray** [1] - 45:6
**trays** [13] - 30:8, 30:10, 30:14, 30:15, 30:16, 39:20, 45:14, 45:15, 53:12, 56:5, 60:7, 65:18, 73:4
**trial** [8] - 3:7, 17:9, 22:13, 24:5, 79:6, 79:8, 79:10, 80:1
**trials** [1] - 28:24
**tried** [1] - 22:19
**triggers** [1] - 17:17
**trips** [2] - 33:8, 72:22
**true** [2] - 14:18, 75:6
**try** [3] - 9:17, 49:14, 72:17
**trying** [9] - 9:20, 10:3, 15:9, 16:20, 17:5, 19:4, 23:6, 47:17, 62:4, 76:2, 78:13, 79:15
**Tuesday** [2] - 79:21, 79:23
**turn** [4] - 7:23, 55:11, 66:19, 78:13
**twice** [1] - 46:14
**Two** [2] - 6:12, 64:3
**two** [36] - 2:7, 4:25, 6:16, 8:19, 17:20, 20:6, 28:24, 29:11, 29:25, 32:15, 33:8, 37:1, 46:22, 48:11, 52:1, 52:10, 52:11, 52:21, 58:17, 60:17, 60:22, 62:22, 63:3, 63:8, 67:11, 69:11, 70:2, 70:11, 70:15, 71:24, 72:11, 72:22, 79:8, 80:9, 80:12
**two-hour** [1] - 70:15
**two-level** [6] - 58:17, 60:22, 62:22, 63:3, 67:11
**two-point** [1] - 52:10
**two-week** [1] - 79:8
**type** [1] - 31:2
**types** [1] - 31:9
**typically** [1] - 11:14

# U

**U.S** [8] - 1:23, 6:12, 6:13, 54:1, 54:7, 63:11, 63:13, 63:15
**ultimately** [1] - 39:9, 42:11, 61:7
**um-hum** [1] - 47:12
**uncommon** [1] - 8:1
**under** [18] - 2:3, 2:9, 2:14, 6:15, 9:23, 52:10, 53:17, 54:1, 57:10, 62:22, 64:4, 65:11, 74:23, 75:4, 75:5, 78:5
**underlined** [1] - 13:20
**undersigned** [1] - 13:17
**understandably** [1] - 74:22
**understated** [2] - 72:21, 73:21
**understood** [1] - 65:14
**undertake** [3] - 3:24, 12:17, 17:4, 53:23
**undertaken** [1] - 3:12
**undisputed** [1] - 66:22
**undo** [2] - 21:5, 21:6
**unhappy** [1] - 22:25
**unindicted** [1] - 55:14
**UNITED** [2] - 1:1, 1:4
**United** [9] - 2:3, 2:4, 2:5, 3:4, 5:10, 6:12, 21:3, 52:2, 52:4
**unless** [3] - 19:10, 61:4, 78:2
**unpublished** [2] - 63:12, 63:13
**up** [48] - 4:20, 12:14, 12:19, 17:11, 20:25, 26:13, 27:16, 30:6, 30:7, 30:10, 30:18, 31:20, 31:23, 34:14, 36:7, 39:3, 39:6, 39:20, 41:1, 44:10, 45:2, 47:16, 47:23, 48:4, 48:7, 48:15, 49:24, 50:2, 50:11, 51:1, 53:14, 56:6, 57:11, 57:12, 58:5, 59:4, 60:9, 63:1, 65:13, 66:1, 72:1, 73:3, 75:2, 75:3, 81:10, 81:13
**upheld** [1] - 68:2
**upper** [1] - 55:9
**upward** [5] - 60:22, 64:8, 67:10, 67:11, 67:24
**USA** [1] - 83:4
**USC** [1] - 6:15
**uses** [1] - 67:25
**USSG** [1] - 2:14
**utilizes** [1] - 54:21
**utilizing** [1] - 42:25

# V

**value** [1] - 16:14
**variance** [1] - 6:15
**various** [6] - 55:13, 55:14, 56:21, 57:8, 72:18, 73:2
**versus** [3] - 2:3, 30:22
**view** [9] - 2:22, 5:18, 6:2, 14:13, 18:7, 24:6, 66:16, 70:11, 70:18
**violent** [1] - 25:7
**Virginia** [7] - 32:9, 32:17, 35:16, 35:17, 37:19, 53:1, 69:17
**vividly** [1] - 62:17
**voluntary** [1] - 56:9
**volunteered** [1] - 51:6

# W

**wait** [1] - 78:10
**walked** [2] - 36:7, 56:2
**wants** [4] - 14:13, 66:2, 78:2, 78:3
**warrant** [3] - 30:25, 31:5, 31:12
**warranted** [1] - 64:9
**ways** [1] - 58:10
**weather** [1] - 81:8
**Webster's** [2] - 54:25, 60:13
**Wednesday** [1] - 1:10
**week** [12] - 33:8, 33:10, 34:3, 34:5, 36:19, 48:10, 72:23, 72:24, 73:1, 73:8, 79:8, 80:2
**weeks** [3] - 6:16, 48:11, 74:11
**West** [1] - 1:23
**Western** [2] - 37:22, 53:1
**Westlaw** [1] - 52:2
**Whealton** [2] - 38:1, 38:13
**whereas** [1] - 10:15
**Whereof** [1] - 83:9
**white** [3] - 8:8, 44:15, 57:2
**who've** [1] - 70:14
**whoa** [2] - 39:5
**whole** [2] - 21:23
**Wiggins** [2] - 78:23, 79:11
**willing** [1] - 66:23
**wiretap** [4] - 25:23, 28:15, 48:7, 48:15
**wish** [10] - 19:23, 20:3,

20:7, 20:20, 21:6, 21:9, 21:17, 22:25, 23:20, 51:20

  **wishes** [1] - 20:20
  **withdraw** [9] - 18:17, 19:23, 20:3, 20:7, 20:13, 21:17, 21:24, 61:19, 61:20
  **withdrawing** [1] - 19:14
  **Witness** [1] - 83:9
  **WITNESS** [8] - 24:14, 24:15, 24:19, 24:22, 29:25, 44:25, 50:6, 82:4
  **witness** [4] - 28:18, 62:9, 70:16, 72:21
  **witnesses** [1] - 12:13
  **woman** [2] - 34:23, 74:7
  **wonder** [1] - 71:12
  **woody** [2] - 52:4, 53:5
  **Woody** [2] - 53:4, 63:11
  **word** [10] - 8:4, 13:20, 29:23, 43:21, 44:13, 44:14, 56:16, 65:6, 73:18
  **words** [3] - 55:21, 66:7, 75:13
  **worth** [3] - 61:3, 63:20, 68:6
  **wrench** [1] - 18:21
  **writes** [1] - 18:11
  **written** [1] - 57:17
  **wrote** [4] - 10:18, 18:3, 18:15, 22:8

## Y

  **year** [2] - 7:3, 18:1
  **years** [10] - 7:2, 7:5, 15:24, 17:18, 25:10, 25:14, 62:8, 62:12, 75:13
  **yesterday** [3] - 3:4, 5:15, 70:21
  **yesterday's** [1] - 5:10
  **yourself** [1] - 40:10

## Z

  **Zajac** [3] - 1:22, 83:3, 83:14